IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF DELAWARE

Don's Hydraulics, Inc.                    :
              Plaintiff                 :     Civil Action No.:  04-1275 KAJ
                          :
    vs.                                   :
                          :
Colony Insurance Company and              :
Truck Tech Industries, Inc., and          :
Tipco Technologies, Inc.                  :
              Defendants

## APPENDIX TO DEFENDANT, COLONY INSURANCE COMPANY'S, RESPONSE TO PLAINTIFF'S CROSS MOTION

Colony Insurance Company Commercial General Liability Policy ……………………...    C1 – C24

Don Cathell Deposition Transcript dated May 26, 2005 ……………………………….    C25 - C32

Don Cathell Deposition Exhibit 3 …………………………………………………....    C33 – C34

FIGIOLA & FACCIOLO

/s/ Anthony A. Figliola
Anthony A. Figliola, Jr. (I.D. # 957)
1813 Marsh Road, Suite A
Wilmington, DE 19810
(302) 475-0460
Attorney for Defendant Colony Insurance
Company

Dated: July 1, 2005

## COMMON POLICY DECLARATIONS

**COLONY INSURANCE COMPANY**
**9201 FOREST HILL AVENUE**
**RICHMOND, VA 23235**

*Vim S. Sisman*
NOTARY PUBLIC

My 06/30/96 Expires

**POLICY NUMBER**

GL123393

**RENEWAL OF**

NEW

**PROGRAM CODE:**

1. **NAMED INSURED AND MAILING ADDRESS:**

DON'S HYDRAULICS INC.
RR 7, BOX 223 C
GEORGETOWN, DE 19947

**PRODUCER:** 37003

D.V.U.A. (HATBORO)
420 S YORK RD
HATBORO, PA 19040

2. **POLICY PERIOD:** From 07/28/2003 to 07/28/2004 12:01 A.M. Standard Time at your Mailing Address above.

IN RETURN FOR THE PAYMENT OF THE PREMIUM, AND SUBJECT TO ALL OF THE TERMS OF THIS POLICY, WE AGREE WITH YOU TO PROVIDE THE INSURANCE AS STATED IN THIS POLICY.

3. **THIS POLICY CONSISTS OF THE FOLLOWING COVERAGE PARTS FOR WHICH A PREMIUM IS INDICATED. THIS PREMIUM MAY BE SUBJECT TO ADJUSTMENT.**

| COVERAGE PARTS | PREMIUM |
| --- | --- |
| COMMERCIAL GENERAL LIABILITY COVERAGE PART | $7,500.00 |
| I hereby certify this to be a true and correct copy | |
| Connie Hasso-Vice President/Underwriting | |
| | |
| | |
| Premium charge for coverage of certified acts of terrorism: (Per Policyholder Disclosure TRIA2002Notice-1202 attached.) | $ |
| **or** | |
| Coverage for certified acts of terrorism has been rejected; exclusion attached. (Per Policyholder Disclosure TRIA2002Notice-1202 attached.) | [X] |
| ISSUED 08/15/2003 SC | |

Premium shown is payable at inception.          **Total Policy Premium:**     $7,500.00

**Inspection Fee:**          $150.00

4. **FORMS APPLICABLE TO ALL COVERAGES:**

SEE SCHEDULE OF FORMS AND ENDORSEMENTS - FORM U001

5. **BUSINESS DESCRIPTION:** SERVICE & REPAIR OF HYDRAULIC COMPONENTS

**Countersigned:** _____          **By:** _____
Date          Authorized representative

C-1

Includes copyrighted material of Insurance Services Office, Inc. with its permission.
Copyright, Insurance Services Office, Inc., 1994

Insured:   DEAN'S HYDRAULICS INC.                                    J0001(05/01)
Policy Number:   G_23393

# SCHEDULE OF FORMS AND ENDORSEMENTS

Forms and Endorsements applying to and made part of this policy at the time of issuance:

| NUMBER | TITLE |
|---|---|
| FORMS APPLICABLE - | COMMON POLICY DECLARATIONS |
| | |
| IL0017-1185 | COMMON POLICY CONDITIONS |
| U002-0702 | MINIMUM POLICY PREMIUM |
| U094-0702 | SERVICE OF SUIT |
| U173-0702 | CANCELLATION |
| U184-0702 | INSPECTION |
| | |
| FORMS APPLICABLE - | COMMERCIAL GENERAL LIABILITY COVERAGE PART |
| | |
| DCJ6553-0702 | COMMERCIAL GENERAL LIABILITY COVERAGE PART DECLARATIONS |
| CG0001-1001 | COMMERCIAL GENERAL LIABILITY COVERAGE FORM |
| CG2133-1185 | EXCL-DESIGNATED PRODUCTS |
| CG2134-0187 | EXCLUSION - DESIGNATED WORK |
| CG2167-0402 | FUNGI OR BACTERIA EXCLUSION |
| CG2295-1001 | EXCLUSION-DAMAGE TO WORK PERFORMED BY SUBCONTRACTORS ON YOUR BEHALF-DESIGNATED SITES OR OPERATIONS |
| IL0021-0498 | NUCLEAR ENERGY LIABILITY EXCLUSION ENDORSEMENT |
| U003-0702 | HAZARDOUS MATERIALS EXCLUSION |
| U004-0702 | MISCELLANEOUS EXCLUSIONS ENDORSEMENT |
| U008-0195 | SPECIAL CONDITIONS ENDORSEMENT-SUBCONTRACTORS |
| U009-0702 | AIRCRAFT PRODUCTS AND GROUNDING EXCLUSION |
| U048-0702 | EMPLOYMENT-RELATED PRACTICES EXCLUSION |
| U070-0702 | DEDUCTIBLE LIABILITY INSURANCE |
| UCG2175-1102 | WAR, CERTIFIED ACTS OF TERRORISM AND OTHER ACTS OF TERRORISM EXCLUSION |

# COMMON POLICY CONDITIONS

All Coverage Parts included in this policy are subject to the following conditions.

## A. CANCELLATION

1. The first Named Insured shown in the Declarations may cancel this policy by mailing or delivering to us advance written notice of cancellation.

2. We may cancel this policy by mailing or delivering to the first Named Insured written notice of cancellation at least:

   a. 10 days before the effective date of cancellation if we cancel for nonpayment of premium; or

   b. 30 days before the effective date of cancellation if we cancel for any other reason.

3. We will mail or deliver our notice to the first Named Insured's last mailing address known to us.

4. Notice of cancellation will state the effective date of cancellation. The policy period will end on that date.

5. If this policy is cancelled, we will send the first Named Insured any premium refund due. If we cancel, the refund will be pro rata. If the first Named Insured cancels, the refund may be less than pro rata. The cancellation will be effective even if we have not made or offered a refund.

6. If notice is mailed, proof of mailing will be sufficient proof of notice.

## B. CHANGES

This policy contains all the agreements between you and us concerning the insurance afforded. The first Named Insured shown in the Declarations is authorized to make changes in the terms of this policy with our consent. This policy's terms can be amended or waived only by endorsement issued by us and made a part of this policy.

## C. EXAMINATION OF YOUR BOOKS AND RECORDS

We may examine and audit your books and records as they relate to this policy at any time during the policy period and up to three years afterward.

## D. INSPECTIONS AND SURVEYS

We have the right but are not obligated to:

1. Make inspections and surveys at any time;

2. Give you reports on the conditions we find; and

3. Recommend changes.

Any inspections, surveys, reports or recommendations relate only to insurability and the premiums to be charged. We do not make safety inspections. We do not undertake to perform the duty of any person or organization to provide for the health or safety of workers or the public. And we do not warrant that conditions:

1. Are safe or healthful; or

2. Comply with laws, regulations, codes or standards.

This condition applies not only to us, but also to any rating, advisory, rate service or similar organization which makes insurance inspections, surveys, reports or recommendations.

## E. PREMIUMS

The first Named Insured shown in the Declarations:

1. Is responsible for the payment of all premiums; and

2. Will be the payee for any return premiums we pay.

## F. TRANSFER OF YOUR RIGHTS AND DUTIES UNDER THIS POLICY

Your rights and duties under this policy may not be transferred without our written consent except in the case of death of an individual named insured.

If you die, your rights and duties will be transferred to your legal representative but only while acting within the scope of duties as your legal representative. Until your legal representative is appointed, anyone having proper temporary custody of your property will have your rights and duties but only with respect to that property.

C_#

**THIS ENDORSEMENT CHANGES THE POLICY. PLEASE READ IT CAREFULLY.**

# MINIMUM POLICY PREMIUM

The minimum earned premium for this policy will be calculated as follows:

1.  The total policy premium as shown in the policy Declarations plus any premium adjustment by endorsements and any additional premium developed by audit. The due date for audit premiums is the date shown as the due date on the bill.

2.  Audits that indicate a return premium will not reduce the minimum as stated in paragraph **1.**

3.  If the insured cancels this policy, the return premium will be 90% of the unearned premium subject to a minimum of 25% of the minimum earned premium described in paragraph **1.**

4.  If the company cancels the policy for any reason, other than for non-payment of premium, then the insured will be returned the full amount of the unearned premium without any minimum premium restrictions.

ALL OTHER TERMS AND CONDITIONS OF THE POLICY REMAIN UNCHANGED.

**THIS ENDORSEMENT CHANGES THE POLICY. PLEASE READ IT CAREFULLY.**

# SERVICE OF SUIT

Service of process may be made upon the Company to:

Claims Manager
  Colony Insurance Company,
  Colony National Insurance Company, or
  Colony Specialty Insurance Company
9201 Forest Hill Avenue, Suite 200
Richmond, Virginia 23235

Where required by statute, regulation or other regulatory directive, the Company appoints the Commissioner of Insurance, or other designee specified for that purpose, as its attorney for acceptance of service of all legal process in the state in any action or proceeding arising out of this insurance.

The Commissioner or other designee is requested to forward process to the Company as shown above, or if required in his/her particular state, to a designated resident agent for service of process.


ALL OTHER TERMS AND CONDITIONS OF THE POLICY REMAIN UNCHANGED.

C-5

THIS ENDORSEMENT CHANGES THE POLICY. PLEASE READ IT CAREFULLY.

# CANCELLATION

This endorsement modifies insurance provided under the following:

OUTPUT POLICY COVERAGE PART
COMMERCIAL AUTOMOBILE COVERAGE PART
COMMERCIAL GENERAL LIABILITY COVERAGE PART
COMMERCIAL INLAND MARINE COVERAGE PART
COMMERCIAL LIABILITY UMBRELLA COVERAGE PART
COMMERCIAL PROPERTY COVERAGE PART
CRIME AND FIDELITY COVERAGE PART
EMPLOYMENT-RELATED PRACTICES LIABILITY COVERAGE PART
EXCESS LIABILITY POLICY
FARM COVERAGE PART
FARM UMBRELLA LIABILITY POLICY
LIQUOR LIABILITY COVERAGE PART
PRODUCTS/COMPLETED OPERATIONS LIABILITY COVERAGE PART
PROFESSIONAL LIABILITY COVERAGE PART

Paragraph **A. 2. Cancellation** of the COMMON POLICY CONDITIONS is deleted and replaced by the following:

   **2.** We may cancel this policy by mailing or delivering to the first Named Insured written notice of cancellation at least:

      **a.** 10 days before the effective date of cancellation if we cancel for one or more of the following reasons:

         **(1)** nonpayment of premium or failure to pay a premium when due; or

         **(2)** conviction of an insured of a crime arising out of acts increasing the hazard insured against;

         **(3)** violation of any local fire, health, safety, building or construction regulation or ordinance which increases the hazard insured against under the policy;

         **(4)** any willful or reckless act or omission by an insured increasing the hazard insured against;

         **(5)** omission or concealment of fact relating to an insurance application, rating, claim or coverage under this policy;

         **(6)** failure or refusal of an insured to:

            **(a)** provide information necessary to confirm exposure or determine the policy premium; or

            **(b)** comply with underwriting requirements;

         **(7)** a substantial change in the risk covered by the policy;

         **(8)** loss of reinsurance or substantial decrease in reinsurance;

         **(9)** the cancellation is for all insureds under such policies for a given class of insureds; or

        **(10)** any reason determined by the insurance commissioner.

      **b.** 30 days before the effective date of cancellation if we cancel for any other reason.

    ALL OTHER TERMS AND CONDITIONS OF THE POLICY REMAIN UNCHANGED.

U173-0702          Contains material copyright, Insurance Services Office, Inc.,          Page 1 of 1
1997 with its permission.

**THIS ENDORSEMENT CHANGES THE POLICY. PLEASE READ IT CAREFULLY.**

# INSPECTION

This endorsement modifies the policy as follows:

<u>$150.00</u> is added to this policy for an inspection and is not refundable.

ALL OTHER TERMS AND CONDITIONS OF THE POLICY REMAIN UNCHANGED.

C–7

U184-0702

# COMMERCIAL GENERAL LIABILITY COVERAGE PART DECLARATIONS

This coverage part consists of this Declarations form, the Common Policy Conditions, the Commercial General Liability Coverage Form and the endorsements indicated as applicable. (See COMMON POLICY DECLARATIONS for items 1 and 2.)

POLICY NO.        GL123393
NAMED INSURED:    DON'S HYDRAULICS INC.

## LIMITS OF INSURANCE

| | | |
|---|---|---|
| General Aggregate Limit (Other Than Products – Completed Operations) | $1,000,000.00 | |
| Products Completed Operations Aggregate Limit | $1,000,000.00 | |
| Personal & Advertising Injury Limit | $500,000.00 | |
| Each Occurrence Limit | $500,000.00 | |
| Damage To Premises Rented To You Limit | $100,000.00 | Any One Premises |
| Medical Expense Limit | $5,000.00 | Any One Person |

**RETROACTIVE DATE** (CG 00 02 only) – Coverage A of this insurance does not apply to "bodily injury" or "Property damage" which occurs before Retroactive Date, if any, shown below.

Retroactive Date:                    (Enter Date or "None" if no Retroactive Date Applies)

Location of All Premises You Own, Rent or Occupy (Same as Item 1 unless shown below):
ROUTE 113                        GEORGETOWN DE  19947

| CLASSIFICATION | CODE NO. | PREMIUM BASIS | RATE | ADVANCE PREMIUM | |
|---|---|---|---|---|---|
| | | | | PR / CO | ALL OTHER |
| MACHINERY OR MACHINERY PARTS MFG. – INDUSTRIAL TYPE | 334-56652 336-56652 | (S) 750,000 (S) 750,000 | 2.00 8.00 | $6,000.00 | $1,500.00 |

| FORMS / ENDORSEMENTS APPLICABLE: | TOTAL PREMIUM FOR THIS COVERAGE PART | |
|---|---|---|
| SEE SCHEDULE OF FORMS AND ENDORSEMENTS – FORM U001 | | $7,500.00 |

**FORM OF BUSINESS:**   CORPORATION

Audit Period:  Annual unless otherwise stated:

C–8

Includes copyrighted material of Insurance Services Office, Inc. with its permission.
Copyright, Insurance Services Office, Inc., 1984

DCJ6553 (07-02)

COMMERCIAL GENERAL LIABILITY
CG 00 01 10 01

# COMMERCIAL GENERAL LIABILITY COVERAGE FORM

Various provisions in this policy restrict coverage. Read the entire policy carefully to determine rights, duties and what is and is not covered.

Throughout this policy the words "you" and "your" refer to the Named Insured shown in the Declarations, and any other person or organization qualifying as a Named Insured under this policy. The words "we", "us" and "our" refer to the company providing this insurance.

The word "insured" means any person or organization qualifying as such under Section II – Who Is An Insured.

Other words and phrases that appear in quotation marks have special meaning. Refer to Section V – Definitions.

## SECTION I – COVERAGES

### COVERAGE A BODILY INJURY AND PROPERTY DAMAGE LIABILITY

**1. Insuring Agreement**

   **a.** We will pay those sums that the insured becomes legally obligated to pay as damages because of "bodily injury" or "property damage" to which this insurance applies. We will have the right and duty to defend the insured against any "suit" seeking those damages. However, we will have no duty to defend the insured against any "suit" seeking damages for "bodily injury" or "property damage" to which this insurance does not apply. We may, at our discretion, investigate any "occurrence" and settle any claim or "suit" that may result. But:

      **(1)** The amount we will pay for damages is limited as described in Section III – Limits Of Insurance; and

      **(2)** Our right and duty to defend ends when we have used up the applicable limit of insurance in the payment of judgments or settlements under Coverages **A** or **B** or medical expenses under Coverage **C**.

   No other obligation or liability to pay sums or perform acts or services is covered unless explicitly provided for under Supplementary Payments – Coverages **A** and **B**.

   **b.** This insurance applies to "bodily injury" and "property damage" only if:

      **(1)** The "bodily injury" or "property damage" is caused by an "occurrence" that takes place in the "coverage territory";

      **(2)** The "bodily injury" or "property damage" occurs during the policy period; and

      **(3)** Prior to the policy period, no insured listed under Paragraph **1.** of Section II – Who Is An Insured and no "employee" authorized by you to give or receive notice of an "occurrence" or claim, knew that the "bodily injury" or "property damage" had occurred, in whole or in part. If such a listed insured or authorized "employee" knew, prior to the policy period, that the "bodily injury" or "property damage" occurred, then any continuation, change or resumption of such "bodily injury" or "property damage" during or after the policy period will be deemed to have been known prior to the policy period.

   **c.** "Bodily injury" or "property damage" which occurs during the policy period and was not, prior to the policy period, known to have occurred by any insured listed under Paragraph **1.** of Section II – Who Is An Insured or any "employee" authorized by you to give or receive notice of an "occurrence" or claim, includes any continuation, change or resumption of that "bodily injury" or "property damage" after the end of the policy period.

   **d.** "Bodily injury" or "property damage" will be deemed to have been known to have occurred at the earliest time when any insured listed under Paragraph **1.** of Section II – Who Is An Insured or any "employee" authorized by you to give or receive notice of an "occurrence" or claim:

      **(1)** Reports all, or any part, of the "bodily injury" or "property damage" to us or any other insurer;

      **(2)** Receives a written or verbal demand or claim for damages because of the "bodily injury" or "property damage"; or

      **(3)** Becomes aware by any other means that "bodily injury" or "property damage" has occurred or has begun to occur.

C–9

e. Damages because of "bodily injury" include damages claimed by any person or organization for care, loss of services or death resulting at any time from the "bodily injury".

2. **Exclusions**

This insurance does not apply to:

a. **Expected Or Intended Injury**

"Bodily injury" or "property damage" expected or intended from the standpoint of the insured. This exclusion does not apply to "bodily injury" resulting from the use of reasonable force to protect persons or property.

b. **Contractual Liability**

"Bodily injury" or "property damage" for which the insured is obligated to pay damages by reason of the assumption of liability in a contract or agreement. This exclusion does not apply to liability for damages:

(1) That the insured would have in the absence of the contract or agreement; or

(2) Assumed in a contract or agreement that is an "insured contract", provided the "bodily injury" or "property damage" occurs subsequent to the execution of the contract or agreement. Solely for the purposes of liability assumed in an "insured contract", reasonable attorney fees and necessary litigation expenses incurred by or for a party other than an insured are deemed to be damages because of "bodily injury" or "property damage", provided:

(a) Liability to such party for, or for the cost of, that party's defense has also been assumed in the same "insured contract"; and

(b) Such attorney fees and litigation expenses are for defense of that party against a civil or alternative dispute resolution proceeding in which damages to which this insurance applies are alleged.

c. **Liquor Liability**

"Bodily injury" or "property damage" for which any insured may be held liable by reason of:

(1) Causing or contributing to the intoxication of any person;

(2) The furnishing of alcoholic beverages to a person under the legal drinking age or under the influence of alcohol; or

(3) Any statute, ordinance or regulation relating to the sale, gift, distribution or use of alcoholic beverages.

This exclusion applies only if you are in the business of manufacturing, distributing, selling, serving or furnishing alcoholic beverages.

d. **Workers' Compensation And Similar Laws**

Any obligation of the insured under a workers' compensation, disability benefits or unemployment compensation law or any similar law.

e. **Employer's Liability**

"Bodily injury" to:

(1) An "employee" of the insured arising out of and in the course of:

(a) Employment by the insured; or

(b) Performing duties related to the conduct of the insured's business; or

(2) The spouse, child, parent, brother or sister of that "employee" as a consequence of Paragraph (1) above.

This exclusion applies:

(1) Whether the insured may be liable as an employer or in any other capacity; and

(2) To any obligation to share damages with or repay someone else who must pay damages because of the injury.

This exclusion does not apply to liability assumed by the insured under an "insured contract".

C–10

© ISO Properties, Inc., 2000

☐

**f. Pollution**

(1) "Bodily injury" or "property damage" arising out of the actual, alleged or threatened discharge, dispersal, seepage, migration, release or escape of "pollutants":

(a) At or from any premises, site or location which is or was at any time owned or occupied by, or rented or loaned to, any insured. However, this subparagraph does not apply to:

(i) "Bodily injury" if sustained within a building and caused by smoke, fumes, vapor or soot from equipment used to heat that building;

(ii) "Bodily injury" or "property damage" for which you may be held liable, if you are a contractor and the owner or lessee of such premises, site or location has been added to your policy as an additional insured with respect to your ongoing operations performed for that additional insured at that premises, site or location and such premises, site or location is not and never was owned or occupied by, or rented or loaned to, any insured, other than that additional insured; or

(iii) "Bodily injury" or "property damage" arising out of heat, smoke or fumes from a "hostile fire";

(b) At or from any premises, site or location which is or was at any time used by or for any insured or others for the handling, storage, disposal, processing or treatment of waste;

(c) Which are or were at any time transported, handled, stored, treated, disposed of, or processed as waste by or for:

(i) Any insured; or

(ii) Any person or organization for whom you may be legally responsible; or

(d) At or from any premises, site or location on which any insured or any contractors or subcontractors working directly or indirectly on any insured's behalf are performing operations if the "pollutants" are brought on or to the premises, site or location in connection with such operations by such insured, contractor or subcontractor. However, this subparagraph does not apply to:

(i) "Bodily injury" or "property damage" arising out of the escape of fuels, lubricants or other operating fluids which are needed to perform the normal electrical, hydraulic or mechanical functions necessary for the operation of "mobile equipment" or its parts, if such fuels, lubricants or other operating fluids escape from a vehicle part designed to hold, store or receive them. This exception does not apply if the "bodily injury" or "property damage" arises out of the intentional discharge, dispersal or release of the fuels, lubricants or other operating fluids, or if such fuels, lubricants or other operating fluids are brought on or to the premises, site or location with the intent that they be discharged, dispersed or released as part of the operations being performed by such insured, contractor or subcontractor;

(ii) "Bodily injury" or "property damage" sustained within a building and caused by the release of gases, fumes or vapors from materials brought into that building in connection with operations being performed by you or on your behalf by a contractor or subcontractor; or

(iii) "Bodily injury" or "property damage" arising out of heat, smoke or fumes from a "hostile fire".

C-11

(e) At or from any premises, site or location on which any insured or any contractors or subcontractors working directly or indirectly on any insured's behalf are performing operations if the operations are to test for, monitor, clean up, remove, contain, treat, detoxify or neutralize, or in any way respond to, or assess the effects of, "pollutants".

(2) Any loss, cost or expense arising out of any:

(a) Request, demand, order or statutory or regulatory requirement that any insured or others test for, monitor, clean up, remove, contain, treat, detoxify or neutralize, or in any way respond to, or assess the effects of, "pollutants"; or

(b) Claim or "suit" by or on behalf of a governmental authority for damages because of testing for, monitoring, cleaning up, removing, containing, treating, detoxifying or neutralizing, or in any way responding to, or assessing the effects of, "pollutants".

However, this paragraph does not apply to liability for damages because of "property damage" that the insured would have in the absence of such request, demand, order or statutory or regulatory requirement, or such claim or "suit" by or on behalf of a governmental authority.

g. **Aircraft, Auto Or Watercraft**

"Bodily injury" or "property damage" arising out of the ownership, maintenance, use or entrustment to others of any aircraft, "auto" or watercraft owned or operated by or rented or loaned to any insured. Use includes operation and "loading or unloading".

This exclusion applies even if the claims against any insured allege negligence or other wrongdoing in the supervision, hiring, employment, training or monitoring of others by that insured, if the "occurrence" which caused the "bodily injury" or "property damage" involved the ownership, maintenance, use or entrustment to others of any aircraft, "auto" or watercraft that is owned or operated by or rented or loaned to any insured.

This exclusion does not apply to:

(1) A watercraft while ashore on premises you own or rent;

(2) A watercraft you do not own that is:

(a) Less than 26 feet long; and

(b) Not being used to carry persons or property for a charge;

(3) Parking an "auto" on, or on the ways next to, premises you own or rent, provided the "auto" is not owned by or rented or loaned to you or the insured;

(4) Liability assumed under any "insured contract" for the ownership, maintenance or use of aircraft or watercraft; or

(5) "Bodily injury" or "property damage" arising out of the operation of any of the equipment listed in Paragraph f.(2) or f.(3) of the definition of "mobile equipment".

h. **Mobile Equipment**

"Bodily injury" or "property damage" arising out of:

(1) The transportation of "mobile equipment" by an "auto" owned or operated by or rented or loaned to any insured; or

(2) The use of "mobile equipment" in, or while in practice for, or while being prepared for, any prearranged racing, speed, demolition, or stunting activity.

i. **War**

"Bodily injury" or "property damage" due to war, whether or not declared, or any act or condition incident to war. War includes civil war, insurrection, rebellion or revolution. This exclusion applies only to liability assumed under a contract or agreement.

j. **Damage To Property**

"Property damage" to:

(1) Property you own, rent, or occupy, including any costs or expenses incurred by you, or any other person, organization or entity, for repair, replacement, enhancement, restoration or maintenance of such property for any reason, including prevention of injury to a person or damage to another's property;

(2) Premises you sell, give away or abandon, if the "property damage" arises out of any part of those premises;

(3) Property loaned to you;

(4) Personal property in the care, custody or control of the insured;

(5) That particular part of real property on which you or any contractors or subcontractors working directly or indirectly on your behalf are performing operations, if the "property damage" arises out of those operations; or

(6) That particular part of any property that must be restored, repaired or replaced because "your work" was incorrectly performed on it.

C–12

© ISO Properties, Inc., 2000

□

Paragraphs **(1)**, **(3)** and **(4)** of this exclusion do not apply to "property damage" (other than damage by fire) to premises, including the contents of such premises, rented to you for a period of 7 or fewer consecutive days. A separate limit of insurance applies to Damage To Premises Rented To You as described in Section **III** – Limits Of Insurance.

Paragraph **(2)** of this exclusion does not apply if the premises are "your work" and were never occupied, rented or held for rental by you.

Paragraphs **(3)**, **(4)**, **(5)** and **(6)** of this exclusion do not apply to liability assumed under a sidetrack agreement.

Paragraph **(6)** of this exclusion does not apply to "property damage" included in the "products-completed operations hazard".

**k. Damage To Your Product**

"Property damage" to "your product" arising out of it or any part of it.

**l. Damage To Your Work**

"Property damage" to "your work" arising out of it or any part of it and included in the "products-completed operations hazard".

This exclusion does not apply if the damaged work or the work out of which the damage arises was performed on your behalf by a subcontractor.

**m. Damage To Impaired Property Or Property Not Physically Injured**

"Property damage" to "impaired property" or property that has not been physically injured, arising out of:

**(1)** A defect, deficiency, inadequacy or dangerous condition in "your product" or "your work"; or

**(2)** A delay or failure by you or anyone acting on your behalf to perform a contract or agreement in accordance with its terms.

This exclusion does not apply to the loss of use of other property arising out of sudden and accidental physical injury to "your product" or "your work" after it has been put to its intended use.

**n. Recall Of Products, Work Or Impaired Property**

Damages claimed for any loss, cost or expense incurred by you or others for the loss of use, withdrawal, recall, inspection, repair, replacement, adjustment, removal or disposal of:

**(1)** "Your product";

**(2)** "Your work"; or

**(3)** "Impaired property";

if such product, work, or property is withdrawn or recalled from the market or from use by any person or organization because of a known or suspected defect, deficiency, inadequacy or dangerous condition in it.

**o. Personal And Advertising Injury**

"Bodily injury" arising out of "personal and advertising injury".

Exclusions **c.** through **n.** do not apply to damage by fire to premises while rented to you or temporarily occupied by you with permission of the owner. A separate limit of insurance applies to this coverage as described in Section **III** – Limits Of Insurance.

## COVERAGE B PERSONAL AND ADVERTISING INJURY LIABILITY

**1. Insuring Agreement**

**a.** We will pay those sums that the insured becomes legally obligated to pay as damages because of "personal and advertising injury" to which this insurance applies. We will have the right and duty to defend the insured against any "suit" seeking those damages. However, we will have no duty to defend the insured against any "suit" seeking damages for "personal and advertising injury" to which this insurance does not apply. We may, at our discretion, investigate any offense and settle any claim or "suit" that may result. But:

**(1)** The amount we will pay for damages is limited as described in Section **III** – Limits Of Insurance ; and

**(2)** Our right and duty to defend end when we have used up the applicable limit of insurance in the payment of judgments or settlements under Coverages **A** or **B** or medical expenses under Coverage **C**.

C–13

        © ISO Properties, Inc., 2000          □

No other obligation or liability to pay sums or perform acts or services is covered unless explicitly provided for under Supplementary Payments – Coverages **A** and **B**.

**b.** This insurance applies to "personal and advertising injury" caused by an offense arising out of your business but only if the offense was committed in the "coverage territory" during the policy period.

**2. Exclusions**

This insurance does not apply to:

**a. Knowing Violation Of Rights Of Another**

"Personal and advertising injury" caused by or at the direction of the insured with the knowledge that the act would violate the rights of another and would inflict "personal and advertising injury".

**b. Material Published With Knowledge Of Falsity**

"Personal and advertising injury" arising out of oral or written publication of material, if done by or at the direction of the insured with knowledge of its falsity.

**c. Material Published Prior To Policy Period**

"Personal and advertising injury" arising out of oral or written publication of material whose first publication took place before the beginning of the policy period.

**d. Criminal Acts**

"Personal and advertising injury" arising out of a criminal act committed by or at the direction of the insured.

**e. Contractual Liability**

"Personal and advertising injury" for which the insured has assumed liability in a contract or agreement. This exclusion does not apply to liability for damages that the insured would have in the absence of the contract or agreement.

**f. Breach Of Contract**

"Personal and advertising injury" arising out of a breach of contract, except an implied contract to use another's advertising idea in your "advertisement".

**g. Quality Or Performance Of Goods – Failure To Conform To Statements**

"Personal and advertising injury" arising out of the failure of goods, products or services to conform with any statement of quality or performance made in your "advertisement".

**h. Wrong Description Of Prices**

"Personal and advertising injury" arising out of the wrong description of the price of goods, products or services stated in your "advertisement".

**i. Infringement Of Copyright, Patent, Trademark Or Trade Secret**

"Personal and advertising injury" arising out of the infringement of copyright, patent, trademark, trade secret or other intellectual property rights.

However, this exclusion does not apply to infringement, in your "advertisement", of copyright, trade dress or slogan.

**j. Insureds In Media And Internet Type Businesses**

"Personal and advertising injury" committed by an insured whose business is:

**(1)** Advertising, broadcasting, publishing or telecasting;

**(2)** Designing or determining content of websites for others; or

**(3)** An Internet search, access, content or service provider.

However, this exclusion does not apply to Paragraphs **14.a.**, **b.** and **c.** of "personal and advertising injury" under the Definitions Section.

For the purposes of this exclusion, the placing of frames, borders or links, or advertising, for you or others anywhere on the Internet, is not by itself, considered the business of advertising, broadcasting, publishing or telecasting.

**k. Electronic Chatrooms Or Bulletin Boards**

"Personal and advertising injury" arising out of an electronic chatroom or bulletin board the insured hosts, owns, or over which the insured exercises control.

C–14

© ISO Properties, Inc., 2000

CG 00 01 10 01

**l. Unauthorized Use Of Another's Name Or Product**

"Personal and advertising injury" arising out of the unauthorized use of another's name or product in your e-mail address, domain name or metatag, or any other similar tactics to mislead another's potential customers.

**m. Pollution**

"Personal and advertising injury" arising out of the actual, alleged or threatened discharge, dispersal, seepage, migration, release or escape of "pollutants" at any time.

**n. Pollution-Related**

Any loss, cost or expense arising out of any:

(1) Request, demand or order that any insured or others test for, monitor, clean up, remove, contain, treat, detoxify or neutralize, or in any way respond to, or assess the effects of, "pollutants"; or

(2) Claim or suit by or on behalf of a governmental authority for damages because of testing for, monitoring, cleaning up, removing, containing, treating, detoxifying or neutralizing, or in any way responding to, or assessing the effects of, "pollutants".

**COVERAGE C MEDICAL PAYMENTS**

**1. Insuring Agreement**

**a.** We will pay medical expenses as described below for "bodily injury" caused by an accident:

(1) On premises you own or rent;

(2) On ways next to premises you own or rent; or

(3) Because of your operations;

provided that:

(1) The accident takes place in the "coverage territory" and during the policy period;

(2) The expenses are incurred and reported to us within one year of the date of the accident; and

(3) The injured person submits to examination, at our expense, by physicians of our choice as often as we reasonably require.

**b.** We will make these payments regardless of fault. These payments will not exceed the applicable limit of insurance. We will pay reasonable expenses for:

(1) First aid administered at the time of an accident;

(2) Necessary medical, surgical, x-ray and dental services, including prosthetic devices; and

(3) Necessary ambulance, hospital, professional nursing and funeral services.

**2. Exclusions**

We will not pay expenses for "bodily injury":

**a. Any Insured**

To any insured, except "volunteer workers".

**b. Hired Person**

To a person hired to do work for or on behalf of any insured or a tenant of any insured.

**c. Injury On Normally Occupied Premises**

To a person injured on that part of premises you own or rent that the person normally occupies.

**d. Workers Compensation And Similar Laws**

To a person, whether or not an "employee" of any insured, if benefits for the "bodily injury" are payable or must be provided under a workers' compensation or disability benefits law or a similar law.

**e. Athletics Activities**

To a person injured while taking part in athletics.

**f. Products-Completed Operations Hazard**

Included within the "products-completed operations hazard".

**g. Coverage A Exclusions**

Excluded under Coverage **A**.

**h. War**

Due to war, whether or not declared, or any act or condition incident to war. War includes civil war, insurrection, rebellion or revolution.

**SUPPLEMENTARY PAYMENTS – COVERAGES A AND B**

**1.** We will pay, with respect to any claim we investigate or settle, or any "suit" against an insured we defend:

**a.** All expenses we incur.

C–15

b. Up to $250 for cost of bail bonds required because of accidents or traffic law violations arising out of the use of any vehicle to which the Bodily Injury Liability Coverage applies. We do not have to furnish these bonds.

c. The cost of bonds to release attachments, but only for bond amounts within the applicable limit of insurance. We do not have to furnish these bonds.

d. All reasonable expenses incurred by the insured at our request to assist us in the investigation or defense of the claim or "suit", including actual loss of earnings up to $250 a day because of time off from work.

e. All costs taxed against the insured in the "suit".

f. Prejudgment interest awarded against the insured on that part of the judgment we pay. If we make an offer to pay the applicable limit of insurance, we will not pay any prejudgment interest based on that period of time after the offer.

g. All interest on the full amount of any judgment that accrues after entry of the judgment and before we have paid, offered to pay, or deposited in court the part of the judgment that is within the applicable limit of insurance.

These payments will not reduce the limits of insurance.

2. If we defend an insured against a "suit" and an indemnitee of the insured is also named as a party to the "suit", we will defend that indemnitee if all of the following conditions are met:

a. The "suit" against the indemnitee seeks damages for which the insured has assumed the liability of the indemnitee in a contract or agreement that is an "insured contract";

b. This insurance applies to such liability assumed by the insured;

c. The obligation to defend, or the cost of the defense of, that indemnitee, has also been assumed by the insured in the same "insured contract";

d. The allegations in the "suit" and the information we know about the "occurrence" are such that no conflict appears to exist between the interests of the insured and the interests of the indemnitee;

e. The indemnitee and the insured ask us to conduct and control the defense of that indemnitee against such "suit" and agree that we can assign the same counsel to defend the insured and the indemnitee; and

f. The indemnitee:

(1) Agrees in writing to:

(a) Cooperate with us in the investigation, settlement or defense of the "suit";

(b) Immediately send us copies of any demands, notices, summonses or legal papers received in connection with the "suit";

(c) Notify any other insurer whose coverage is available to the indemnitee; and

(d) Cooperate with us with respect to coordinating other applicable insurance available to the indemnitee; and

(2) Provides us with written authorization to:

(a) Obtain records and other information related to the "suit"; and

(b) Conduct and control the defense of the indemnitee in such "suit".

So long as the above conditions are met, attorneys' fees incurred by us in the defense of that indemnitee, necessary litigation expenses incurred by us and necessary litigation expenses incurred by the indemnitee at our request will be paid as Supplementary Payments. Notwithstanding the provisions of Paragraph 2.b.(2) of Section I – Coverage A – Bodily Injury And Property Damage Liability, such payments will not be deemed to be damages for "bodily injury" and "property damage" and will not reduce the limits of insurance.

Our obligation to defend an insured's indemnitee and to pay for attorneys' fees and necessary litigation expenses as Supplementary Payments ends when:

a. We have used up the applicable limit of insurance in the payment of judgments or settlements; or

b. The conditions set forth above, or the terms of the agreement described in Paragraph f. above, are no longer met.

C–16

© ISO Properties, Inc., 2000

## SECTION II – WHO IS AN INSURED

1. If you are designated in the Declarations as:

   a. An individual, you and your spouse are insureds, but only with respect to the conduct of a business of which you are the sole owner.

   b. A partnership or joint venture, you are an insured. Your members, your partners, and their spouses are also insureds, but only with respect to the conduct of your business.

   c. A limited liability company, you are an insured. Your members are also insureds, but only with respect to the conduct of your business. Your managers are insureds, but only with respect to their duties as your managers.

   d. An organization other than a partnership, joint venture or limited liability company, you are an insured. Your "executive officers" and directors are insureds, but only with respect to their duties as your officers or directors. Your stockholders are also insureds, but only with respect to their liability as stockholders.

   e. A trust, you are an insured. Your trustees are also insureds, but only with respect to their duties as trustees.

2. Each of the following is also an insured:

   a. Your "volunteer workers" only while performing duties related to the conduct of your business, or your "employees", other than either your "executive officers" (if you are an organization other than a partnership, joint venture or limited liability company) or your managers (if you are a limited liability company), but only for acts within the scope of their employment by you or while performing duties related to the conduct of your business. However, none of these "employees" or "volunteer workers" are insureds for:

      (1) "Bodily injury" or "personal and advertising injury":

         (a) To you, to your partners or members (if you are a partnership or joint venture), to your members (if you are a limited liability company), to a co-"employee" while in the course of his or her employment or performing duties related to the conduct of your business, or to your other "volunteer workers" while performing duties related to the conduct of your business;

         (b) To the spouse, child, parent, brother or sister of that co-"employee" or "volunteer worker" as a consequence of Paragraph (1)(a) above;

         (c) For which there is any obligation to share damages with or repay someone else who must pay damages because of the injury described in Paragraphs (1)(a) or (b) above; or

         (d) Arising out of his or her providing or failing to provide professional health care services.

      (2) "Property damage" to property:

         (a) Owned, occupied or used by,

         (b) Rented to, in the care, custody or control of, or over which physical control is being exercised for any purpose by

         you, any of your "employees", "volunteer workers", any partner or member (if you are a partnership or joint venture), or any member (if you are a limited liability company).

   b. Any person (other than your "employee" or "volunteer worker"), or any organization while acting as your real estate manager.

   c. Any person or organization having proper temporary custody of your property if you die, but only:

      (1) With respect to liability arising out of the maintenance or use of that property; and

      (2) Until your legal representative has been appointed.

   d. Your legal representative if you die, but only with respect to duties as such. That representative will have all your rights and duties under this Coverage Part.

3. With respect to "mobile equipment" registered in your name under any motor vehicle registration law, any person is an insured while driving such equipment along a public highway with your permission. Any other person or organization responsible for the conduct of such person is also an insured, but only with respect to liability arising out of the operation of the equipment, and only if no other insurance of any kind is available to that person or organization for this liability. However, no person or organization is an insured with respect to:

   a. "Bodily injury" to a co-"employee" of the person driving the equipment; or

   b. "Property damage" to property owned by, rented to, in the charge of or occupied by you or the employer of any person who is an insured under this provision.

4. Any organization you newly acquire or form, other than a partnership, joint venture or limited liability company, and over which you maintain ownership or majority interest, will qualify as a Named Insured if there is no other similar insurance available to that organization. However:

   a. Coverage under this provision is afforded only until the 90th day after you acquire or form the organization or the end of the policy period, whichever is earlier;

   b. Coverage **A** does not apply to "bodily injury" or "property damage" that occurred before you acquired or formed the organization; and

   c. Coverage **B** does not apply to "personal and advertising injury" arising out of an offense committed before you acquired or formed the organization.

No person or organization is an insured with respect to the conduct of any current or past partnership, joint venture or limited liability company that is not shown as a Named Insured in the Declarations.

## SECTION III – LIMITS OF INSURANCE

1. The Limits of Insurance shown in the Declarations and the rules below fix the most we will pay regardless of the number of:

   a. Insureds;

   b. Claims made or "suits" brought; or

   c. Persons or organizations making claims or bringing "suits".

2. The General Aggregate Limit is the most we will pay for the sum of:

   a. Medical expenses under Coverage **C**;

   b. Damages under Coverage **A**, except damages because of "bodily injury" or "property damage" included in the "products-completed operations hazard"; and

   c. Damages under Coverage **B**.

3. The Products-Completed Operations Aggregate Limit is the most we will pay under Coverage **A** for damages because of "bodily injury" and "property damage" included in the "products-completed operations hazard".

4. Subject to **2.** above, the Personal and Advertising Injury Limit is the most we will pay under Coverage **B** for the sum of all damages because of all "personal and advertising injury" sustained by any one person or organization.

5. Subject to **2.** or **3.** above, whichever applies, the Each Occurrence Limit is the most we will pay for the sum of:

   a. Damages under Coverage **A**; and

   b. Medical expenses under Coverage **C**

   because of all "bodily injury" and "property damage" arising out of any one "occurrence".

6. Subject to **5.** above, the Damage To Premises Rented To You Limit is the most we will pay under Coverage **A** for damages because of "property damage" to any one premises, while rented to you, or in the case of damage by fire, while rented to you or temporarily occupied by you with permission of the owner.

7. Subject to **5.** above, the Medical Expense Limit is the most we will pay under Coverage **C** for all medical expenses because of "bodily injury" sustained by any one person.

The Limits of Insurance of this Coverage Part apply separately to each consecutive annual period and to any remaining period of less than 12 months, starting with the beginning of the policy period shown in the Declarations, unless the policy period is extended after issuance for an additional period of less than 12 months. In that case, the additional period will be deemed part of the last preceding period for purposes of determining the Limits of Insurance.

## SECTION IV – COMMERCIAL GENERAL LIABILITY CONDITIONS

1. **Bankruptcy**

   Bankruptcy or insolvency of the insured or of the insured's estate will not relieve us of our obligations under this Coverage Part.

2. **Duties In The Event Of Occurrence, Offense, Claim Or Suit**

   a. You must see to it that we are notified as soon as practicable of an "occurrence" or an offense which may result in a claim. To the extent possible, notice should include:

      (1) How, when and where the "occurrence" or offense took place;

      (2) The names and addresses of any injured persons and witnesses; and

      (3) The nature and location of any injury or damage arising out of the "occurrence" or offense.

 © ISO Properties, Inc., 2000

**b.** If a claim is made or "suit" is brought against any insured, you must:

  **(1)** Immediately record the specifics of the claim or "suit" and the date received; and

  **(2)** Notify us as soon as practicable.

  You must see to it that we receive written notice of the claim or "suit" as soon as practicable.

**c.** You and any other involved insured must:

  **(1)** Immediately send us copies of any demands, notices, summonses or legal papers received in connection with the claim or "suit";

  **(2)** Authorize us to obtain records and other information;

  **(3)** Cooperate with us in the investigation or settlement of the claim or defense against the "suit"; and

  **(4)** Assist us, upon our request, in the enforcement of any right against any person or organization which may be liable to the insured because of injury or damage to which this insurance may also apply.

**d.** No insured will, except at that insured's own cost, voluntarily make a payment, assume any obligation, or incur any expense, other than for first aid, without our consent.

**3. Legal Action Against Us**

No person or organization has a right under this Coverage Part:

**a.** To join us as a party or otherwise bring us into a "suit" asking for damages from an insured; or

**b.** To sue us on this Coverage Part unless all of its terms have been fully complied with.

A person or organization may sue us to recover on an agreed settlement or on a final judgment against an insured; but we will not be liable for damages that are not payable under the terms of this Coverage Part or that are in excess of the applicable limit of insurance. An agreed settlement means a settlement and release of liability signed by us, the insured and the claimant or the claimant's legal representative.

**4. Other Insurance**

If other valid and collectible insurance is available to the insured for a loss we cover under Coverages **A** or **B** of this Coverage Part, our obligations are limited as follows:

**a. Primary Insurance**

  This insurance is primary except when **b.** below applies. If this insurance is primary, our obligations are not affected unless any of the other insurance is also primary. Then, we will share with all that other insurance by the method described in **c.** below.

**b. Excess Insurance**

  This insurance is excess over:

  **(1)** Any of the other insurance, whether primary, excess, contingent or on any other basis:

    **(a)** That is Fire, Extended Coverage, Builder's Risk, Installation Risk or similar coverage for "your work";

    **(b)** That is Fire insurance for premises rented to you or temporarily occupied by you with permission of the owner;

    **(c)** That is insurance purchased by you to cover your liability as a tenant for "property damage" to premises rented to you or temporarily occupied by you with permission of the owner; or

    **(d)** If the loss arises out of the maintenance or use of aircraft, "autos" or watercraft to the extent not subject to Exclusion **g.** of Section **I** – Coverage **A** – Bodily Injury And Property Damage Liability.

  **(2)** Any other primary insurance available to you covering liability for damages arising out of the premises or operations for which you have been added as an additional insured by attachment of an endorsement.

When this insurance is excess, we will have no duty under Coverages **A** or **B** to defend the insured against any "suit" if any other insurer has a duty to defend the insured against that "suit". If no other insurer defends, we will undertake to do so, but we will be entitled to the insured's rights against all those other insurers.

When this insurance is excess over other insurance, we will pay only our share of the amount of the loss, if any, that exceeds the sum of:

(1) The total amount that all such other insurance would pay for the loss in the absence of this insurance; and

(2) The total of all deductible and self-insured amounts under all that other insurance.

We will share the remaining loss, if any, with any other insurance that is not described in this Excess Insurance provision and was not bought specifically to apply in excess of the Limits of Insurance shown in the Declarations of this Coverage Part.

**c. Method Of Sharing**

If all of the other insurance permits contribution by equal shares, we will follow this method also. Under this approach each insurer contributes equal amounts until it has paid its applicable limit of insurance or none of the loss remains, whichever comes first.

If any of the other insurance does not permit contribution by equal shares, we will contribute by limits. Under this method, each insurer's share is based on the ratio of its applicable limit of insurance to the total applicable limits of insurance of all insurers.

**5. Premium Audit**

a. We will compute all premiums for this Coverage Part in accordance with our rules and rates.

b. Premium shown in this Coverage Part as advance premium is a deposit premium only. At the close of each audit period we will compute the earned premium for that period and send notice to the first Named Insured. The due date for audit and retrospective premiums is the date shown as the due date on the bill. If the sum of the advance and audit premiums paid for the policy period is greater than the earned premium, we will return the excess to the first Named Insured.

c. The first Named Insured must keep records of the information we need for premium computation, and send us copies at such times as we may request.

**6. Representations**

By accepting this policy, you agree:

a. The statements in the Declarations are accurate and complete;

b. Those statements are based upon representations you made to us; and

c. We have issued this policy in reliance upon your representations.

**7. Separation Of Insureds**

Except with respect to the Limits of Insurance, and any rights or duties specifically assigned in this Coverage Part to the first Named Insured, this insurance applies:

a. As if each Named Insured were the only Named Insured; and

b. Separately to each insured against whom claim is made or "suit" is brought.

**8. Transfer Of Rights Of Recovery Against Others To Us**

If the insured has rights to recover all or part of any payment we have made under this Coverage Part, those rights are transferred to us. The insured must do nothing after loss to impair them. At our request, the insured will bring "suit" or transfer those rights to us and help us enforce them.

**9. When We Do Not Renew**

If we decide not to renew this Coverage Part, we will mail or deliver to the first Named Insured shown in the Declarations written notice of the nonrenewal not less than 30 days before the expiration date.

If notice is mailed, proof of mailing will be sufficient proof of notice.

**SECTION V – DEFINITIONS**

1. "Advertisement" means a notice that is broadcast or published to the general public or specific market segments about your goods, products or services for the purpose of attracting customers or supporters. For the purposes of this definition:

a. Notices that are published include material placed on the Internet or on similar electronic means of communication; and

b. Regarding web-sites, only that part of a web-site that is about your goods, products or services for the purposes of attracting customers or supporters is considered an advertisement.

2. "Auto" means a land motor vehicle, trailer or semi-trailer designed for travel on public roads, including any attached machinery or equipment. But "auto" does not include "mobile equipment".

C-20

   © ISO Properties, Inc., 2000   CG 00 01 10 01   ☐

3. "Bodily injury" means bodily injury, sickness or disease sustained by a person, including death resulting from any of these at any time.

4. "Coverage territory" means:

   a. The United States of America (including its territories and possessions), Puerto Rico and Canada;

   b. International waters or airspace, but only if the injury or damage occurs in the course of travel or transportation between any places included in **a.** above; or

   c. All other parts of the world if the injury or damage arises out of:

      (1) Goods or products made or sold by you in the territory described in **a.** above;

      (2) The activities of a person whose home is in the territory described in **a.** above, but is away for a short time on your business; or

      (3) "Personal and advertising injury" offenses that take place through the Internet or similar electronic means of communication

   provided the insured's responsibility to pay damages is determined in a "suit" on the merits, in the territory described in **a.** above or in a settlement we agree to.

5. "Employee" includes a "leased worker". "Employee" does not include a "temporary worker".

6. "Executive officer" means a person holding any of the officer positions created by your charter, constitution, by-laws or any other similar governing document.

7. "Hostile fire" means one which becomes uncontrollable or breaks out from where it was intended to be.

8. "Impaired property" means tangible property, other than "your product" or "your work", that cannot be used or is less useful because:

   a. It incorporates "your product" or "your work" that is known or thought to be defective, deficient, inadequate or dangerous; or

   b. You have failed to fulfill the terms of a contract or agreement;

   if such property can be restored to use by:

   a. The repair, replacement, adjustment or removal of "your product" or "your work"; or

   b. Your fulfilling the terms of the contract or agreement.

9. "Insured contract" means:

   a. A contract for a lease of premises. However, that portion of the contract for a lease of premises that indemnifies any person or organization for damage by fire to premises while rented to you or temporarily occupied by you with permission of the owner is not an "insured contract";

   b. A sidetrack agreement;

   c. Any easement or license agreement, except in connection with construction or demolition operations on or within 50 feet of a railroad;

   d. An obligation, as required by ordinance, to indemnify a municipality, except in connection with work for a municipality;

   e. An elevator maintenance agreement;

   f. That part of any other contract or agreement pertaining to your business (including an indemnification of a municipality in connection with work performed for a municipality) under which you assume the tort liability of another party to pay for "bodily injury" or "property damage" to a third person or organization. Tort liability means a liability that would be imposed by law in the absence of any contract or agreement.

   Paragraph **f.** does not include that part of any contract or agreement:

      (1) That indemnifies a railroad for "bodily injury" or "property damage" arising out of construction or demolition operations, within 50 feet of any railroad property and affecting any railroad bridge or trestle, tracks, roadbeds, tunnel, underpass or crossing;

      (2) That indemnifies an architect, engineer or surveyor for injury or damage arising out of:

         (a) Preparing, approving, or failing to prepare or approve, maps, shop drawings, opinions, reports, surveys, field orders, change orders or drawings and specifications; or

         (b) Giving directions or instructions, or failing to give them, if that is the primary cause of the injury or damage; or

      (3) Under which the insured, if an architect, engineer or surveyor, assumes liability for an injury or damage arising out of the insured's rendering or failure to render professional services, including those listed in **(2)** above and supervisory, inspection, architectural or engineering activities.

C–21

10. "Leased worker" means a person leased to you by a labor leasing firm under an agreement between you and the labor leasing firm, to perform duties related to the conduct of your business. "Leased worker" does not include a "temporary worker".

11. "Loading or unloading" means the handling of property:

   a. After it is moved from the place where it is accepted for movement into or onto an aircraft, watercraft or "auto";

   b. While it is in or on an aircraft, watercraft or "auto"; or

   c. While it is being moved from an aircraft, watercraft or "auto" to the place where it is finally delivered;

   but "loading or unloading" does not include the movement of property by means of a mechanical device, other than a hand truck, that is not attached to the aircraft, watercraft or "auto".

12. "Mobile equipment" means any of the following types of land vehicles, including any attached machinery or equipment:

   a. Bulldozers, farm machinery, forklifts and other vehicles designed for use principally off public roads;

   b. Vehicles maintained for use solely on or next to premises you own or rent;

   c. Vehicles that travel on crawler treads;

   d. Vehicles, whether self-propelled or not, maintained primarily to provide mobility to permanently mounted:

      (1) Power cranes, shovels, loaders, diggers or drills; or

      (2) Road construction or resurfacing equipment such as graders, scrapers or rollers;

   e. Vehicles not described in a., b., c. or d. above that are not self-propelled and are maintained primarily to provide mobility to permanently attached equipment of the following types:

      (1) Air compressors, pumps and generators, including spraying, welding, building cleaning, geophysical exploration, lighting and well servicing equipment; or

      (2) Cherry pickers and similar devices used to raise or lower workers;

   f. Vehicles not described in a., b., c. or d. above maintained primarily for purposes other than the transportation of persons or cargo.

   However, self-propelled vehicles with the following types of permanently attached equipment are not "mobile equipment" but will be considered "autos":

      (1) Equipment designed primarily for:

         (a) Snow removal;

         (b) Road maintenance, but not construction or resurfacing; or

         (c) Street cleaning;

      (2) Cherry pickers and similar devices mounted on automobile or truck chassis and used to raise or lower workers; and

      (3) Air compressors, pumps and generators, including spraying, welding, building cleaning, geophysical exploration, lighting and well servicing equipment.

13. "Occurrence" means an accident, including continuous or repeated exposure to substantially the same general harmful conditions.

14. "Personal and advertising injury" means injury, including consequential "bodily injury", arising out of one or more of the following offenses:

   a. False arrest, detention or imprisonment;

   b. Malicious prosecution;

   c. The wrongful eviction from, wrongful entry into, or invasion of the right of private occupancy of a room, dwelling or premises that a person occupies, committed by or on behalf of its owner, landlord or lessor;

   d. Oral or written publication, in any manner, of material that slanders or libels a person or organization or disparages a person's or organization's goods, products or services;

   e. Oral or written publication, in any manner, of material that violates a person's right of privacy;

   f. The use of another's advertising idea in your "advertisement"; or

   g. Infringing upon another's copyright, trade dress or slogan in your "advertisement".

© ISO Properties, Inc., 2000

C–22

CG 00 01 10 01    □

15. "Pollutants" mean any solid, liquid, gaseous or thermal irritant or contaminant, including smoke, vapor, soot, fumes, acids, alkalis, chemicals and waste. Waste includes materials to be recycled, reconditioned or reclaimed.

16. "Products-completed operations hazard":

  a. Includes all "bodily injury" and "property damage" occurring away from premises you own or rent and arising out of "your product" or "your work" except:

   (1) Products that are still in your physical possession; or

   (2) Work that has not yet been completed or abandoned. However, "your work" will be deemed completed at the earliest of the following times:

     (a) When all of the work called for in your contract has been completed.

     (b) When all of the work to be done at the job site has been completed if your contract calls for work at more than one job site.

     (c) When that part of the work done at a job site has been put to its intended use by any person or organization other than another contractor or subcontractor working on the same project.

    Work that may need service, maintenance, correction, repair or replacement, but which is otherwise complete, will be treated as completed.

  b. Does not include "bodily injury" or "property damage" arising out of:

   (1) The transportation of property, unless the injury or damage arises out of a condition in or on a vehicle not owned or operated by you, and that condition was created by the "loading or unloading" of that vehicle by any insured;

   (2) The existence of tools, uninstalled equipment or abandoned or unused materials; or

   (3) Products or operations for which the classification, listed in the Declarations or in a policy schedule, states that products-completed operations are subject to the General Aggregate Limit.

17. "Property damage" means:

  a. Physical injury to tangible property, including all resulting loss of use of that property. All such loss of use shall be deemed to occur at the time of the physical injury that caused it; or

  b. Loss of use of tangible property that is not physically injured. All such loss of use shall be deemed to occur at the time of the "occurrence" that caused it.

For the purposes of this insurance, electronic data is not tangible property.

As used in this definition, electronic data means information, facts or programs stored as or on, created or used on, or transmitted to or from computer software, including systems and applications software, hard or floppy disks, CD-ROMS, tapes, drives, cells, data processing devices or any other media which are used with electronically controlled equipment.

18. "Suit" means a civil proceeding in which damages because of "bodily injury", "property damage" or "personal and advertising injury" to which this insurance applies are alleged. "Suit" includes:

  a. An arbitration proceeding in which such damages are claimed and to which the insured must submit or does submit with our consent; or

  b. Any other alternative dispute resolution proceeding in which such damages are claimed and to which the insured submits with our consent.

19. "Temporary worker" means a person who is furnished to you to substitute for a permanent "employee" on leave or to meet seasonal or short-term workload conditions.

20. "Volunteer worker" means a person who is not your "employee", and who donates his or her work and acts at the direction of and within the scope of duties determined by you, and is not paid a fee, salary or other compensation by you or anyone else for their work performed for you.

21. "Your product":

  a. Means:

   (1) Any goods or products, other than real property, manufactured, sold, handled, distributed or disposed of by:

     (a) You;

     (b) Others trading under your name; or

     (c) A person or organization whose business or assets you have acquired; and

   (2) Containers (other than vehicles), materials, parts or equipment furnished in connection with such goods or products.

C–23

**b.** Includes

    **(1)** Warranties or representations made at any time with respect to the fitness, quality, durability, performance or use of "your product"; and

    **(2)** The providing of or failure to provide warnings or instructions.

**c.** Does not include vending machines or other property rented to or located for the use of others but not sold.

**22.** "Your work":

    **a.** Means:

        **(1)** Work or operations performed by you or on your behalf; and

        **(2)** Materials, parts or equipment furnished in connection with such work or operations.

    **b.** Includes

        **(1)** Warranties or representations made at any time with respect to the fitness, quality, durability, performance or use of "your work", and

        **(2)** The providing of or failure to provide warnings or instructions.

C–24

© ISO Properties, Inc.,  2000

CG 00 01 10 01    ☐



Page 1

IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF DELAWARE
------

DON'S HYDRAULICS, INC.        :C.A. No. 04-1275 (KAJ)
        Plaintiff.            :
                              :
        Vs.                   :
                              :
COLONY INSURANCE COMPANY, TRUCK :
TECH INDUSTRIES, INC., and TIPCO :
TECHNOLOGIES, INC.            :
        Defendants            :
                              :

------

        Oral deposition of DON CATHELL, taken by and
before Joanne H. Gusler, Registered Professional Reporter
and Notary Public, at the Law Offices of Reger, Rizzo,
Kavulich & Darnall, LLP., 1001 North Jefferson Street,
Suite 202, Wilmington, Delaware 19801, on Thursday, May
26, 2005, commencing at 10:55 a.m.


                VOLUME I


        KARASCH & ASSOCIATES
    REGISTERED PROFESSIONAL REPORTERS
        PENNSYLVANIA and DELAWARE
            (800) 621-5689

---

Page 2

1 A P P E A R A N C E S :
2
3    Tighe, Cottrell & Logan, P.A.
     BY: ABIGAIL E. RODGERS, ESQUIRE
4    First Federal Plaza
     P.O. Box 1031
5    Wilmington, De 19899
     (302) 658-6400
6    Attorney for the Plaintiff
7
8    Reger, Rizzo, Kavulich & Darnall, LLP
     BY: CYNTHIA G. BEAM, ESQUIRE
9    1001 North Jefferson Street, Suite 202
     Wilmington, De 19801
10   (302) 652-3611
     Attorney for Defendant, Truck Tech Industries
11
12
     Goldfein and Joseph
13   BY: GARY H. KAPLAN, ESQUIRE
     222 Delaware Avenue, Suite 1110
14   Wilmington, De 19899
     (302) 656-3301
15   Attorney for Defendant, Tipco Technologies, Inc.
16
17   Zarwin, Baum, DeVito, Kaplan, Schaer, Toddy, P.C.
     BY: DEVON F. SNELL, ESQUIRE
18   1515 Market Street, Suite 1200
     Philadelphia, Pa 19102
19   (215) 569-2800
     Attorney for Defendant, Colony Insurance Company
20
21
22
23
24
25

---

Page 3

1                I N D E X
2
   WITNESS         PAGE
   DON CATHELL
3
4  BY MS. BEAM      4
5
6            E X H I B I T S
7  NUMBER      DESCRIPTION         PAGE
8  Cathell-1    Proposal dated 12/4/02    4
   Cathell-2    Invoice dated 8/7/03    4
9
   Cathell-3    Timeline dated 9/10/03    4
10
   Cathell-4    Color picture    4
11
   Cathell-5    Color picture    4
12
   Cathell-6    Color picture    4
13
   Cathell-7    Color picture    4
14
   Cathell-8    Color picture    4
15
   Cathell-9    Common policy declarations    124
16
   Cathell-10   Project summary report    127
17
   Cathell-11   Fax dated 2/24/04    130
18
   Cathell-12   Handwritten evidence transfer    130
19               Sheet
20 Cathell-13   Fax dated 2/19/04    130
21 Cathell-14   Letter dated 8/25/03    141
22 Cathell-15   List from Don's Hydraulics    145
23 Cathell-16   Letter dated 3/5/04    152
24 Cathell-17   Letter dated 3/24/04    158
25          (EXHIBITS CATHELL-4 THROUGH CATHELL-8 WERE
            RETAINED BY COUNSEL.)

---

Page 4

1        Documents marked for identification as
2   Cathell-1 through 3 and pictures Cathell-4 through
    8.)
3            - - -
4        DON CATHELL, having been duly sworn, was examined
5   and testified as follows:
6            - - -
7 BY MS. BEAM:
8   Q. Mr. Cathell, my name is Cynthia Beam. I
9   introduced myself earlier. I represent Truck Tech in
10  litigation that has been filed on behalf of Don's
11  Hydraulics, Inc. We're here to take your deposition
12  today.
13      I'm sure your counsel has explained to you what a
14  deposition is. We're going to ask you a series of
15  questions. I need you to respond to those verbally
16  because nods of the head and uh-huh and unh-unh isn't
17  going to come out on the transcript later, okay?
18      A. Yes.
19      Q. If you don't hear me, let me know because I
20  tend to trail off after a while. If you don't understand
21  a question, please let me know and I'll rephrase it,
22  okay?
23      A. Okay.
24      Q. All right. If you need a break at any time,
25  please let me know. This isn't an endurance test. This

---

1 (Pages 1 to 4)

DON CATHELL
May 26, 2005

Page 85

1    A.  Yes.
2    Q.  -- and gave it to one of the secretaries to
3  type --
4    A.  Yes.
5    Q.  -- it up for you?  When did you sit down and
6  write out in longhand the information that's contained in
7  what's been marked as exhibit number three?
8    A.  I don't recall the date.
9    Q.  Okay.  The first dated entry on Exhibit number
10  three is September 10 and 11th of 2003.  So it's safe to
11  assume that this wasn't made before September 10, 2003,
12  correct?
13    A.  Correct.
14    Q.  All right.  Why did you sit down and write out
15  the information that's contained in exhibit number three?
16    A.  On the advice of my attorney.
17    Q.  Okay.  And so this document that's been marked
18  as exhibit number three was not made until after you had
19  retained your present counsel; is that correct?
20    A.  Correct.
21    Q.  How long after the Fieldale Farms project did
22  you retain your counsel?
23    A.  I don't recall exactly.
24    Q.  Was it more than a year after the project had
25  concluded?

Page 86

1    A.  No.  Less than that.
2    Q.  And how long after you had retained your
3  counsel, did you sit down and write up what I'll refer to
4  as a diary?
5    A.  Very soon after that.
6    Q.  Okay.  Let's take a couple minutes and go
7  through the information that's contained on exhibit
8  number three.  It indicates that on September 10 and 11th
9  you travelled to Gainesville, Georgia.  Is that where
10  Fieldale Farms is located?
11    A.  Yes.
12    Q.  All right.  And you had indicated that
13  someone traveled with you.  Who was it; Al Collins?
14    A.  Yes.
15    Q.  How did you all travel to Gainesville?
16    A.  By car.
17    Q.  All right.  The next entry indicates that on
18  September 12th, you checked the installation of the
19  hydraulic power unit and welded external seam on the
20  reservoir.  What steps did you and/or Al Collins take to
21  check the installation of the hydraulic power unit?
22    A.  I checked to make sure the piping was being
23  connected properly; that the cooling systems were
24  installed properly, and that was it at that time.
25    Q.  Okay.  The piping system was being installed

Page 87

1  by an outside contractor, correct?
2    A.  Yes.
3    Q.  The piping system that's being installed by
4  this outside contractor, what part of the hydraulic power
5  unit that you had manufactured does that piping system
6  get hooked up to?
7    A.  This end of this pipe, that end of that pipe.
8  (Indicating.)  The backside of that, and the backside of
9  that one.
10    Q.  And can you describe for us the process by
11  which this piping system is connected to the hydraulic
12  power unit that you've manufactured?
13    A.  The fittings are welded to it.
14    Q.  Okay.  The cooling system that you just
15  indicated had to be installed also, is that something
16  that was done by the outside contractor?
17    A.  Yes.
18    Q.  To your knowledge, was it the same outside
19  contractor who installed the piping system?
20    A.  The same one.
21    Q.  Okay.  And this cooling system, is it
22  installed through more piping?
23    A.  Yes.
24    Q.  And where is the cooling system piping
25  attached to the hydraulic power unit?

Page 88

1    A.  (Indicating.)  Right there and right there.
2    Q.  So you've indicated on the top of the unit,
3  correct?
4    A.  Yes.
5    Q.  Would it be just on just one-half of the
6  unit --
7    A.  Yes.
8    Q.  -- or on -- okay.  And when you say you
9  checked to make sure the piping system and the cooling
10  system had been installed on to it, what did you do
11  specifically to check that it had been done properly?
12    A.  Visual.
13    Q.  Okay.  Now, when you indicated that you welded
14  the external seam on the reservoir, can you indicate for
15  me on one of these exhibits where the reservoir is?
16    A.  This is the reservoir.  (Indicating.)  The
17  entire unit.
18    Q.  The entire unit --
19    A.  Yes.
20    Q.  -- is the reservoir?
21    A.  Yes.
22    Q.  That would be both of the units put together?
23    A.  Yes.
24    Q.  All right.  So the welding the external seam
25  on the reservoir, is that the flange welding that you

22 (Pages 85 to 88)

DON CATHELL
May 26, 2005

| Page 89 |
|---|
| 1  were talking about? |
| 2    A. Yes. |
| 3    Q. Was that something that you or other Don's |
| 4  Hydraulics employees or subcontractors performed? Either |
| 5  you, Al or Greg was his name? |
| 6    A. Al, correct. Did the welding. |
| 7    Q. Al did the welding? |
| 8    A. Yes. |
| 9    Q. Okay. Now, you have an entry next on exhibit |
| 10  number three that on September 13, oil was pumped in the |
| 11  reservoir by Castrol at Atlanta, Georgia. How does that |
| 12  happen in Atlanta if you and the unit are in Gainesville |
| 13  the day before? |
| 14    A. It probably should read of not at. |
| 15    Q. Ahh, okay. |
| 16    A. They were out of Atlanta. |
| 17    Q. That makes a little more sense, all right. So |
| 18  Castrol brings in some kind of truck and fills up the |
| 19  reservoir? |
| 20    A. Correct. |
| 21    Q. All right. Pump cases were filled using |
| 22  approximately 15 gallons. What is a pump case and where |
| 23  are they at on this unit? |
| 24    A. (Indicating.) Disconnect this hose, this hose |
| 25  on each one. Pour the oil into the pump. |

| Page 90 |
|---|
| 1      MR. KAPLAN: Can you label that, sir, on |
| 2    the picture? And you're looking at photo number |
| 3    six. |
| 4      THE WITNESS: How do you want that labeled? |
| 5  BY MS. BEAM: |
| 6    Q. If you could just label where the pump cases |
| 7  would be. |
| 8    A. (Witness complies.) |
| 9    Q. Okay. Thank you. And filling the pump cases |
| 10  is done by disconnecting the case drain hoses; is that |
| 11  correct? |
| 12    A. Yes. |
| 13    Q. All right. Now, the filling of the pump |
| 14  cases, that was done by Castrol also? |
| 15    A. No, that was done by us, Don's Hydraulics. |
| 16    Q. Okay. And where did you get the -- is it oil |
| 17  that you're putting in the pump cases? |
| 18    A. Correct. |
| 19    Q. Where did you get the oil to put into the pump |
| 20  cases? |
| 21    A. It was supplied by Fieldale personnel. |
| 22    Q. Okay. Next entry indicates suction valves to |
| 23  pumps were opened. I'm assuming that's just your |
| 24  flipping something open on one of these valves, right? |
| 25    A. (Indicating.) There. |

| Page 91 |
|---|
| 1    Q. I see, okay. Before Mr. Kaplan asks, could |
| 2  you indicate on exhibit number five where the suction |
| 3  valves are please. |
| 4    A. (Witness complies.) |
| 5    Q. Thank you. And then the next entry states |
| 6  backed out all pressure compensators with all underlined |
| 7  which indicates that had some significance. So first of |
| 8  all, explain to me what you mean by backed out all |
| 9  pressure compensators and why you do that process? |
| 10    A. On variable volume pumps, you cannot initially |
| 11  start one under load without the possibility of tearing |
| 12  one up. You back out the pressure adjustment which is |
| 13  the pressure compensator so the pump starts under no |
| 14  load. No pressure. |
| 15    Q. How many pressure compensators are there in |
| 16  this hydraulic unit? |
| 17    A. Twenty. |
| 18    Q. So each pump has a pressure compensator? |
| 19    A. Yes. |
| 20    Q. All right. Was there a suggestion by someone |
| 21  after this incident that perhaps all of the pressure |
| 22  compensators had been backed out prior to each start up? |
| 23    A. No. |
| 24    Q. Had there been some thought process that you |
| 25  or some other Don's Hydraulics employee had that one or |

| Page 92 |
|---|
| 1  more of the pressure compensators hadn't been backed out |
| 2  and that's what caused the failure? |
| 3    A. No. |
| 4    Q. What is the significance of having the word |
| 5  "all" underlined in this entry? |
| 6    A. Just my own idea to do it, you know, just. |
| 7    Q. Okay. Is there anything unusual about that |
| 8  procedure of backing out all the pressure compensators at |
| 9  that point in the process? |
| 10    A. No. |
| 11    Q. Okay. So that's what was done Saturday. On |
| 12  Sunday, September the 14th, you have entered here, |
| 13  "Checked rotation on each pump unit." Could you explain |
| 14  to us what that means? |
| 15    A. A motor that is wired up on three phase can |
| 16  operate in either direction, either rotation. These |
| 17  pumps have to turn one certain direction. |
| 18      So they turn backwards, you have to change two |
| 19  wires on the electrical starter and that corrects it, so |
| 20  it'll operate in the right direction. |
| 21    Q. Do you know what rotation is going to be |
| 22  needed on this unit before it left your shop? |
| 23    A. Yes. |
| 24    Q. Okay. Is there a reason that it doesn't get |
| 25  checked until the Sunday after you're installing it? |

23 (Pages 89 to 92)

DON CATHELL
May 26, 2005

Page 93

```
 1      A.  It's impossible.
 2      Q.  Why?
 3      A.  Because you never know.  You got a 50/50
 4  chance of which way it runs when the electrician wires up
 5  the motors.
 6      Q.  So whose electrician would have wired up the
 7  motors?
 8      A.  Outside contractor.
 9      Q.  This would be the same outfit that's doing the
10  piping and cooling system?
11      A.  No.  It'd be an electrical contractor.
12      Q.  Is it a normal course of events when you
13  deliver a hydraulic power unit that an outside contractor
14  electrician has to come in and wire up your electric
15  motors?
16      A.  Either outside or in-plant.
17      Q.  Okay.  The next entry for September 14th
18  states, "Proceeded to start each unit one by one and set
19  the pressure at 900 PSI."  Explain to me what you mean by
20  that.
21      A.  To start one electric motor and then you set
22  the pressure compensator to your desired pressure that
23  you want which at this time was 900.
24      Q.  Okay.  So each unit is each --
25      A.  Pump.
```

Page 94

```
 1      Q.  -- pump and each motor and two pumps; is that
 2  how it goes?
 3      A.  Correct.
 4      Q.  So how many units all together were on this
 5  hydraulic power unit?
 6      A.  There's ten electric motors with tandem pumps.
 7      Q.  Okay.  So when you're talking about proceeded
 8  to start each unit, there's ten units; is that correct?
 9      A.  Correct.
10      Q.  All right.  How do you determine that the
11  pressure that you need is 900 PSI?
12      A.  It's not determined at that time that 900 is
13  what you need, but I knew it was lower than what I
14  needed.  So it's a safe starting point and then you
15  increase once you start the plant up according to what
16  you need.
17      Q.  Okay.  And how do you know how much pressure
18  you need when the plant gets up and running?
19      A.  When everything is operating satisfactorily,
20  capable of starting and stopping under the load they want
21  and at the speed they want.
22      Q.  So when you go down there and you're setting
23  this up to get ready to run on September 14th, have the
24  plant engineers already told you what the full PSI
25  they're going to need when the plant is up and running?
```

Page 95

```
 1      A.  Nobody knew.
 2      Q.  So how are you going to figure it out between
 3  Sunday and Monday when the thing is supposed to go
 4  online?
 5      A.  We start up on Sunday night and operate the
 6  equipment.
 7      Q.  So it's just hit and miss is how you figure
 8  out what your total pressure is you're going to need when
 9  your system is up and running?
10      A.  (No response.)
11      Q.  Are my questions making sense or if you want
12  to explain to me in a way that maybe us lawyers can
13  understand, that would be good.
14      A.  Normally, the equipment that was in this
15  plant, 1,000 PSI will operate all of it satisfactorily.
16      Q.  The old equipment?
17      A.  All.
18      Q.  All of it?
19      A.  (Nods head.)
20      Q.  All right.  So is that the number you were
21  assuming was going to be needed when you got this
22  hydraulic unit online?
23      A.  Yes.
24      Q.  Okay.  Did that turn out to be the pressure
25  that was needed?
```

Page 96

```
 1      A.  No.
 2      Q.  What turned out to be the pressure that was
 3  needed?
 4      A.  Six hundred.
 5      Q.  Six hundred?
 6      A.  (Nods head.)
 7      Q.  Okay.
 8          MR. KAPLAN:  Six hundred PSI, correct?
 9          THE WITNESS:  Six hundred PSI, yes.
10  BY MS. BEAM:
11      Q.  So you were expecting -- let me see if I
12  understand this.  You were expecting that the pressure
13  that you were going to need for your unit was somewhere
14  around 1,000 because that's what had been used in the
15  past to run all of the machinery in the plant?
16      A.  Not that particular plant.  I don't know what
17  pressure they were operating at.  At this time, I don't
18  recall.
19      Q.  Okay.  So you were going by your experience at
20  other poultry processing plants --
21      A.  Yes.
22      Q.  -- to come up with a number of 1,000?
23      A.  Yes.
24      Q.  All right.  Had you ever installed power units
25  in a poultry processing plant that was as large as the
```

24 (Pages 93 to 96)

DON CATHELL
May 26, 2005

Page 97

1  one at Fieldale Farms?
2      A.  Yes.
3      Q.  And on how many occasions, sir?
4      A.  Numerous.
5      Q.  Okay.
6      A.  I don't know.
7      Q.  So this is an average-size production at
8  Fieldale Farms?
9      A.  Yes.
10     Q.  Were the plant engineers available to you for
11 consultation over the weekend of September 13th and 14th
12 for installation of these units?
13     A.  Yes.
14     Q.  Did you take advantage of their availability
15 and consult with them in regards to the needed pressures
16 for running this system?
17     A.  No.
18     Q.  Okay.  Is there a reason you did not, sir?
19     A.  They wouldn't know.
20     Q.  They wouldn't know?
21     A.  No.
22     Q.  Well, would they know the pressures that were
23 needed to run the existing equipment?
24     A.  They knew what pressure they were operating at
25 prior with the old units.

Page 98

1      Q.  So I guess that takes me back to my question
2  before.  Is it sort of like an educated guess that you
3  use when you're trying to determine what pressure you
4  think you're going to have to run this new unit at?
5      A.  I have records or knowledge I guess of prior
6  experiences with all of this type of equipment in the
7  poultry plants that repeats and that's what I base all my
8  design on is the past experience.
9      Q.  Okay.  So when you set out to design a
10 hydraulic power unit, are you going to design it one way
11 if you're looking for say 1,000 PSI as opposed to if
12 you're looking for 600 PSI?
13     A.  No.  Be no difference.
14     Q.  Okay.  And you would anticipate using the same
15 equipment regardless of what PSI you're expecting to have
16 to run the unit at?
17     A.  The only change would be the electric motor
18 horsepower.
19     Q.  And why would you change the electric motor
20 horsepower?
21     A.  A higher pressure requires higher horsepower.
22     Q.  And is there a problem if you use a higher
23 horsepower motor for a lower pressure need?
24     A.  No problem.
25     Q.  Okay.  Going down to the next entry under

Page 99

1  September 14th, sir.  It says, "Maintenance personnel
2  opened all valves to the equipment in the processing
3  rooms."
4      I assume I know what that means but can you explain
5  to us for the record what that entry means?
6      A.  There are hand valves on the majority of the
7  equipment in the plant for maintenance purposes so they
8  can work on it and not shut the unit down which would
9  shut the entire plant down.
10     Those were all closed, so they went through
11 and opened all of them and made sure everything was
12 opened.
13     Q.  Okay.  And that process connects the plant to
14 your hydraulic unit?
15     A.  It was already connected in the piping.  They
16 just had to open the valves.
17     Q.  Okay.  The next entry states, "The pumps were
18 started one by one until we had six pump sets running."
19 So you had six out of the ten motors with the two pump
20 operating at that point, correct?
21     A.  Correct.
22     Q.  At that point, did you notice any problem at
23 all with the hoses or the unit at all?
24     A.  At that point, no.
25     Q.  The next entry states, "The equipment operated

Page 100

1  for one hour and then we turned off three pump sets,
2  leaving three pump sets running for the clean-up
3  operation."  What's the clean-up operation?
4      A.  The plant has a specified clean-up crew that
5  comes in which has to clean all the plant and make sure
6  it's sanitary for USDA inspection before start-up.
7      Q.  So the three pumps were so there's electricity
8  in the plant so they can get their job done?
9      A.  Not electricity because everything operates
10 hydraulically, so they had to have the system running so
11 they can run the equipment to clean it.
12     Q.  Okay.  And for how long did those three pumps
13 that you left running for the clean-up operation continue
14 running?
15     A.  All night.
16     Q.  Okay.  So you left and you and your people
17 left and the clean-up crew came in, correct?
18     A.  Yes.
19     Q.  All right.  You came back on September 15th
20 which is that Monday morning, correct?
21     A.  Yes.
22     Q.  Were the three pumps that you had left running
23 for the clean-up operation still operating when you went
24 back on Monday morning?
25     A.  Yes.

25 (Pages 97 to 100)

DON CATHELL
May 26, 2005

## Page 101

1    Q.  At that point, did you notice any problems
2  with the three pumps that had been running all night?
3    A.  No.
4    Q.  Can you tell us at this point which three
5  pumps on the unit had been running all night?
6    A.  No, I cannot.
7    Q.  Okay.  Is there a usual way which is to do the
8  first three?
9    A.  It may have been but I couldn't say for
10  certain so.
11    Q.  Would the plant have any kind of records that
12  would indicate something like that?
13    A.  I doubt it very much.
14    Q.  Okay.  Monday, September the 15th, your entry
15  on exhibit number three states, "Started four pump sets
16  to begin shift operation."  Now, is that four additional
17  pump sets in the addition to the three that were still
18  running?
19    A.  No.
20    Q.  So did you shut the other three down and start
21  four more or how did that happen?
22    A.  We just started one additional.
23    Q.  Gotcha, all right.  Next line states, "We
24  started operation pumps as needed to operate the plant
25  until we had eight sets of pump running."  So you just

## Page 102

1  started four more pumps at that point?
2    A.  One at a time.
3    Q.  And as you're -- tell me why it is that you'd
4  go one at a time; is there a specific reason?
5    A.  That whole design of this unit is to reduce
6  cost of mainly electric.  The more pumps you have
7  running, the larger the electric bill.
8        Less pumps, the lower the electric bill.  So
9  you don't want to run five pumps if two will do it.  You
10  generate excess heat and oil and lots of other problems
11  with it.
12    Q.  Okay.  So are the plant engineers in on this
13  process at this point with you?
14    A.  Yes.
15    Q.  Okay.  So you and your guys are starting the
16  pumps one by one and someone's in the plant reading
17  valves and telling you if it's enough power to do what
18  they need; is that what's going on?
19    A.  The maintenance supervisor worked with us
20  closely and as they started up -- they start up one line
21  at a time.  I think there's six, five or six lines in
22  that plant, but they don't start them all at once.
23        So as they started additional equipment and
24  they didn't operate, we started additional pumps to give
25  it more hydraulic flow.

## Page 103

1    Q.  Okay.  The next line reads, "With eight pump
2  sets operating, we could not achieve full speed on
3  several pieces of equipment.  By noon, we had lost two
4  pumps."  Okay.  So I guess my first question is when you
5  couldn't achieve full speed on two pieces of equipment,
6  did you then start the other two pumps?
7    A.  Correct.
8    Q.  All right.  And then by noon, you had lost two
9  pumps.  What do you mean you had lost two pumps?
10    A.  Two pumps had failed.
11    Q.  Probably an obvious answer, but when you said
12  they had failed, does the what; the motor just stops
13  working or?
14    A.  Pressure drops off.
15    Q.  Okay.
16    A.  Indicating no output.
17    Q.  I see.  And then just for completion, the next
18  line reads, "During the second shift, two more pumps
19  failed."  Which would mean you're down to six pumps at
20  that point, correct?
21    A.  Could you repeat that please?
22    Q.  I'm just reading the last line in your
23  September 15th entry.  "During the second shift, two more
24  pumps failed."  We're under September 15th.
25    A.  Oh, okay.

## Page 104

1    Q.  Okay?
2    A.  Um-hmm.
3    Q.  So by the end of Monday, September 15th, you
4  have four pumps out of ten that aren't working on this
5  unit; is that correct?
6    A.  Four out of 20.
7    Q.  Four out of 20.
8    A.  (Nods head.)
9    Q.  Which translates into two units out of ten
10  units that aren't working, correct?
11    A.  Yes.
12    Q.  All right.  At this point at the day,
13  September 15th, 2003, what if anything had you and your
14  employees determined was the problem in why these pumps
15  were failing?
16    A.  At first I thought it was the compensators and
17  I talked with the supplier, the pump supplier and he
18  suggested that we change them.  So he sent me two new
19  ones.
20        MR. KAPLAN:  By pump supplier, who do you
21  mean?
22        THE WITNESS:  Livingston Haven.  They
23  arrived the next day.
24  BY MS. BEAM:
25    Q.  Okay.  The compensator, is that a separate

26 (Pages 101 to 104)

DON CATHELL
May 26, 2005

Page 105

1 part of the pump or is that part integrated into the
2 pump?
3     A.  Integrated in the pump.
4     Q.  So if the compensator was bad, you had to
5 replace the whole pump; is that correct?
6     A.  No.  You can replace just the compensator.
7     Q.  So when you said the new ones arrived the next
8 day, it was two new compensators?
9     A.  Yes.
10    Q.  All right.  Why did you think it was the
11 compensator at first?
12    A.  Because I couldn't get any response out of
13 them.
14    Q.  So is the compensator part of the tandem
15 Rexroth variable volume pumps?
16    A.  Yes.
17    Q.  All right.  And you had obtained those ten
18 pumps from Livingston Haven, is it?
19    A.  Yes.
20    Q.  So what happens when you replaced the
21 compensators in two of the pumps?
22    A.  No change.
23    Q.  And then what did you do to determine what the
24 problem was?
25    A.  Remove the pumps and sent them to Livingston

Page 106

1 Haven.
2     Q.  So you removed the four out of the 20 pumps --
3     A.  Two of them.
4     Q.  -- that had failed?
5     A.  We took two.
6     Q.  Okay.  So you took two of the pumps and you
7 sent the whole pump assembly to Livingston Haven?
8     A.  Yes.
9     Q.  When was that done?
10    A.  (No response.)
11    Q.  Would that have been on the 6th -- well, let's
12 see.
13    A.  I think it was on Tuesday; I'm not sure.
14    Q.  Okay.  And what was the purpose or what were
15 you hoping to achieve by sending two of the pumps back to
16 Livingston Haven?
17    A.  Find out what the problem was.
18    Q.  Okay.  And when did you next communicate with
19 Livingston Haven about the pumps?
20    A.  The same day.
21    Q.  And what did they tell you?
22    A.  The pumps were disintegrated internally.
23    Q.  What does that mean?
24    A.  Ground up.  Fine pieces of metal is the only
25 thing that was left.

Page 107

1     Q.  Okay.
2     A.  Non-repairable.
3     Q.  All right.  In your years of experience
4 building hydraulic power units, had you ever encountered
5 a pump that was destroyed internally like that?
6     A.  Yes.
7     Q.  And in your experience, what have you found to
8 be the cause of that?
9     A.  Majority of the time, it's sucking air into
10 the pump.
11    Q.  Okay.  How about the minority of times?  What
12 could be the other causes?
13    A.  Foreign material.
14    Q.  Foreign material?
15    A.  (Nods head.)  Starting up dry instead of
16 filling the case would do the same thing.
17    Q.  Okay.  So after you communicated with
18 Livingston Haven and they told you that the two pumps
19 were disintegrated internally, what did you do next?
20    A.  Authorized them to rebuild them.
21    Q.  Okay.
22    A.  Using new parts out of other pumps they had in
23 stock.
24    Q.  All right.  And I'm assuming they did that?
25    A.  Yes.

Page 108

1     Q.  And sent them back to you?
2     A.  Yes.
3     Q.  All right.  So after you get these two new
4 pumps back, what do you do?
5     A.  Reinstalled them on the unit.
6     Q.  All right.  Now, were you still trying to run
7 the unit while these two pumps had been shipped off to
8 Livingston Haven?
9     A.  Had to.
10    Q.  All right.  And there's an entry under
11 September 16th which would be Tuesday, when you had sent
12 the pumps back to Livingston and Haven, and the first
13 sentence states, "We decided to use elastic tape and tape
14 both ends of all 20 hoses."
15    Q.  First of all, whose we in the "we decided"?
16    A.  Myself and the plant maintenance supervisor
17 and the general manager.
18    Q.  What was the plant maintenance supervisor's
19 name?
20    A.  Oh.
21    Q.  Would it be either --
22    A.  -- Egbert.
23    Q.  Egbert, okay.  Is that his first name or last
24 name?
25    A.  First.

27 (Pages 105 to 108)

KARASCH & ASSOCIATES
800-621-5689

Page 109

1    Q.  Okay.
2    A.  I don't remember his last name right now.
3    Q.  How about the general manager, do you remember
4  his name?
5    A.  Claude Sullens.
6    Q.  Claude S --
7    A.  -- S-U-L-L-E-N-S.  Martin.  That's that kid's
8  last name.  I'm sorry.
9    Q.  Okay.  Thank you.  In your next sentence under
10 September 16th, "This step decreased the rate of pump
11 loss enough that we were able to maintain partial
12 production by shutting down some lines and sending the
13 employees home."
14    At this point, were the other eight units still
15 running?
16    A.  Yes.
17    Q.  All right.  Maybe I'm confused, but when the
18 two units out of the ten had failed, the other eight
19 units were still running, correct?
20    A.  Yes.
21    Q.  All right.  So you sent the two units, pumps
22 back off to Livingston Haven for them to check it out,
23 right?
24    A.  Yes.
25    Q.  The other eight units were still running?

Page 110

1    A.  Yes.
2    Q.  Okay.  Was it because you needed all ten units
3  to provide enough power that you weren't getting the job
4  done?
5    A.  As the pump's starting to fail, the pressure
6  starts dropping, and if the pressure dropped, I had to
7  increase more pumps while I'm running until I had
8  everything running that was left to run.  And it kept
9  dropping.
10    Q.  So the eight units that were left running, the
11 eight pumps that were left --
12    A.  Yes.
13    Q.  -- were the 16 pumps that were left, were
14 losing pressure --
15    A.  Yes.
16    Q.  -- as this process is going on?
17    A.  Yes.
18    Q.  All right.  And how is it that you can tell
19 that they're losing pressure as the process goes on?
20    A.  Reading the gauge.
21    Q.  Okay.  So what happened after you taped up the
22 ends of the hoses with the elastic tape?
23    A.  It increased.  Gave us enough time to get
24 through the weekend so we could change the pumps out
25 without having to shut the plant down entirely.

Page 111

1    Q.  Okay.  Your next line reads, "By Friday
2  evening, had finalized all arrangements to have 20 new
3  suction hoses and 20 new pumps flown in"; is that
4  correct?
5    A.  Yes.
6    Q.  All right.  So Wednesday and Thursday the
7  plant was running on the eight units that you had
8  provided?
9    A.  Yes.
10    Q.  Okay.  The 20 new pumps came from where, sir?
11    A.  Bensalem, Pennsylvania.  I mean, I'm sorry.
12 Bethlehem, Pennsylvania.
13    Q.  Is that where Livingston Haven is?
14    A.  No.
15    Q.  Who did you get --
16    A.  -- Rexroth.  They went through Livingston
17 Haven but they're Rexroth's warehouse is in Pennsylvania.
18    Q.  Okay.  So you got new Rexroth pumps but they
19 came through Livingston Haven?
20    A.  They are the distributor.
21    Q.  I see, okay.  At that point, what made you
22 think you needed all new pumps?
23    A.  Majority of them had failed.
24    Q.  When had that happened?
25    A.  Continuously from Monday.

Page 112

1    Q.  And Livingston Haven had rebuilt the two pumps
2  that you had sent them initially?
3    A.  (Nods head.)
4    Q.  Did they ever send those rebuilt pumps back to
5  you?
6    A.  Yes.
7    Q.  All right.  So then you only needed eight more
8  new pumps; is that correct?
9    A.  (Shakes head.)
10    Q.  No?  How come?
11    A.  We destroyed them too.
12    Q.  Okay.  Where did you get the new suction hoses
13 from?
14    A.  They were manufactured in Texas and shipped to
15 me next-day air.
16    Q.  How did you find the company to order the
17 hoses through?
18    A.  From Rob's Hydraulics.
19    Q.  And had you had a prior relationship with
20 Rob's Hydraulics?
21    A.  My son-in-law.
22    Q.  Rob's your son-in-law?
23    A.  (Nods head.)
24    Q.  Is that yes?
25    A.  He bought the business from me.

28 (Pages 109 to 112)

# Don's Hydraulics, Inc.

25029 Dupont Hwy Unit 1 Georgetown DE 19947
Phone # (302)856-4545 . Fax # (302)856-1874

|  |  |
|---|---|
| Wed. & Thur. | A. Sept.10th & 11- Travel to Gainsville, Ga.. |
| Friday | B. Sept 12th. Checked the installation of the hyd. powerunit. Welded external seam on Resevoir. |
| Sat. | C. Sept.13th.Oil was pumped in Resevoir by Castrol at Atlanta, Ga. Pump cases were filled using approximately 15 gallons. Suction valves to pumps were opened. Backed out All pressure compensators. |
| Sun. | D. Sept 14th. Checked rotation on each pump unit. Proceeded to start each unit one by one and set the pressure at 900 PSI. Maintenance personnel opened all valves to the equipment in the processing rooms. The pumps were started one by one until we had six pump sets running. The equipment operated for one hour then we turned off three pump sets leaving three pump sets running for the clean up operation. |
| Mon. | E. Sept 15th. Started four pump sets to begin shift operation. We started operation pumps as needed to operate the plant until we had eight sets of pumps running. With eight pump sets operating we could not achieve full speed on several pieces of equipment. By noon we had lost Two pumps. During the second shift two more pumps failed. |
| Tues. | F. Sept 16th. We decided to use and elastic Tape and Tape both ends of all twenty hoses. This step decreased the rate of pump loss enough that we were able to maintain partial production by shutting down some lines and sending the employees home. |
|  | G. By Friday evening I had finalized all arrangements to have twenty new suction hoses and twenty new pumps flown in. I had also contacted COT-PuriTech to clean the oil in the system and the Resevoir. |
|  | H. On 9/21/03 (Sunday) 4:00 A.M.. The general manager of the plant released the plant to us and COT to begin work. I had three additional people from Rob's Hydraulics Inc. come in from Grimesland, N.C. giving me a total of six men. We changed the twenty hoses and pumps while COT cleaned the oil. We completed our work at 1:00P.M. and COT completed their work At 3:00P.M.. Start up was done under the supervision of a manager from Livingston and Haven. |

C-33

EXHIBIT

Cathell-3
5/26/05    JH4

I.  With the same manager on site at 6:00A.M. on 9/22/03 we started four pumps on line. The fifth was started as needed also the sixth. With six pump sets operating the plant was operating at full production and much better and more efficient than the start up with eight pump sets in the beginning. This was additional proof that the hoses were defective allowing the pumps to suck air.

J.  I released the three personnel of Rob's Hydraulics Inc. the afternoon of 9/22/03 and we left on 9/24/03 to return to Delaware.