**IN THE UNITED STATES DISTRICT COURT**

**FOR THE DISTRICT OF DELAWARE**

| | | |
|---|---|---|
| DON'S HYDRAULICS, INC., | ) | |
| | ) | |
| Plaintiff, | ) | C.A. No.: 04-1275 (KAJ) |
| | ) | |
| v. | ) | |
| | ) | |
| COLONY INSURANCE COMPANY, | ) | |
| TRUCK TECH INDUSTRIES, INC., | ) | |
| and TIPCO TECHNOLOGIES, INC., | ) | |
| | ) | |
| Defendant. | ) | |

**TRUCK TECH INDUSTRIES, INC.'S OPENING BRIEF
IN SUPPORT OF ITS MOTION FOR SUMMARY JUDGMENT**

**REGER RIZZO KAVULICH & DARNALL LLP**

**CYNTHIA G. BEAM, ESQUIRE**
**Delaware State Bar I.D. No. 2565**
**1001 Jefferson Plaza, Suite 202**
**Wilmington, DE 19899**
**(302) 652-3611**
**Attorney for Defendant**
**Truck Tech Industries, Inc.**

Dated:   October 3, 20005

# TABLE OF CONTENTS

**PAGE(S)**

**TABLE OF CITATIONS**................................................................................... ii

**NATURE AND STAGE OF THE PROCEEDINGS**.................................................... 1

**SUMMARY OF ARGUMENTS**........................................................................... 2

**STATEMENT OF FACTS**................................................................................. 3

**ARGUMENTS**............................................................................................... 14

    **I.**    **PLAINTIFF DID NOT RELY UPON TRUCK TECH INDUSTRIES' EXPERTISE OR JUDGMENT IN SELECTION OF THE SUBJECT HOSES, THEREFORE, PLAINTIFF'S CLAIM FOR BREACH OF IMPLIED WARRANTY OF FITNESS FOR A PARTICULAR PURPOSE MUST BE DISMISSED**........................................................... 14

    **II.**    **THE FACTUAL RECORD DOES NOT SUPPORT A CLAIM THAT THERE WAS AN EXPRESS WARRANTY REGARDING THE HOSES, THEREFORE, THE CLAIM OF BREACH OF EXPRESS WARRANTY FOR FAILURE TO CONFORM TO SPECIFICATION MUST BE DISMISSED**.............................................................. 15

    **III.**    **NOTHING IN THE FACTUAL RECORD SUPPORTS THE ALLEGATION OF A VIOLATION OF 6 *Del C*. §2532 AND, THEREFORE, THAT CLAIM MUST BE DISMISSED**........................ 16

    **IV.**    **PLAINTIFF HAS FAILED TO PROVE THE PROXIMATE CAUSE OF THE FAILURE OF THE HYDRAULIC POWER UNIT AND THUS THE CLAIM OF BREACH OF IMPLIED WARRANTY OF MERCHANTABILITY MUST ALSO FAIL**............................................ 17

        **A.**    **Since Purchaser Don's Hydraulics Knew of the Danger of the Product as Specifically Ordered by Purchaser, No Implied Warranty of Merchantability Arises**............................................. 17

        **B.**    **The Economic Loss for Which Recovery is Sought Were Not the Proximate Result of the Alleged Breach of Warranty**.......... 18

**CONCLUSION**.............................................................................................. 19

i

<u>**TABLE OF CITATIONS**</u>

<u>**CASES**</u>                                                                                          <u>**PAGE(S)**</u>

*Falcon Tankers, Inc. v. Litton Sys*., 300 A.2d 231 (1972)................................................   17

*Grand Ventures, Inc. v. Whaley*, Del. Super. 623 A.2d 63 (1993).................................   16

In re Asbestos Litigation (Merganthaler), 542 A.2d 1205, 1214, (Del. Super. 1986)......   17

*Scheibe v. Fort James Corp.*, 276 F.2d 246, (Dist. Del. 2003)......................................   14, 17

<u>**STATUTES**</u>

6 *Del. C.* §2-315..........................................................................................................   14

6 *Del. C.* §2532..........................................................................................................  1, 2, 16, 19

ii

## **NATURE AND STAGE OF THE PROCEEDING**

Don's Hydraulics, Inc. has filed a claim against its insurer Colony Insurance Company and also against hose distributor Truck Tech Industries, Inc. and against hose manufacturer Tipco Technologies, Inc. seeking to recover damages for the purchase of allegedly defective industrial suction hoses which were used in the manufacture of a large hydraulic power unit which was subsequently installed in a poultry processing plant in Georgia, Fieldale Farms. The hydraulic power unit malfunctioned upon start-up, and Plaintiff has sued alleging defective suction hoses caused the power unit to fail. This is Defendant Truck Tech Industries' Opening Brief in Support of Its Motion for Summary Judgment against Plaintiff's claims of breach of express warranty to conform to specifications, breach of implied warranty of fitness for a particular purpose and for violation of 6 *Del. C.* §2532 and breach of implied warranty of merchantability.

## SUMMARY OF ARGUMENT

I.    PLAINTIFF DID NOT RELY UPON TRUCK TECH INDUSTRIES'
      EXPERTISE OR JUDGMENT IN SELECTION OF THE SUBJECT HOSES,
      THEREFORE, PLAINTIFF'S CLAIM OF A BREACH OF IMPLIED
      WARRANTY OF FITNESS FOR A PARTICULAR PURPOSE MUST BE
      DISMISSED.

II.   THE FACTUAL RECORD DOES NOT SUPPORT THE CLAIM THAT THERE
      WAS AN EXPRESS WARRANTY REGARDING THE HOSES, THEREFORE,
      THE CLAIM OF BREACH OF EXPRESS WARRANTY FOR FAILURE TO
      CONFORM TO SPECIFICATION MUST BE DISMISSED.

III.  NOTHING IN THE FACTUAL RECORD SUPPORTS THE ALLEGATION OF
      A VIOLATION OF 6 *Del C.* §2532 AND, THEREFORE, THAT CLAIM MUST
      BE DISMISSED.

IV.   PLAINTIFF HAS FAILED TO PROVE THE PROXIMATE CAUSE OF THE
      FAILURE OF THE HYDRAULIC POWER UNIT AND THUS THE CLAIM OF
      BREACH OF IMPLIED WARRANTY OF MERCHANTABILITY MUST ALSO
      FAIL.

      A.    Since Purchaser Don's Hydraulics Knew of the Danger of the Product as
            Specifically Ordered by Purchaser, No Implied Warranty of
            Merchantability Arises.

      B.    The Economic Loss for Which Recovery is Sought Were Not the Proximate
            Result of the Alleged Breach of Warranty.

## STATEMENT OF FACTS

Plaintiff Don's Hydraulics is a designer, manufacturer and installer of hydraulic power units based out of southern Delaware. The principal in Don's Hydraulics is owner Don Cathell who was deposed at length in this matter. Don's Hydraulics is a small shop consisting of Mr. Cathell, his son, Delmar Cathell, and two or three other employees. Don Cathell has owned Don's Hydraulics for over 20 years. Prior to that, his knowledge in regards to designing and building hydraulic power units comes from hands on experience from his previous employer. Don's Hydraulics' base business is designing, manufacturing and installing small hydraulic power units mainly for poultry plants and the logging industry. Exhibit "A", Vol. I, pages 6-8. This unit that Don Cathell designed and built for Fieldale Farms is by far the largest hydraulic power unit he has built in his career. Exhibit "A", Vol. II, page 55. The most common size of the hydraulic power units that Mr. Cathell and Don's Hydraulics is experienced with is a 200 horse power output hydraulic power unit. The unit built for Fieldale Farms was a 1000 horsepower unit. Exhibit "A", Vol. II, pages 56-57.

In December of 2002, Don Cathell was contacted by an engineer at Fieldale Farms and was told that the plant was in the process of accepting bids for the addition of a large hydraulic power unit for the poultry plant. Don Cathell submitted bids to Fieldale Farms on December 14, 2002 and again on May 5, 2003. In May of 2003, he learned that he had won the bid for this project at Fieldale Farms. Exhibit "A", pages 25-28. In the process of submitting his original bid to Fieldale Farms, Don Cathell and his son Delmar Cathell made contact with their normal suppliers to get quotes so that they could price out their bid proposal for Fieldale Farms. During this time period, Don's Hydraulics contacted Truck Tech Industries (hereinafter "TTI") to obtain a proposal for 20 industrial hoses which were to be 2 ½ inches in diameter with threaded male ends and 37 degree swivel JIC female ends. Exhibit "A", pages 44-47. Additionally, the specifications provided by Don Cathell for these hydraulic suction hoses was that the fittings had to be crimped onto the ends of the hydraulic hose instead of the fittings being affixed by the process banded or

3

swaged.   Exhibit "A", page 48.

The assembly of industrial hoses calls for the rubber hose, with wire coiled inside the hose for strength, to have affixed to the ends fittings so that the hose can be attached to the machinery. The most common way for these fittings to be attached to the hose ends, especially if the hose is 2 inches in diameter or less, is by a process called crimping.  One would take the filling, put it over the end of the hose and put the stem of the fitting in a crimping machine.  A certain pressure setting is entered into the crimping machine which then squeezes the metal onto the hose, causing the fitting to seal to the hose.  Exhibit "A", pages 65-66.

Certain applications in the industrial hose industry call for the fittings to be affixed by a method called banding, in which metal slips are tightened around the stem and the hose and the band itself is tightened until the stem is sealed with the hose.  Exhibit "B" Swain deposition, pages 48-50; 120-121.

Don's Hydraulics is also a manufacturer of industrial hoses.  However, the machinery that Don's Hydraulics owned needed to affix the fittings onto the ends of the hoses would only accommodate hoses up to the diameter of 2 inches.  Don's Hydraulics had an ongoing relationship with TTI.  Don's Hydraulics has purchased hoses from TTI since the Fieldale Farms project also. Exhibit "A", pages 9-13.  TTI can also manufacture or assemble industrial hoses, but only up to hoses which are 2 inches in diameter.  Exhibit "B", Swain deposition, pages 160-161.

Don Cathell provided and designed the suction hose specifications which are at issue in this matter.   Mr. Cathell acknowledged that he had very limited experience in designing and installing applications which required use of hoses larger than 2 inch diameter.  Exhibit "A", pages 12-13.  Additionally, Sean Swain of TTI had informed Don's Hydraulics that he was having difficulty procuring the specific JIC swivel head female fittings that the Plaintiff had specified. Exhibit "A", pages 52-53.

Don Cathell specifically testified that when he placed his proposed order with Sean Swain of TTI, he was not relying upon Sean Swain's or anyone other employee of TTI's expertise or

skill in choosing what type of hoses would be used.  Exhibit "A", Vol. II, pages 91; 114.

Likewise, Sean Swain testified that he never offered any advice or suggestions regarding the

design specifications of the hoses at issue in this matter.  Exhibit "B, pages 21-22; 57.  Mr. Swain

did at one point in the order process relayed to Don' Hydraulics that the manufacturer, Tipco,

recommended that the photos did apply by a process caused banding rather than crimping.

Exhibit "B", pages 122-128.  Don's Hydraulics summarily refused to entertain the suggestion of

the manufacturer in regards to the hose specifications and insisted that the fittings be applied with

the crimping method.  Exhibit "A", Vol. I, pages 53-54; Volume II, pages 82-83.  Don Cathell

never even considered the manufacture's recommendation because in his opinion from twenty

years of building power units, banding of any method should not be used on suction hoses.

Exhibit "A", Vol. II, page 84.

Don Cathell placed the order for the 20 hoses with TTI on August 7, 2003.  Mr. Cathell

usually only allowed a one week turn around time on the hoses.  Exhibit "A", Vol. I, pages 38 and

46.  Exhibit "C", Invoice for hoses.

Mr. Swain placed the order for the initial ten hoses for Don's Hydraulics with Tipco after

he went to Don's shop with two sample fittings he acquired from Tipco and Don Cathell gave

Sean Swain the hose measurements for the first ten hoses for the one half of the power unit that

was assembled.  Exhibit "A", Vol. I, pages 50-52.  Five of the original hoses of that set of ten

were too short for the application of the hydraulic unit and the other five hoses of that original set

of ten were rejected by Plaintiff because the stems or fittings were turning inside of the hoses.

The entire order of ten was taken by Sean Swain back to Tipco.  Exhibit "A", Vol. I, pages 55-58,

62.  Tipco was given the new hose lengths to replace the five short lengths and was told that there

was a problem with the other five hoses being returned.  Tipco had already been informed by Mr.

Swain that the hoses were to be used as oil suction drainage hoses on a large hydraulic unit.  Mr

Swain now relayed to Tipco that the customer was requesting proof that the hoses had been tested.

Exhibit "B", pages 40-44; 102-106.  See also Exhibit "D", letter from Swain to Tipco.  The order

5

of ten hoses was picked up by Mr. Swain and delivered to Don's Hydraulics and the necessary measurements for the second batch of ten hoses was supplied to Mr. Swain by Don's Hydraulics. Exhibit "A", Vol. I, pages 59-61. That information was relayed to Tipco by TTI and the second set of ten hoses was delivered to Don's Hydraulics by Sean Swain. The second set of hoses was rejected when one of the Don's Hydraulics' employees noticed one of the hoses was turning in its stem while attempting to install it on the hydraulic unit. Again, Mr. Swain took the ten hoses, returned them to Tipco with the insistence that the hoses be tested. Exhibit "A", Vol. I, page 62. Exhibit "B", pages 102-106. The ten hoses were supplied again by Tipco. Mr. Swain took them to Don's Hydraulics. Mr. Swain then received a telephone call at a later time stating that one of the ferrules or fitting ends was cracked. Exhibit "B:, pages 46-47. Mr. Swain picked that hose up, returned it to Tipco's shop in Salisbury, Maryland, and waited while the hose was fixed. Mr. Swain returned that hose to Don's Hydraulics for installation on the unit. Exhibit "B", pages 52-54.

At the time that Mr. Swain returned to Don's Hydraulics with the first set of ten hoses, the five replacement length hoses and replacement for the five original hoses that had been rejected by Plaintiff, he relayed to Don's Hydraulics that Tipco Technologies was the manufacturer or assembler of the suction hoses. Exhibit "A", page 60. Sean Swain also relayed to Don's Hydraulics that Tipco's fabrication shop had assured him that the hoses were being tested to 150 PSI. Exhibit "B", pages 40-45. See also memo of Tipco employee Tim Bombick attached as Exhibit "E". See also letter from Tipco President attached as Exhibit "F".

Don's Hydraulics accepted the last set of hoses with the exception of the one cracked ferrule and applied those to the hydraulic unit in August of 2003. Don's Hydraulics accepted the remaining hose, applied it to the hydraulic unit, and then arranged to have the hydraulic unit shipped via flat bed truck to the poultry plant in Georgia for assembly and installation. Exhibit "A", Vol. I, page 63. See also photos of the hydraulic power unit attached to Cathell deposition and hereto as Exhibit "G".

Don Cathell does not recall requesting that the hoses be tested nor did he discuss with Sean Swain how the hoses were being fixed. Mr. Cathell assumed the hoses were being re-crimped because the crimping indentations did not match up exactly when he would receive the hoses back from Tipco. Also, Mr. Cathell testified that if he were assembling the hoses, that is how he would correct the problem of the stems turning inside the hoses. Exhibit "A", Vol. I, pages 64, 68-69; 75.

Don Cathell noticed no indication of a problem with any of the 20 hoses when they ultimately were applied to the unit. Don's Hydraulics performed no testing on the hoses nor any part of this unit even though it was the first time in his career he had ever built a hydraulic power unit this large. Exhibit "A", Vol. I, pages 76-77. Mr. Cathell testified that he had never in his career tested a hose which he assembled or bought from a vendor. Exhibit "A", Vol. I page 89. Further, Mr. Cathell acknowledged that it is common practice in his field for a distributor not to name the manufacturers, because the distributor does not want to lose a customer. Mr. Cathell knew TTI was not assembling the hose but never asked TTI who the manufacturer was until his problems at Fieldale Farms. Exhibit "A", Vol. II, pages 63-64.

The quote that was prepared by Don Cathell and sent to Fieldale Farms included a central hydraulic system designed to operate the five production lines that were presently operating as well as some additional equipment. In Mr. Cathell's bid, he included the language, "This hydraulic power unit will not solve your problems alone. The piping changes I stated in my report must be done to complete the task satisfactorily. Exhibit "A", Vol. I, page 30. Report of Don Cathell attached hereto as Exhibit "H". Mr. Cathell testified that other than the power unit, Fieldale Farms needed to install all new hydraulic piping, all new hydraulic oil, new electrical service, and the labor to install all of these things in order to solve their problems. Fieldale Farms contracted with another outside contractor to provide thousands of feet of additional hydraulic piping, additional hydraulic oil, and also the electrical hook up for the power unit motors. The

7

piping in the plant had to be changed due to the volume of oil that this hydraulic unit would pump in relation to the smaller pumps that were presently in the plant. Exhibit "A", Vol. I, pages 30-35.

Once the hydraulic power unit was loaded on to the two flat bed trucks, Don Cathell and two employees went to Fieldale Farms. When they arrived, the two halves of the power unit had already been taken off of the flat beds and were sitting in the room ready to be bolted and welded together. Back in Georgetown, Delaware, Al Collins had welded hundreds of pieces of metal together to make the reservoir. The reservoir had to be cleaned of any slag or metal left behind by the welding process and as well as any other debris. Any debris left inside the reservoir would destroy the pumps. Exhibit "A", Volume II, pages 44-48. However, because of how large the reservoir is and because of the baffle design, no one could get all the way into the reservoir to clean it. Don's employees just reached in as far as they could to clean it by hand and used a vacuum without really being able to see what was inside the reservoir. Exhibit "A", Vol. II, pages 67-69. The installation and hook up process of the new hydraulic piping system to the actual hydraulic power unit had already begun by the other outside contractor. Exhibit "A", Vol. I, pages 40-44. The morning of September 12, 2003, Mr. Cathell checked the installation visually of the hydraulic power unit and Al Collins welded the external seam on the reservoir. On September 13, 2003, oil was pumped into the reservoir by Castrol of Atlanta, Georgia. The oil was not filtered as it went from the tanker to the reservoir. Exhibit "A", Vol. I, page 42. The pump cases of the motors were filled using approximately 15 gallons of oil which was supplied by Fieldale Farms employees. On that same date, the suction valves to the pumps were opened. Mr. Cathell testified that also on that day, he "backed out all pressure compensators on the pumps". The following day, September 14, 2003, the rotation on each pump unit was checked after the electricians had wired the motors to make sure that all of the rotors were turning in the same direction. Six pump sets which equals twelve pumps were started on September 14, 2003 with no problem. Three of those pump sets ran all night long with no problem. Fieldale Farm maintenance personnel opened all the valves to the equipment in the processing rooms that were

already attached to new hydraulic piping. The equipment operated for one and a half hours and then it turned off three of the pump. The three pump sets were left running for a clean up operation that continued all night into the next morning. Fieldale Farms had a clean up crew that worked the overnight shift to clean the plant machinery to make sure it was sanitary for the USDA requirements. The next day, an additional pump set was started to start one of the processing lines of the plant. It was not until they continued to add equipment lines at the factory and with eight pump sets operating that the system could not achieve full speed. By the end of the day, Monday, September 15, 2003, two of the pump units out of the ten on the hydraulic power unit were not working. Exhibit "A", Vol. I, pages 86-104.

Don Cathell testified that the pump distributor inspected the two pumps and they were "disintegrated internally". He had, during his career, seen pumps disintegrated internally on prior occasions and that three causes that he knew of that would cause that kind of disintegration of a pump were: sucking air, foreign material, or not enough oil volume. Mr. Cathell continued to run the power unit until the following weekend and then changed all the pumps. Meanwhile, a company called COT-Puritech was contacted to drain the hydraulic system and to clean the oil to factory specs or beyond. Exhibit "A", Vol. I, pages 105-115. COT-Puritech drained and filtered the oil from the system and cleaned the reservoir of the hydraulic power unit. They prepared a report after analyzing the oil that was present in the unit. A copy of that report is attached hereto as Exhibit "I". Debris in the form of metal bits and paper was found present in the oil and the system. Metal particles were found throughout the system including the pump suction strainers and the reservoir. The report describes "moderate amounts of metal and some paper removed from the system's oil supply and reservoir". Exhibit "I".

After his return from Georgia, Don Cathell contacted his carrier, Colony Insurance Company, to report his business loss. Colony in turn retained SEA to perform tests upon the hoses which Mr. Cathell alleges were defective. Thomas Butler, Ph.D. of SEA had visited Don's Hydraulics once in November 2003, and Mr. Cathell had opened the boxes containing the pumps

9

that had been taken off of the unit. Mr. Cathell testified that Dr. Butler did a cursory visual inspection of the pumps. Mr. Cathell also relinquished custody of four of the hoses which purportedly failed in the initial start up of the hydraulic unit. Exhibit "J". Butler deposition, pages 14; 19; 25-27. At some point later, Mr. Cathell was contacted by Dr. Butler's associate Anthony Cornetto stating that he had no way to test the hoses at SEA and asked him if he could have the hoses tested at Don's facility.

Don Cathell testified that Mr. Cornetto brought the four hoses back Don's Hydraulics on February 24, 2004 and that Don Cathell was the one who actually tested the hoses by pressure testing. Mr. Cornetto observed the testing that was performed by Mr. Cathell. Exhibit "A", Vol. I, pages 130-136.

Colony Insurance Company retained SEA Consultants to test four of the hydraulic suction hoses at issue in this matter. Thomas Butler, Ph.D. was initially assigned to this matter and on November 24, 2003, Dr. Butler traveled to Don's Hydraulics, Inc. in Georgetown, Delaware to perform a cursory visual inspection of the hydraulic pumps which were contained in three separate cartons, spoke to Mr. Cathell about the hydraulic power unit failure, and took possession of the four hydraulic suction hoses that were at the Don's Hydraulics' warehouse. Exhibit "J", deposition of Thomas Butler, Ph.D., pages 14-27. Dr. Butler confirmed several times during his deposition testimony that he was only asked to check whether the subject hoses showed a leak. Dr. Butler started with the assumption the pumps failed because of a hose leak and was asked by Colony Insurance Company whether the hoses in Don's possession were leaking. Exhibit "J", pages 61, 75. Dr. Butler did not perform the testing, rather, he sent his associate, Anthony Cornetto, back to Don's Hydraulics shop in February of 2004 to perform testing on the hoses at Don's Hydraulics because SEA did not have the equipment to pressure test hoses of a 2 ½ inch diameter size. Mr. Cornetto had never tested industrial hoses before that day and actually Don Cathell did the testing and Mr. Cornetto observed. Deposition of Anthony Cornetto, Exhibit "K", pages 4-41. Mr. Cornetto also verified that he was asked to perform testing on the hoses and was

10

not asked to research other possible causes of failures in hydraulic pump systems.  Mr. Cornetto agreed that his task was to ascertain whether there was a leak in the hose, and he was not asked to ascertain what caused the leaks in the hose, nor was he asked to ascertain other causes of the pump failure other than a leak in the hose.  Exhibit "K".  Cornetto deposition, pages 53, 54, 60, 63.  Even though Mr. Cornetto believed that SEA was asked to determine the cause of the pump failure, he acknowledged that no one at SEA took other steps to determine the cause of the pump failure other than determining whether there was a leak in the subject hoses.

As far as an inspection of the pumps is concerned, Dr. Butler admits that he started with the assumption that the pumps did not function properly due to the air leak because that is what Mr. Cathell at Don's Hydraulics had told him.  To verify the pumps were not functioning properly, he did nothing but look at them.  Exhibit "J".  Butler deposition, pages 14-15; 25-27; 66; 69-70.  He did not disassemble the pumps, nor did her perform any testing on the pumps.  Dr. Butler attempts to make a correlation between some "scoring" that he states were on a "plate" of one of the two pumps that were disassembled that he took photos of, however, there is no verbal description of that scoring in his report, nor is there any discussion in his report between this alleged nexus of a leaking suction hose and "plate scoring".  Exhibit "J", page 15.

Dr. Butler purports that the basis of his opinion that the appearance of one of the pumps that he saw at Don's Hydraulics failed "because of a suction hose leak was his investigation of checking the manufacturer instructions and his general background and machinery over the years".  Exhibit J, page 67.  However, when Dr. Butler was asked to describe what parts of the pump were showing the scoring that he was of the opinion was caused by air that went into the system by a leaking suction hose, Dr. Butler could not identify by name any of the parts of the pumps that he said showed this scoring.  Exhibit "J", pages 71-73.  Dr. Butler also could not give an answer as to how long a pump would have to be exposed to a contaminate such as air before it started to show physical signs of scoring.  Dr. Butler agreed that there was data available regarding micron sizes of debris and what physical evidence of damage is going to appear in

11

different parts of the pump, but he did not know what that data was.  Exhibit "J", page 74.  Dr. Butler had no idea how long it would take before the system with a hose leak to have a pump failure.  Exhibit "J", pages 77-79.

Dr. Butler admits that it was Mr. Cathell who determined that the air was getting into the system because of leaking hydraulic suction hoses.  That was not determined originally by Dr. Butler and that was the reason why the hoses were the only thing tested.  Exhibit "J", page 66.

Other than a cursory physical visual exam of two pumps that had been taken apart by someone else and considering the testing information that was given to him which was observed by Mr. Cornetto, the only other information that Dr. Butler considers in reaching his opinion is some information that he pulled off of the internet regarding installation and start up for the Rexrath variable volume pumps that just were not used in this hydraulic power unit.  Exhibit "J", page 11.

Dr. Butler acknowledged that there are various causes of pump damage during installation: contaminated oil, either from water, air, or debris; incorrect installation; low volume of oil, excessive heat, and over-pressure.  Exhibit "J", pages 59, 67-68.  When questioned as to what other investigation he performed to rule out other probable causes of hydraulic pump failure, his response was the only other cause that he could rule out by his visual inspection was overheating.

Dr. Butler acknowledges that he never reviewed any design diagrams for the hydraulic power unit as part of his evaluation.  He did not review the start up procedure employed by Don's Hydraulics at Fieldale Farms.  He admitted that he was not aware of any steps taken to filter the existing oil that was being run through the system to which was being attached to the new hydraulic power unit installed by Plaintiff.  Exhibit "J", page 70.  He acknowledged that he had no idea if the oil being used in the system was filtered or cleaned by Don's prior to being put in the system.  Dr. Butler never examined the oil that was used in the system and agrees that that kind of testing could have been done, but he was not asked to do it.  Exhibit "J", pages 70-75.

12

Dr. Butler was never provided with a copy of the COT Purtec report which showed paper and other metal debris that was in the oil in the hydraulic system.  Exhibit "J", page 75.  Dr. Butler testified that he has no opinion whether the debris in the system was the cause of any of the pump failures because that is not what he was contracted to do.  He also testified that he had no opinion whether the pumps were or were not the cause of the failure in the hydraulic system. Exhibit "J", pages 90-93.  Finally, Dr. Butler testified that through his years of experience in dealing with machinery, he could not tell by visual inspection or by handling the subject hoses that they would in fact leak air under pressure testing.   Exhibit "J", page 94.

Don Cathell, however, did testify that if foreign objects are in the oil, it will positively disintegrate a pump.  Likewise, if oil is contaminated with debris, it is going to loop around in the system and eventually reach all the pumps and disintegrate them.  Exhibit "A", Volume II, pages 117-118.

13

## ARGUMENTS

I.    **PLAINTIFF DID NOT RELY UPON TRUCK TECH INDUSTRIES'
      EXPERTISE OR JUDGMENT IN SELECTION OF THE SUBJECT
      HOSES, THEREFORE, PLAINTIFF'S CLAIM FOR BREACH OF
      IMPLIED WARRANTY OF FITNESS FOR A PARTICULAR PURPOSE
      MUST BE DISMISSED.**

6 *Del. C.* 2-315 states that where the seller at the time of contracting has reason to know any particular purpose for which the goods are required and that <u>the buyer is relying under seller's skill or judgment to select or furnish suitable goods</u>, there is unless excluded or modified under the next section an implied warranty that the goods shall be fit for such purpose. (Emphasis added). Don's Hydraulics, through Don Cathell, did not rely upon TTI's skill or judgment to select or furnish suitable hoses for this application. By Plaintiff's own admission, Don Cathell believed he had much more skill and expertise in selecting hoses for the construction of this hydraulic power unit than Sean Swain or anyone else at TTI. Don Cathell did not ask for any advice from Sean Swain or any TTI employee in regards to drawing up the specifications for this hose order. Specifically, Mr. Cathell rejected the one recommendation that was relayed to the Plaintiff that came from the manufacturer, Tipco, and was relayed by Sean Swain of TTI. Mr. Cathell admits that he rejected these recommendations because he believed his past skill and experience in building hydraulic power units made him the expert in selecting the method to be used in manufacturing these suction hoses.

Since there is no proof that Don's Hydraulics relied upon seller's skill or judgment in placing this hose order, then under Delaware law, TTI is not liable to the buyer for breach of implied warranty of fitness for a particular purpose. *Scheibe v. Fort James Corp.*, 276 F.2d 246 (Dist. Del. 2003) and that portion of Plaintiff's claim should be dismissed.

14

II.    **THE FACTUAL RECORD DOES NOT SUPPORT A CLAIM THAT THERE WAS AN EXPRESS WARRANTY REGARDING THE HOSES, THEREFORE, THE CLAIM OF BREACH OF EXPRESS WARRANTY FOR FAILURE TO CONFORM TO SPECIFICATION MUST BE DISMISSED.**

Plaintiff is making a claim for breach of express warranty for failure to conform to specifications regarding the hoses. Don's Hydraulics, through its principal, Don Cathell, has admitted in his deposition that there was no express warranty, either written or verbal, between TTI and Don's Hydraulics in regards the hoses. Furthermore, after Don Cathell of Don's Hydraulics accepted the last order of hoses and applied them to the hydraulic unit, there was no communication from buyer that the hoses did not conform to the specifications drafted by Don Cathell.

Conversely, since Don's Hydraulics was a sophisticated commercial purchaser, any express warranty Plaintiff claims against the distributor TTI were excluded once Plaintiff rejected the manufacturer's recommendations regarding the method by which to affix the fittings to the hose ends. Moreover, from the record, it is clear that buyer was only relying on TTI to deliver the hoses on time. No other representations were either made by TTI, nor relied upon by the Plaintiff which can be said to be the basis of this bargain. As such, Plaintiff's claim of breach of an express warranty must be dismissed.

III.    **NOTHING IN THE FACTUAL RECORD SUPPORTS THE ALLEGATION OF A VIOLATION OF 6 *Del C.* §2532 AND, THEREFORE, THAT CLAIM MUST BE DISMISSED.**

The record does not support the allegation of a violation of 6 Del. C. §2532.  The Delaware Deceptive Trade Practices is intended by the legislature to address unfair or deceptive trade practices that interfere with the promotion and conduct of another's business.  *Grand Ventures, Inc. v. Whaley*, Del. Supr., 623 A.2d 63 (1993).  The Deceptive Trade Practices Act is not intended to redress wrong between a business and its customers.  Rather, it is meant to provide a remedy for injuries to a business interest rather than for harm to individual consumers.  This act is meant to address unreasonable or unfair interference with the horizontal relationships between various business interests.  Grand Ventures, id.  Therefore, Don's Hydraulics would have standing under the Delaware Deceptive Trade Practices Act only if his business or trade interest at stake was the subject of interference by the unfair or deceptive trade practices of TTI.  The relief that is available under this act is in the form of injunction under the principles of equity.

Plaintiff's Complaint is clearly a complaint between a business, TTI, and its customer, Don's Hydraulics.  Moreover, Plaintiff readily admits that it was the regular course of business that a distributor not offer the manufacturer's name to its customer.  Mr. Cathell acknowledged in his deposition testimony he did not consider TTI's conduct as deceitful, it was just how business was done so the distributors did not lose their customers.  Since there is no evidence in the record to support a claims of deceptive trade practices under 6 *Del*. *C.* §2532, that claim must be dismissed.

16

**IV.    PLAINTIFF HAS FAILED TO PROVE THE PROXIMATE CAUSE OF THE FAILURE OF THE HYDRAULIC POWER UNIT AND THUS THE CLAIM OF BREACH OF IMPLIED WARRANTY OF MERCHANTABILITY MUST ALSO FAIL.**

      **A.    Since Purchaser Don's Hydraulics Knew of the Danger of the Product as Specifically Ordered by Purchaser, No Implied Warranty of Merchantability Arises.**

The record shows that Don Cathell knew of the danger posed by ordering the suction hoses to be assembled in a manner contrary to the manufacturer's recommendation.  He knew that suction hoses sometimes leak depending on how they are assembled.  He specifically rejected the manufacturer's recommendation that the fittings be attached to the hoses by the "banding" method.  Plaintiff specifically insisted the fittings be crimped onto the hose ends contrary to the manufacturer's recommendation.  In re Asbestos Litigation (Merganthaler), 542 A.2d 1205, 1214 (Del. Super 1986) cited by the Court in Schiebe supra at p6.

In the case at hand, the purchaser is also the Plaintiff, but the rule of law as applied in Merganthaler would lead to the conclusion that no implied warranty of merchantability arises under these set of facts since Plaintiff purchaser has held himself out as having superior knowledge in regards to the manufacture of the subject suction hoses.  Likewise, the Delaware Superior Court held in *Falcon Tankers, Inc. v. Litton Sys.*, 300 A.2d 231 (1972) that where a buyer gives precise and complete specifications to the seller without relying on the seller, implied warranties are sometimes deemed excluded.

After Plaintiff rejected manufacturer's recommendations for assembling the hoses, Plaintiff cannot now try to take advantage of a doctrine meant to protect innocent consumers from the negligence of manufacturers with whom the consumer had no privity of contract and, thus under common law, no redress.  Under the facts of this case, no implied warranty of merchantability arises.

**B.     The Economic Loss for Which Recovery is Sought Were Not the Proximate Result of the Alleged Breach of Warranty.**

Plaintiff is attempting to claim consequential damages for the failure of an entire 1000 horsepower hydraulic power unit designed to run an entire poultry processing plaint in this lawsuit.  The damages that Plaintiff is attempting to claim in his lawsuit include lost profits for the poultry farm itself.

However, in order to succeed in this claim, Plaintiff must prove that the results of a pressure test performed upon three (3) of the suction hoses six months after the hoses were disassembled from the power unit somehow proves the proximate cause of the failure of the entire power unit.  Plaintiff purports to do this through the opinions of Dr. Thomas Butler and/or Mr. Anthony Cornetto, employees of SEA.

There are a number of problems, however, with Dr. Butler's opinions.  These problems are addressed in detail in TTI's accompanying Motion to Exclude Certain Testimony of Plaintiff's Liability Expert Witnesses, and TTI would respectfully request the Court to consider Defendant's Brief in Support in lieu of reiterating the arguments in full here.

Since Dr. Butler's testimony regarding the cause of the compressor pumps failure should be excluded, Plaintiff cannot prove the proximate cause of the failure of the hydraulic power unit. Thus, Plaintiff cannot prove the failure of the hydraulic power unit was proximately caused by the alleged breach of warranty in regards to the twenty suction hoses, and as such, the claims against TTI should be dismissed.

## CONCLUSION

Therefore, for the foregoing reasons, Plaintiff's claims of breach of express warranty, violation of 6 *Del. C.* §2532, and breach of implied warranties of fitness for a particular purpose and of merchantability against TTI should be dismissed.

REGER RIZZO KAVULICH & DARNALL LLP


  */s/ Cynthia G. Beam, Esquire*
Cynthia G. Beam, Esquire
Delaware State Bar I.D. No. 2565
CBeam@rrkdlaw.com
1001 Jefferson Plaza, Suite 202
Wilmington, DE  19801
(302) 652-3611
Attorney for Defendant
Truck Tech Industries, Inc.

Dated:   October 3, 2005

19

**IN THE UNITED STATES DISTRICT COURT**

**FOR THE DISTRICT OF DELAWARE**

| | | |
|---|---|---|
| **DON'S HYDRAULICS, INC.,** | ) | |
| | ) | |
| **Plaintiff,** | ) | **C.A. No.: 04-1275 (KAJ)** |
| | ) | |
| **v.** | ) | |
| | ) | |
| **COLONY INSURANCE COMPANY,** | ) | |
| **TRUCK TECH INDUSTRIES, INC.,** | ) | |
| **and TIPCO TECHNOLOGIES, INC.,** | ) | |
| | ) | |
| **Defendant.** | ) | |

## <u>ORDER</u>

**AND NOW, TO WIT**, this _____ day of _____, 2005, having considered Defendant Truck Tech Industries, Inc.'s Opening Brief in Support of Its Motion for Summary Judgment and the Response thereto, if any:

**IT IS HEREBY ORDERED** that Defendant Truck Tech Industries, Inc.'s Motion for Summary Judgment has been GRANTED.

**BY THE COURT:**

_____

**The Honorable Kent A. Jordan**

**IN THE UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF DELAWARE**

| | | |
|---|---|---|
| DON'S HYDRAULICS, INC., | ) | |
| | ) | |
| Plaintiff, | ) | C.A. No.: 04-1275 (KAJ) |
| | ) | |
| v. | ) | |
| | ) | |
| COLONY INSURANCE COMPANY, | ) | |
| TRUCK TECH INDUSTRIES, INC., | ) | |
| and TIPCO TECHNOLOGIES, INC., | ) | |
| | ) | |
| Defendant. | ) | |

<u>**CERTIFICATE OF SERVICE**</u>

I, the undersigned, do hereby certify on this 3rd day of October, 2005 that a true and correct copy of Defendant Truck Tech Industries, Inc.'s Opening Brief in Support of Its Motion for Summary Judgment has been served electronically and/or by first class mail, postage prepaid, upon the following:

Michael K. Tighe, Esquire
Tighe, Cottrell & Logan
First Federal Plaza
P.O. Box 1031
Wilmington, DE 19899

Anthony Figliola, Jr., Esquire
Figliola & Facciolo
1813 Marsh Road, Suite A
Wilmington, DE 19810

Michael Toddy, Esquire
Devon Snell, Esquire
Zarwin, Baum, DeVito, Kaplan,
    Schaer, Toddy, P.C.
1515 Market Street, Suite 1200
Philadelphia, PA 19102-1981

Gary H. Kaplan, Esquire
Goldfein & Hosmer
222 Delaware Avenue, Suite 1110
P.O. Box 2206
Wilmington, DE 19899

REGER RIZZO KAVULICH & DARNALL LLP


_/s/ Cynthia G. Beam, Esquire_
Cynthia G. Beam, Esquire
Delaware State Bar I.D. No. 2565
CBeam@rrkdlaw.com
1001 Jefferson Plaza, Suite 202
Wilmington, DE  19801
(302) 652-3611
Attorney for Defendant
Truck Tech Industries, Inc.

Dated:   October 3, 2005