IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF DELAWARE

| | | |
|---|---|---|
| DON'S HYDRAULICS, INC., | ) | |
| | ) | |
| Plaintiff, | ) | C.A. No.: 04-1275 (KAJ) |
| | ) | |
| v. | ) | |
| | ) | |
| COLONY INSURANCE COMPANY, | ) | |
| TRUCK TECH INDUSTRIES, INC., | ) | |
| and TIPCO TECHNOLOGIES, INC., | ) | |
| | ) | |
| Defendant. | ) | |

**NOTICE OF MOTION IN LIMINE**

To: Michael K. Tighe, Esquire
Tighe, Cottrell & Logan
First Federal Plaza, Suite 500
P.O. Box 1031
Wilmington, DE 19899

PLEASE TAKE NOTICE that the undersigned will present the attached Motion in Limine at the convenience of the Court.

REGER RIZZO KAVULICH & DARNALL LLP

 */s/ Cynthia G. Beam, Esquire*
Cynthia G. Beam, Esquire
Delaware State Bar I.D. No. 2565
1001 Jefferson Plaza, Suite 202
Wilmington, DE 19899
(302) 652-3611
Attorney for Defendant
Truck Tech Industries, Inc.

Dated: October 3, 20005

IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF DELAWARE

| | | |
|---|---|---|
| DON'S HYDRAULICS, INC., | ) | |
| | ) | |
| Plaintiff, | ) | C.A. No.: 04-1275 (KAJ) |
| | ) | |
| v. | ) | |
| | ) | |
| COLONY INSURANCE COMPANY, | ) | |
| TRUCK TECH INDUSTRIES, INC., | ) | |
| and TIPCO TECHNOLOGIES, INC., | ) | |
| | ) | |
| Defendant. | ) | |

**DEFENDANT TRUCK TECH INDUSTRIES, INC.'S
MOTION IN LIMINE TO PRECLUDE TESTIMONY OF PLAINTIFF'S
LIABILITY EXPERT IN REGARDS TO PROXIMATE CAUSE**

**STATEMENT OF THE NATURE AND STAGE OF THE PROCEEDING**

This is Defendant Truck Tech Industries' ("TTI") Motion in Limine to Preclude certain Testimony by Plaintiff Don's Hydraulics, Inc.'s Liability Expert Thomas Butler, Ph.D. Since this motion is in the nature of a Daubert hearing, it is being filed in conjunction with TTI's Brief in Support of Its Motion for Summary Judgment.

1

## **SUMMARY OF ARGUMENT**

**Dr. Butler's testimony in regards to the proximate cause of the failure of the hydraulic power unit should be excluded.**

    **A.**    **DR. BUTLER'S METHODOLOGY IS SEVERELY FLAWED AND HIS CONCLUSIONS ARE SPECULATION BASED UPON NO PHYSICAL EVIDENCE AND NO TESTING.**

    **B.**    **DR. BUTLER'S OPINION REGARDING THE CAUSE OF THE FAILURE OF THE HYDRAULIC POWER UNIT IS NOT SCIENTIFICALLY VALID IN THAT HE HAS FAILED TO CONSIDER OTHER OBVIOUS AND PROBABLE CAUSES FOR THE PUMP FAILURE.**

## **STATEMENT OF FACTS**

Plaintiff Don's Hydraulics is a designer, manufacturer and installer of hydraulic power units based out of southern Delaware. The principal in Don's Hydraulics is owner Don Cathell who was deposed at length in this matter. Don's Hydraulics is a small shop consisting of Mr. Cathell, his son, Delmar Cathell, and two or three other employees. Don Cathell has owned Don's Hydraulics for over 20 years. Prior to that, his knowledge in regards to designing and building hydraulic power units comes from hands on experience from his previous employer. Don's Hydraulics' base business is designing, manufacturing and installing small hydraulic power units mainly for poultry plants and the logging industry. Exhibit "A", Deposition of Don Cathell, Vol. I, pages 6-8.

In December of 2002, Don Cathell was contacted by an engineer at Fieldale Farms and was told that the plant was in the process of accepting bids for the addition of a large hydraulic power unit for the poultry plant. Don Cathell submitted bids to Fieldale Farms on December 14, 2002 and again on May 5, 2003. In May of 2003, he learned that he had won the bid for this project at Fieldale Farms. Exhibit "A", pages 25-28.

Don Cathell placed the order for the 20 hoses with TTI on August 7, 2003. Don's Hydraulics accepted the remaining hose, applied it to the hydraulic unit, and then arranged to have the hydraulic unit shipped via flat bed truck to the poultry plant in Georgia for assembly and installation.

Don Cathell noticed no indication of a problem with any of the 20 hoses when they ultimately were applied to the unit. Don's Hydraulics performed no testing on the hoses nor any part of this unit even though it was the first time in his career he had ever built a hydraulic power unit this large. Exhibit "A", Vol. I, pages 76-77. Mr. Cathell testified that he had never in his career tested a hose which he assembled or bought from a vendor. Exhibit "A", Vol. I page 89. Further, Mr. Cathell acknowledged that it is common practice in his field for a distributor not to name the manufacturers, because the distributor does not want to lose a customer. Mr. Cathell

knew TTI was not assembling the hose but never asked TTI who the manufacturer was until his problems at Fieldale Farms. Exhibit "A", Vol. II, pages 63-64.

      The quote that was prepared by Don Cathell and sent to Fieldale Farms included a central hydraulic system designed to operate the five production lines that were presently operating as well as some additional equipment. In Mr. Cathell's bid, he included the language, "This hydraulic power unit will not solve your problems alone. The piping changes I stated in my report must be done to complete the task satisfactorily. Exhibit "A", Vol. I, page 30. Report of Don Cathell attached hereto as Exhibit "B". Mr. Cathell testified that other than the power unit, Fieldale Farms needed to install all new hydraulic piping, all new hydraulic oil, new electrical service, and the labor to install all of these things in order to solve their problems. Fieldale Farms contracted with another outside contractor to provide thousands of feet of additional hydraulic piping, additional hydraulic oil, and also the electrical hook up for the power unit motors. The piping in the plant had to be changed due to the volume of oil that this hydraulic unit would pump in relation to the smaller pumps that were presently in the plant. Exhibit "A", Vol. I, pages 30-35.

      Once the hydraulic power unit was loaded on to the two flat bed trucks, Don Cathell and two employees went to Fieldale Farms. When they arrived, the two halves of the power unit had already been taken off of the flat beds and were sitting in the room ready to be bolted and welded together. Back in Georgetown, Delaware, Al Collins had welded hundreds of pieces of metal together to make the reservoir. The reservoir had to be cleaned of any slag or metal left behind by the welding process and as well as any other debris. Any debris left inside the reservoir would destroy the pumps. Exhibit "A", Volume II, pages 44-48. However, because of how large the reservoir is and because of the baffle design, no one could get all the way into the reservoir to clean it. Don's employees just reached in as far as they could to clean it by hand and used a vacuum without really being able to see what was inside the reservoir. Exhibit "A", Vol. II, pages 67-69. The installation and hook up process of the new hydraulic piping system to the

actual hydraulic power unit had already begun by the other outside contractor. Exhibit "A", Vol. I, pages 40-44. The morning of September 12, 2003, Mr. Cathell checked the installation visually of the hydraulic power unit and Al Collins welded the external seam on the reservoir. On September 13, 2003, oil was pumped into the reservoir by Castrol of Atlanta, Georgia. The oil was not filtered as it went from the tanker to the reservoir. Exhibit "A", Vol. I, page 42. The pump cases of the motors were filled using approximately 15 gallons of oil which was supplied by Fieldale Farms employees. On that same date, the suction valves to the pumps were opened. Mr. Cathell testified that also on that day, he "backed out all pressure compensators on the pumps". The following day, September 14, 2003, the rotation on each pump unit was checked after the electricians had wired the motors to make sure that all of the rotors were turning in the same direction. Six pump sets which equals twelve pumps were started on September 14, 2003 with no problem. Three of those pump sets ran all night long with no problem. Fieldale Farm maintenance personnel opened all the valves to the equipment in the processing rooms that were already attached to new hydraulic piping. The equipment operated for one and a half hours and then it turned off three of the pump. The three pump sets were left running for a clean up operation that continued all night into the next morning. Fieldale Farms had a clean up crew that worked the overnight shift to clean the plant machinery to make sure it was sanitary for the USDA requirements. The next day, an additional pump set was started to start one of the processing lines of the plant. It was not until they continued to add equipment lines at the factory and with eight pump sets operating that the system could not achieve full speed. By the end of the day, Monday, September 15, 2003, two of the pump units out of the ten on the hydraulic power unit were not working. Exhibit "A", Vol. I, pages 86-104.

     Don Cathell testified that the pump distributor inspected the two pumps and they were "disintegrated internally". He had, during his career, seen pumps disintegrated internally on prior occasions and that three causes that he knew of that would cause that kind of disintegration of a pump were: sucking air, foreign material, or not enough oil volume. Mr. Cathell continued to run

5

the power unit until the following weekend and then changed all the pumps. Meanwhile, a company called COT-Puritech was contacted to drain the hydraulic system and to clean the oil to factory specs or beyond. Exhibit "A", Vol. I, pages 105-115. COT-Puritech drained and filtered the oil from the system and cleaned the reservoir of the hydraulic power unit. They prepared a report after analyzing the oil that was present in the unit. A copy of that report is attached hereto as Exhibit "C". Debris in the form of metal bits and paper was found present in the oil and the system. Metal particles were found throughout the system including the pump suction strainers and the reservoir. The report describes "moderate amounts of metal and some paper removed from the system's oil supply and reservoir". Exhibit "C".

After his return from Georgia, Don Cathell contacted his carrier, Colony Insurance Company, to report his business loss. Colony in turn retained SEA to perform tests upon the hoses which Mr. Cathell alleges were defective. Thomas Butler, Ph.D. prepared a report in this matter. A copy is attached hereto as Exhibit "D". Thomas Butler, Ph.D. of SEA had visited Don's Hydraulics once in November 2003, and Mr. Cathell had opened the boxes containing the pumps that had been taken off of the unit. Mr. Cathell testified that Dr. Butler did a cursory visual inspection of the pumps. Mr. Cathell also relinquished custody of four of the hoses which purportedly failed in the initial start up of the hydraulic unit. Exhibit "E". Butler deposition, pages 14; 19; 25-27. At some point later, Mr. Cathell was contacted by Dr. Butler's associate Anthony Cornetto stating that he had no way to test the hoses at SEA and asked him if he could have the hoses tested at Don's facility.

Don Cathell testified that Mr. Cornetto brought the four hoses back Don's Hydraulics on February 24, 2004 and that Don Cathell was the one who actually tested the hoses by pressure testing. Mr. Cornetto observed the testing that was performed by Mr. Cathell. Exhibit "A", Vol. I, pages 130-136.

Colony Insurance Company retained SEA Consultants to test four of the hydraulic suction hoses at issue in this matter. Thomas Butler, Ph.D. was initially assigned to this matter and on

November 24, 2003, Dr. Butler traveled to Don's Hydraulics, Inc. in Georgetown, Delaware to perform a cursory visual inspection of the hydraulic pumps which were contained in three separate cartons, spoke to Mr. Cathell about the hydraulic power unit failure, and took possession of the four hydraulic suction hoses that were at the Don's Hydraulics' warehouse. Exhibit "E", deposition of Thomas Butler, Ph.D., pages 14-27. Dr. Butler confirmed several times during his deposition testimony that he was only asked to check whether the subject hoses showed a leak. Dr. Butler started with the assumption the pumps failed because of a hose leak and was asked by Colony Insurance Company whether the hoses in Don's possession were leaking. Exhibit "E", pages 61, 75. Dr. Butler did not perform the testing, rather, he sent his associate, Anthony Cornetto, back to Don's Hydraulics shop in February of 2004 to perform testing on the hoses at Don's Hydraulics because SEA did not have the equipment to pressure test hoses of a 2 ½ inch diameter size. Mr. Cornetto had never tested industrial hoses before that day and actually Don Cathell did the testing and Mr. Cornetto observed. Deposition of Anthony Cornetto, Exhibit "F", pages 4-41. Mr. Cornetto also verified that he was asked to perform testing on the hoses and was not asked to research other possible causes of failures in hydraulic pump systems. Mr. Cornetto agreed that his task was to ascertain whether there was a leak in the hose, and he was not asked to ascertain what caused the leaks in the hose, nor was he asked to ascertain other causes of the pump failure other than a leak in the hose. Exhibit "F". Cornetto deposition, pages 53, 54, 60, 63. Even though Mr. Cornetto believed that SEA was asked to determine the cause of the pump failure, he acknowledged that no one at SEA took other steps to determine the cause of the pump failure other than determining whether there was a leak in the subject hoses.

     As far as an inspection of the pumps is concerned, Dr. Butler admits that he started with the assumption that the pumps did not function properly due to the air leak because that is what Mr. Cathell at Don's Hydraulics had told him. To verify the pumps were not functioning properly, he did nothing but look at them. Exhibit "E". Butler deposition, pages 14-15; 25-27; 66; 69-70. He did not disassemble the pumps, nor did her perform any testing on the pumps. Dr.

Butler attempts to make a correlation between some "scoring" that he states were on a "plate" of one of the two pumps that were disassembled that he took photos of, however, there is no verbal description of that scoring in his report, nor is there any discussion in his report between this alleged nexus of a leaking suction hose and "plate scoring". Exhibit "E", page 15.

    Dr. Butler purports that the basis of his opinion that the appearance of one of the pumps that he saw at Don's Hydraulics failed "because of a suction hose leak was his investigation of checking the manufacturer instructions and his general background and machinery over the years". Exhibit E, page 67. However, when Dr. Butler was asked to describe what parts of the pump were showing the scoring that he was of the opinion was caused by air that went into the system by a leaking suction hose, Dr. Butler could not identify by name any of the parts of the pumps that he said showed this scoring. Exhibit "E", pages 71-73. Dr. Butler also could not give an answer as to how long a pump would have to be exposed to a contaminate such as air before it started to show physical signs of scoring. Dr. Butler agreed that there was data available regarding micron sizes of debris and what physical evidence of damage is going to appear in different parts of the pump, but he did not know what that data was. Exhibit "E", page 74. Dr. Butler had no idea how long it would take before the system with a hose leak to have a pump failure. Exhibit "E", pages 77-79.

    Dr. Butler admits that it was Mr. Cathell who determined that the air was getting into the system because of leaking hydraulic suction hoses. That was not determined originally by Dr. Butler and that was the reason why the hoses were the only thing tested. Exhibit "E", page 66.

    Other than a cursory physical visual exam of two pumps that had been taken apart by someone else and considering the testing information that was given to him which was observed by Mr. Cornetto, the only other information that Dr. Butler considers in reaching his opinion is some information that he pulled off of the internet regarding installation and start up for the Rexrath variable volume pumps that just were not used in this hydraulic power unit. Exhibit "E", page 11.

Dr. Butler acknowledged that there are various causes of pump damage during installation: contaminated oil, either from water, air, or debris; incorrect installation; low volume of oil, excessive heat, and over-pressure. Exhibit "E", pages 59, 67-68. When questioned as to what other investigation he performed to rule out other probable causes of hydraulic pump failure, his response was the only other cause that he could rule out by his visual inspection was overheating.

Dr. Butler acknowledges that he never reviewed any design diagrams for the hydraulic power unit as part of his evaluation. He did not review the start up procedure employed by Don's Hydraulics at Fieldale Farms. He admitted that he was not aware of any steps taken to filter the existing oil that was being run through the system to which was being attached to the new hydraulic power unit installed by Plaintiff. Exhibit "E", page 70. He acknowledged that he had no idea if the oil being used in the system was filtered or cleaned by Don's prior to being put in the system. Dr. Butler never examined the oil that was used in the system and agrees that that kind of testing could have been done, but he was not asked to do it. Exhibit "E", pages 70-75.

Dr. Butler was never provided with a copy of the COT Purtec report which showed paper and other metal debris that was in the oil in the hydraulic system. Exhibit "E", page 75. Dr. Butler testified that he has no opinion whether the debris in the system was the cause of any of the pump failures because that is not what he was contracted to do. He also testified that he had no opinion whether the pumps were or were not the cause of the failure in the hydraulic system. Exhibit "E", pages 90-93. Finally, Dr. Butler testified that through his years of experience in dealing with machinery, he could not tell by visual inspection or by handling the subject hoses that they would in fact leak air under pressure testing. Exhibit "E", page 94.

Don Cathell, however, did testify that if foreign objects are in the oil, it will positively disintegrate a pump. Likewise, if oil is contaminated with debris, it is going to loop around in the system and eventually reach all the pumps and disintegrate them. Exhibit "A", Volume II, pages 117-118.

**ARGUMENTS**

    A.    **DR. BUTLER'S METHODOLOGY IS SEVERELY FLAWED AND HIS CONCLUSIONS ARE SPECULATION BASED UPON NO PHYSICAL EVIDENCE AND NO TESTING.**

This case involves the alleged defect in suction drainage hose that were purchased by Don's Hydraulics through TTI. The hoses were assembled and manufactured by Tipco. The suction drainage hoses were used in the manufacturer of a hydraulic power unit designed, built and installed by Don's Hydraulics, Inc. at a poultry farm, Fieldale Farms, in Georgia in August of 2003. The Plaintiff alleges that the hoses were defective in that they "sucked air". Thomas Butler, Ph.D. is offered by the Plaintiff as an expert seeking to establish the position that the hydraulic power unit failed because of a manufacturing defect in the suction drainage hoses manufactured by Tipco and distributed by TTI. Dr. Butler's agency, SEA, was retained by Don's Hydraulics' carrier, Colony Insurance Company, to ascertain solely whether or not the four suction hoses in possession of Don's Hydraulics leaked. Dr. Butler sent his associate Anthony Cornetto to Don's Hydraulics shop allegedly to test the hoses. However, Anthony Cornetto admits that he did not test the hoses himself, but rather he observed the Plaintiff's principal, Don Cathell, test the hoses and Mr. Cornetto observed and recorded his observations.

Under the standards as set out in *Daubert v. Merrell Dow Pharmaceuticals, Inc.*, 509 U.S. 579 (1993) for determining the admissibility of expert testimony when scientific, technical or other specialized matter within the scope of Federal Rules of Evidence 703, Dr. Butler's opinion regarding the causation of the hydraulic power unit clearly should be precluded. Both an expert's methodology and ultimate conclusion must be reliable. *M.G. Bancorporation v. LeBeau*, 737 A.2d 513, 521 (Del. 1999). To be reliable, testimony "must be based on the methods and procedures of science, rather than subjective belief or speculation". *In re: TMI Litigation*, 193 F.3d 613, 669 ($3^d$ Cir. 1999). Further, an expert is required to be "as careful as he would be in his regular professional work outside his paid litigation consulting". *Sheehan v.*

*Daily Racing Form, Inc.*, 104 F.3d 940, 942 (7th Cir. 1997). *Daubert* requires the trial court to assure itself that the expert "adheres to the same standards of intellectual rigor that are demanded in his professional work". *Braun v. Lorillard, Inc.*, 84 F.3d 230, 234 (7th Cir. 1996).

      If Dr. Butler had been summoned to Fieldale Farms to determine the cause for the failure of the hydraulic power unit at the time of the initial installation, it is doubtful that he would have reached the conclusion that he has given in this matter merely by looking at the four suction drainage hoses that were ultimately pressure tested in this matter. This would be true especially given the report submitted by COT-Puritech showing the various debris present in the oil when they drained the system and cleaned out the hydraulic unit manufactured by Don's Hydraulics. Both Dr. Butler and Mr. Cornetto have acknowledged that there are various causes of a compressor pump failure. One of the various causes include contamination of the oil with debris. The importance of the paper and metal particles found in the hydraulic system cannot be overstated. Mr. Cathell admitted in his deposition how essential it was that the reservoir be clean prior to the unit start up. Plaintiff acknowledged that if debris were present in the reservoir, it would eventually cause the pumps to disintegrate. Plaintiff and Dr. Butler try to dismiss the existence of the metal debris by saying that debris was caused by the pump failure. No one can explain the paper debris. However, both Mr. Cathell and Dr. Butler admit that those contaminants may well have caused the pumps to fail in the first place.

      No investigation had been made in this matter regarding if the oil placed into the reservoir or into the pumps to prime them was sufficiently clean. No investigation was done to determine if the new hydraulic piping was sufficiently clear of water condensation or air before the piping system was connected to the hydraulic unit.

      Still the fact remains that paper and metal particles were in the oil in the system. Dr. Butler's investigation does not address this fact at all. To be fair, neither Plaintiff nor Co-Defendant Colony ever gave the COT-Puritech report to Dr. Butler for his consideration. Plaintiff nor Co-Defendant Colony ever requested that Dr. Butler test the oil in this case or

11

examine or test the pumps. Plaintiff nor Co-Defendant Colony ever asked Dr. Butler to exam the design specifications of the system.

Dr. Butler freely admits he was only asked to test the three hoses for leaks. Dr. Butler freely admits he started with the assumption that the hoses were the cause of the hydraulic system failure because this is what Plaintiff and Co-Defendant Colony had told him. While acknowledging that Dr. Butler's sole profession is as an expert witness, TTI submits that this expert is not being as careful as he would be in his regular professional work as an engineer as the Daubert progeny cases require. Dr. Butler must adhere to the same standards of intellectual rigor that would be demanded of independent engineers. That simply is not the case here. Dr. Butler had his associate test three hoses under pressure for leaks. From those observations, he has made a huge leap to his conclusion as to the cause of the failure of a large hydraulic power unit without any real basis for that opinion.

Dr. Butler admits he did no testing on the alleged failed pumps. Dr. Butler not only did no testing of the oil from this system, he was never provided with the COT-Puritech report which recorded the debris found in the hydraulic oil. Dr. Butler never considered any other factors which can cause a 1000 horsepower hydraulic power unit to fail, because, as he frankly admits, he was only paid to test the hoses. Dr. Butler accepted Plaintiff, Don Cathell's, conclusions that the pumps failed because of the leaking hoses as the conclusion of the investigation without any scientific or engineering basis to do so. Dr. Butler was merely doing what he was hired to do, pressure test three hoses.

Dr. Butler can certainly testify as to the results of the testing that was observed by his associate Mr. Cornetto. Dr. Butler certainly may testify that the testing observed by Mr. Cornetto showed the female ends of the three of the hoses to leak air. To that extent, Dr. Butler certainly should be permitted to testify that those three hose ends may very well have been defective. However, Dr. Butler should be precluded from offering any opinion regarding the cause of the failure of the hydraulic power unit itself since Dr. Butler has not given any testimony to support

that that conclusion is the product of reliable principles and methodology of engineering science. To allow this testimony would be to allow unjustifiable extrapolation from the premise that three of the hose ends showed an air leak six months after the system start up to the unfounded conclusion that those test results proved the cause of the hydraulic power unit failure.

      The investigation undertaken by SEA to determine the cause of the failure of the hydraulic power unit clearly did not adhere to the standards of intellectual rigor that would be demanded if they were performing an independent evaluation of the cause of this failure. Therefore, Dr. Butler's testimony regarding the cause of the pump failure should be excluded.

### B. DR. BUTLER'S OPINION REGARDING THE CAUSE OF THE FAILURE OF THE HYDRAULIC POWER UNIT IS NOT SCIENTIFICALLY VALID IN THAT HE HAS FAILED TO CONSIDER OTHER OBVIOUS AND PROBABLE CAUSES FOR THE PUMP FAILURE.

Neither Dr. Butler nor Mr. Cornetto conducted any test on any other part of the hydraulic power unit. No examination of the pumps which purportedly failed was conducted other than a cursory visual inspection by Dr. Butler on his one visit to Don's Hydraulics. No review of design specifications or start up procedure performed by Don Cathell was investigated or considered by either Dr. Butler and Mr. Cornetto. Both Mr. Cornetto and Dr. Butler acknowledged that there are various causes for failure of a hydraulic power unit and for the failure of a compressor pump. Both Mr. Cornetto and Dr. Butler admit that they did not investigate or rule out any other probable causes of the hydraulic power unit failure. One obvious alternative reason for the failure of the hydraulic power unit was debris in the system.

After the hydraulic power unit had failed after Don Cathell's initial attempt to start up the unit, Fieldale Farms had an independent oil recovery contractor COT-Puritech drain and filter the oil that was in the hydraulic power unit system and to analyze any foreign matter found in the oil. COT-Puritech found various impurities in the oil including paper and metal. The paper and metal debris was found both in the system oil and in the reservoir portion of the hydraulic unit which purportedly had been cleaned by Don's Hydraulics prior to the unit being transported to Georgia. Don Cathell admitted that he did not pay to have the oil filtered before it was entered into the hydraulic unit. Additionally, Mr. Cathell could not testify as to the source or quality of the oil that he used to initially prime his compressor pumps that was provided by Fieldale Farms. Thus, the one obvious alternative probable cause of the system failure, debris in the system, was never considered by Dr. Butler as required by the law.

Dr. Butler admits in his deposition that he does not know enough about the facts of the hydraulic power unit failure to know if the debris found in the oil by COT-Puritech is an important discovery. This is an admission by Plaintiff's expert that he was not given all the

necessary facts to do a complete investigation into the cause of the power unit failure.  Having only one piece of a puzzle to examine and give an opinion upon certainly does not lead to the type of expert opinion that is admissible under <u>Daubert</u>.  Dr. Butler freely admits that he has no opinion regarding whether the debris in the system was the cause of the pump failure.  He has no opinion regarding whether the pumps themselves were the cause of the failure of the hydraulic power unit.  He holds no opinion other than the results of the pressure testing of the three subject hoses because "that's all he was contracted to do".  Therefore, any opinions expressed by Dr. Butler regarding the cause of the failure of the hydraulic power unit should be excluded.

## **CONCLUSION**

For the above reasons, Dr. Butler's testimony regarding the causation of the pump failure should be excluded.

REGER RIZZO KAVULICH & DARNALL LLP

  */s/ Cynthia G. Beam, Esquire*
Cynthia G. Beam, Esquire
Delaware State Bar I.D. No. 2565
CBeam@rrkdlaw.com
1001 Jefferson Plaza, Suite 202
Wilmington, DE  19801
(302) 652-3611
Attorney for Defendant
Truck Tech Industries, Inc.

Dated:   October 3, 2005

**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF DELAWARE**

| | | |
|---|---|---|
| **DON'S HYDRAULICS, INC.,** | ) | |
| | ) | |
| Plaintiff, | ) | C.A. No.: 04-1275 (KAJ) |
| | ) | |
| v. | ) | |
| | ) | |
| **COLONY INSURANCE COMPANY,** | ) | |
| **TRUCK TECH INDUSTRIES, INC.,** | ) | |
| **and TIPCO TECHNOLOGIES, INC.,** | ) | |
| | ) | |
| Defendant. | ) | |

## ORDER

**AND NOW, TO WIT**, this ____ day of _____, 2005, having considered Defendant Truck Tech Industries, Inc.'s Motion in Limine to Preclude the Testimony of Plaintiff's Liability Expert in Regards to Proximate Cause, and the Response thereto, if any:

**IT IS HEREBY ORDERED** that the testimony of Thomas Butler, Ph.D. in regards to proximate cause of the pump failure will be precluded from trial.

                                                                        **BY THE COURT:**


                                                                        _____
                                                                        **The Honorable Kent A. Jordan**

IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF DELAWARE

| | | |
|---|---|---|
| DON'S HYDRAULICS, INC., | ) | |
| | ) | |
| Plaintiff, | ) | C.A. No.: 04-1275 (KAJ) |
| | ) | |
| v. | ) | |
| | ) | |
| COLONY INSURANCE COMPANY, | ) | |
| TRUCK TECH INDUSTRIES, INC., | ) | |
| and TIPCO TECHNOLOGIES, INC., | ) | |
| | ) | |
| Defendant. | ) | |

**CERTIFICATE OF SERVICE**

    I, the undersigned, do hereby certify on this 3rd day of October, 2005 that a true and correct copy of Defendant Truck Tech Industries, Inc.'s Motion in Limine to Preclude Testimony of Plaintiff's Liability Expert in Regards to Proximate Cause has been served electronically and/or by first class mail, postage prepaid, upon the following:

| | |
|---|---|
| Michael K. Tighe, Esquire | Anthony Figliola, Jr., Esquire |
| Tighe, Cottrell & Logan | Figliola & Facciolo |
| First Federal Plaza | 1813 Marsh Road, Suite A |
| P.O. Box 1031 | Wilmington, DE 19810 |
| Wilmington, DE 19899 | |
| | |
| Michael Toddy, Esquire | |
| Devon Snell, Esquire | Gary H. Kaplan, Esquire |
| Zarwin, Baum, DeVito, Kaplan, | Goldfein & Hosmer |
|    Schaer, Toddy, P.C. | 222 Delaware Avenue, Suite 1110 |
| 1515 Market Street, Suite 1200 | P.O. Box 2206 |
| Philadelphia, PA 19102-1981 | Wilmington, DE 19899 |

                                 REGER RIZZO KAVULICH & DARNALL LLP

                                 */s/ Cynthia G. Beam, Esquire*
                                 Cynthia G. Beam, Esquire
                                 Delaware State Bar I.D. No. 2565
                                 CBeam@rrkdlaw.com
                                 1001 Jefferson Plaza, Suite 202
                                 Wilmington, DE  19801
                                 (302) 652-3611
                                 Attorney for Defendant
                                 Truck Tech Industries, Inc.

Dated:  October 3, 2005