# EXHIBIT "A"

05-207

IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF DELAWARE

------

DON'S HYDRAULICS, INC.
Plaintiff

Vs.

COLONY INSURANCE COMPANY, TRUCK TECH INDUSTRIES, INC., and TIPCO TECHNOLOGIES, INC.
Defendants

:C.A. No. 04-1275 (KAJ)

------

Oral deposition of DON CATHELL, taken by and before Joanne H. Gusler, Registered Professional Reporter and Notary Public, at the Law Offices of Reger, Rizzo, Kavulich & Darnall, LLP., 1001 North Jefferson Street, Suite 202, Wilmington, Delaware 19801, on Friday, May 27, 2005, commencing at 11:04 a.m.

**VOLUME II**

ORIGINAL

**KARASCH & ASSOCIATES**
**REGISTERED PROFESSIONAL REPORTERS**
**PENNSYLVANIA and DELAWARE**
**(800) 621-5689**

Q. Since we have descriptions of Cathell number six, let's turn principally to Cathell number seven. Could you draw a line on the portion of the hose that would reflect what part of that pipe or hose was supplied by Truck Tech?

A. Supplied by?

Q. Yes, sir. In other words, is it the entire (indicating) hose and pipe that was supplied by Truck Tech?

A. No.

Q. Why don't you take a pen and put a line on both ends and this way we'll know exactly what portion was provided by Truck Tech.

A. (Witness complies.)

Q. For the record, you bracketed off sections of both of those pipes or hoses?

A. Hoses only.

Q. Okay. Would it be fair to say the portions within the brackets are the portions that you believe were provided by Truck Tech?

A. Yes.

Q. Now, sir, looking at Cathell-7, could you please identify for me this piece of equipment? (Indicating.) What is this called?

A. Elbow.

Q. Okay. Why don't you write "elbow" there?

A. (Witness complies.)

Q. And we're going to go right down the line, sir. Is all of the hose or pipe part of the elbow up to the part where you bracketed it off?

A. No. There's a bushing right there. (Indicating.)

Q. Why don't you identify that, sir.

A. (Witness complies.)

Q. And what is a bushing?

A. It's a reducer bushing from one size to another.

Q. And again, it's painted gray in the photograph, correct?

A. Yes.

Q. What is the color before it was painted?

A. Black.

Q. And who provided the bushing?

A. R.D. Grier.

Q. And did they provided that directly to you?

A. Yes.

Q. And that was on this piece of equipment before the hose was connected?

A. Yes.

Q. And how is that bushing connected to the hose

or connected to the elbow?

A. Male pipe thread.

Q. By a male pipe thread, what do you mean, sir?

A. I don't know another way to explain it. Just male pipe threads.

Q. Okay. Now, let's turn to the other end of the hose. You've bracketed a portion of the hose that was provided by Truck Tech. What is the piece of equipment that looks like a big nut located on the end of the hose, sir?

A. This? (Indicating.)

Q. Yes, sir. What is that called?

A. That's the female JIC nut.

Q. Why don't you label that, sir.

A. (Witness complies.)

Q. Does that have any other names?

A. Not to my knowledge.

Q. Okay. Does that come in various sizes?

A. Yes.

Q. How is the appropriate size determined?

A. By whatever size you're trying to fit it to.

Q. Okay. What is the name, if there is one, of the next piece material which appears outside the bracket on the female end of the (indicating) pipe and hose there, sir?

hose size, and I think you said the manufacturer?

A. It's to the manufacturer's spec. Specifications.

Q. What were the specifications for this particular project in terms of hose size?

A. Two-and-a-half inch on the suction, inch-and-a-quarter on the discharge.

Q. Were those specifications in writing?

A. In the catalog.

Q. Did you give those written specifications to Truck Tech?

A. For the hose size, yes.

Q. They were given in writing to them?

A. Pardon?

Q. They were given in writing to Truck Tech?

A. No.

Q. How did you make your desires known for those particular sizes of hose, sir?

A. Telephone.

Q. Do you recall when that conversation occurred?

A. No.

Q. Do you recall who the conversation occurred with?

A. Sean.

Q. And were you the one placing the phone call to

Sean?

A. Some, I placed; and some, I think my son talked to him possibly on. We were all three probably involved at different times.

Q. And what son is that, sir?

A. Pardon?

Q. What is the name of that son?

A. Delmar.

Q. That's Delmar, okay. And you said there were a number of conversations regarding it. Do you recall when any of those conversations occurred?

A. Not as exact date, no.

Q. Do you recall the week or the month of those conversations or would it just be guessing at this time?

A. I'd be guessing.

Q. Okay. Let's go on then, sir. Who selected the ports on the pumps?

A. The manufacturer.

Q. Would they be part of the pump specifications?

A. Yes.

Q. Would those sizes and dimensions be given to Truck Tech also?

A. Only on the suction.

Q. And were they given in writing or orally, sir?

A. Orally.

Q. Do you recall who received those directions?
A. Sean.
Q. Do you know when you received them?
A. No.
Q. Did the specifications that you received from the manufacturer for the pumps specify the types of hoses that were to be used?
A. No.
Q. Did it discuss the hoses at all?
A. No.
Q. Did the manufacturer of the pumps leave it up to the designer of the system to choose his or her own hoses?
A. Yes.
Q. As well as his or her own sizes of hoses?
A. Yes.
Q. And did they also leave it up to the designer of the system to choose how the hoses were to be attached to the system?
A. Yes. Other than the flange ports.
Q. When you say, "other than the flange port," what are you referring to? And you can use a photograph to assist you if that will help you.
A. Manufacturer stops right there (indicating) and right there.

Q. Why don't you -- you just drew a line, two lines on Cathell-7. Why don't you draw an arrow and say where manufacturer stopped. This way we'll make sure that the photograph is clear, sir.

A. (Witness complies.)

Q. So looking at Cathell-7 where you drew the line "manufacturer stopped," would the four-bolt flange be above that?

A. Yes.

Q. So it was your choice to use the four-bolt flange?

A. Yes.

Q. And why did you choose to use a four-bolt flange as you did as shown on, I guess, two locations in Cathell-7?

A. That's the only thing you can put on that.

Q. Does a four-bolt flange have any advantages over any other systems of attachment?

A. I have no idea.

Q. Okay. Are you familiar with the SAE code?

A. Yes.

Q. What is the SAE code, sir?

A. I could not give it to you as the code itself. I don't know.

Q. But that is the recognized code that would you

Q. Sure. Are there any other codes that would apply, could be used in place or in lieu of the SAE code?

A. Not that I'm aware of.

Q. Okay. Were the ports which you used in this hydraulic system threaded, sir?

A. The ports on the pump are not threaded, no, sir.

Q. Are any of the pipes or pieces of equipment to which the hoses are attached threaded?

A. Yes.

Q. What pieces of equipment are threaded, sir?

A. Some of the hoses and the pipes. Some of them.

Q. Which pipes? Are those pipes that would be -- that the hoses would be attached to?

A. Yes.

Q. Which pipes would they be? And you can use either of the two diagrams to label that, sir.

A. (Witness complies.)

Q. Sir, although, we're looking at a particular pump and hoses that are shown in Cathell-7 and Cathell-6, would it be fair to say that all of the pumps and hoses that are part of this hydraulic system are identical to what's shown in these photographs?

In other words, the other pump and hoses aren't

different than these hoses, are they?

A. No.

Q. So these are just an example of the pumps and hoses that you used?

A. Correct.

Q. Do you know the location of these particular hoses and pumps in terms of in relation to the other pumps and hoses on this hydraulic system?

A. The location?

Q. Yes. Do you know which pump it is? Is it one in the middle or the end?

A. I do not know.

Q. Okay. Did you select threaded ports?

A. Yes.

Q. So that was your decision?

A. Yes.

Q. Why did you decide to use threaded ports?

A. No choice.

Q. That is, it's your contention that that piece of equipment or that port only came threaded?

A. I don't understand what you mean.

Q. It was your choice to use a threaded port, correct?

A. Threaded fittings, not ports.

Q. Okay. It was your selection or choice to use

a threaded fitting?

A. Yes.

Q. And in fact, that's what you've marked off here on the diagram, Cathell-7?

A. Yes.

Q. Why did you use a threaded fitting?

A. I don't know what else you would use.

Q. So it's your belief that a threaded fitting is the only type of fitting available to be used, correct?

A. There may be something else but I don't know. I don't know what anybody else would use in place of a threaded fitting.

Q. Are you familiar with the term "37-degree adapter"?

A. Yes.

Q. What is a 37-degree adapter?

A. It has a seat, male seat and it has a 37-degree taper on to it.

Q. Are there 37-degree adapters shown in Cathell-6 or Cathell-7?

A. Yes.

Q. Where would the 37-degree adapters be, sir?

A. (Indicating.) The adapters, is marked adapters. You got one, two, three.

Q. So is it your testimony that all the adapters

marked Cathell-7 are 37-degree adapters?

A. Yes.

Q. Why did you -- was the choice to use 37-degree adapters your choice?

A. Yes.

Q. And you used a 37-degree female swivel hose end, correct?

A. Yes.

Q. Why did you use a 37-degree female swivel hose end?

A. To match the 37-degree adapter.

Q. And a 37-degree adapter was your choice?

A. Yes.

Q. And you used a 37-degree adapter because you knew of no other alternative?

A. Well, there is one: A 45-degree but it won't match.

Q. Sir, is leaking or are leaking problems associates with 37-degree connections?

A. Very, very rarely.

Q. Is that to say that you've never experienced leakage problems with 37-degree connections, sir?

A. I have not, no.

Q. Do you receive any journals or periodicals regarding equipment?

A. Occasionally.

Q. What journals or periodicals do you receive, sir?

A. I don't even know. I don't subscribe to any certain one.

Q. And that would includes magazine and periodicals as well?

A. Yes.

Q. When you say you don't subscribe to any, do you have any in your office currently?

A. No.

Q. Any older copies of any periodical or magazine, journal or publication?

A. No.

Q. Are there any journals or publications that you would recognize as being authoritative in the field?

A. That are what?

Q. Authoritative. That you would recognize as a trustworthy source.

A. There probably is. I don't know of any right off.

Q. Okay. In answering questions yesterday, you advised us that you had no formal education in designing units but learned from working in the poultry industry?

A. Yes, sir.

Q. And then from that point, you designed your own and went forward, correct?

A. Correct.

Q. When was the year that you left to open up your own shop, sir?

A. 1980.

Q. Have you taken any courses in the design of hydraulic systems since 1980?

A. Yes.

Q. Have you attended any classes in the design of hydraulic systems since 1980?

A. No.

Q. Have you received any periodicals or bulletins or publications regarding the design of hydraulic systems since 1980?

A. Probably have.

Q. Do you recall any of them?

A. No.

Q. Would you have any of them in your office?

A. No.

Q. So basically your experience comes from hands-on experience?

A. Yes.

Q. Did you personally assemble the hoses to the hydraulic system when they came in?

Q. So other people also cleaned where the excess?

A. Yes.

Q. So you didn't personally check to see the pipe sealant was used on all of the pipes -- pipe connections, correct?

A. I did check all of them, yes.

Q. How did you check them, sir?

A. Visually.

Q. So you walk up and down the row?

A. Yes.

Q. And what were you looking for?

A. To make sure they were all tightened properly and that they were clean before we painted it.

Q. How could you ascertain visually that they were tightened properly?

A. As I said before, two to three threads showing.

Q. Would they be showing after it was tightened or before it was tightened, sir?

A. After.

Q. Do you recall seeing any scratch marks left by the wrenches after these hoses were attached?

A. Got to have.

Q. Got to have them?

A. There's no way around it.

Q. And where would these scratch marks be, sir?

A. (Indicating.) In this area.

Q. Why don't you bracket off and draw an arrow so we're clear.

A. (Witness complies.)

Q. Now, you've just labeled on Cathell-7 the area that there would be pipe wrench marks?

A. Yes.

Q. Would those pipe wrench marks be where all the hoses were assembled or just that one particular area?

A. Just be this end (indicting) of these. The hose is identical to that one.

Q. And which end is that? That's the female end?

A. This is the male pipe thread end. (Indicating.)

Q. I'm sorry. Okay. So would there be wrench marks on the female ends as well or just the male end?

A. There could be some on the nut because the size of them, you've got to use a pipe wrench to tighten them.

Q. The nut that's already -- well, it's not bracketed on Cathell-7. Why don't you put an arrow where that would be, sir.

A. Right there. (Indicating.)

Q. And that's where you had female JIC nut?

A. Yes.

Q. Now, why would there be any scratch marks at all, sir?

A. Because there are teeth on the pipe wrench.

Q. And you're saying the scratches are caused in the process of tightening?

A. Yes.

Q. And those scratches would appear on all of the connections for all of the hoses?

A. Yes.

Q. You told us that the reservoir was used for oil. Was the oil filtered before it was put into the system?

A. There was no filter between the tanker and the reservoir, no.

Q. How more expensive is it to use filtered or cleaned oil as opposed to non-filtered or clean oil, sir?

A. I have no idea.

Q. So it's your recollection though that the oil came directly from the tanker into the reservoir without being filtered or cleaned?

A. Yes.

Q. Could one have filtered or cleaned the oil before it went into the reservoir?

A. Could be, yes.

Q. And that's standard, isn't it?

A. Very, very rarely I've ever seen it done.

Q. The purpose of filtering the oil is to make sure that you're catching any containments that would be in the oil?

A. Yes.

Q. Contaminants such as what, sir?

A. I don't know what would be in new oil.

Q. But you have seen new oil filtered and cleaned, correct?

A. I've not seen it. I've heard of it being done but I've never seen it.

Q. But you've heard of it being done?

A. I have heard of it.

Q. Do you know anything about the ISO code in terms of cleanliness or purity of the oil?

A. Very little.

Q. The reservoir was designed by you, correct?

A. Yes.

Q. And constructed by you?

A. Pardon?

Q. Constructed by you?

A. I was involved, yes.

Q. You say you were involved. Who else did the actual construction of the reservoir?

A. Al Collins.

Q. How is the reservoir put together?

A. Welded.

Q. And how many parts was the -- I'm looking at Cathell-8 that shows the, I guess, half of your hydraulic system on a flatbed. That also shows the half of the reservoir, correct?

A. Yes.

Q. How many pieces was that reservoir before it was welded together?

A. Hundreds.

Q. Hundreds. Is there a process by which the reservoir is welded; in other words, you start with the bottom, sides or you tell me, sir?

A. Yes, sir.

Q. What is that process?

A. You order the steel to whatever dimensions you want, you put it together and you weld it.

Q. How thick is that steel?

A. Three-sixteenths.

Q. And you say you put it together, so there's actually hundreds of welds there, correct?

A. Yes.

Q. And then after the -- what are the last pieces to be welded onto the reservoir?

A. The end plate on this end. (Indicating.)

Q. End plate on, what particular end is that, sir?

A. That would be the left end as you're facing the pumps.

Q. Why is that the last piece? Is it like painting a room where you don't want to paint yourself in? You paint towards the doorway so to speak?

A. You have to put the sides and the bottom and the top together before you could put an end on. You can't start with an end because you got nothing to attach it to.

Q. After you welded the pieces together, how do you go about cleaning the insides of the reservoir?

A. There is several times it is cleaned using scrapers, chipping hammer as far as trying to get any slag off. It was vacuumed several times.

It is wiped down with cloth, towels and the final time is just the hand alone.

Q. Now, did you personally clean out the reservoir, sir?

A. Yes, sir.

Q. And how many times do you believe you cleaned out the reservoir?

A. Numerous times. As you're building, you have

to keep cleaning.

Q. And that's because there's always additional residue or slag that appears, correct?

A. Correct.

Q. Slag is part of the metal?

A. Yes.

Q. And were you the only one who cleaned out these reservoirs?

A. No.

Q. Who else cleaned out the reservoirs?

A. Al Collins.

Q. And so what kind of test is there to determine if the reservoir is clean, sir; that is, void of any slag or metal debris?

A. Your hand.

Q. And what do you mean "your hand"?

A. You wipe it with your hand as the last thing you do.

Q. But when you say there's hundreds of pieces, so there's also hundreds of welds?

A. Yes.

Q. You also said some of the pieces of the slag, they fall off of the metal at various times inside the reservoir?

A. As you build it, you will have slag that pops

and you have very little because we use MIG welders.

Q. Because you what; I'm sorry?

A. Use MIG welders.

Q. What's a MIG welder?

A. M-I-G. Wire feed.

Q. What does that mean? I'm not, you know, I'm a city boy. Got to help me here.

A. You have a 35-pound spool of wire inside the welder and it feeds through a tube.

Q. And what's fed through the tube?

A. The wire.

Q. And what is that wire used for?

A. Welding.

Q. So it's like a long arm you're using to help weld? I don't understand the process here.

A. The method you're probably used to is putting a rod into an electrode holder. That's not for this application.

Q. So what once again --

A. -- you get too much splatter, too much clean up. MIG welder, you have much less clean up, much less splatter.

Q. But there's still some splatter and some clean up?

A. Yes. All welds will.

Q. Other than wiping your hand down inside in the reservoir afterwards, is there any other type of testing to ascertain or learn if there's any debris, slag, dirt, grime, paper or anything in that reservoir?

A. Visually.

Q. Okay. Other than visually and by wiping your hand, are there any other type of test, sir?

A. No.

Q. If you had debris located inside the reservoir, could that destroy the pumps?

A. Yes.

Q. That debris would not have had to be slag or metal, would it?

A. No.

Q. That's because it could even be paper, correct?

A. Possibly.

Q. During the initial setup of your system, was there any oil being re-circulated to the reservoir?

A. I don't understand what you.

Q. During your initial setup of this hydraulic system, was there any oil being re-circulated? When was the first time you put oil into this system, sir?

A. On the Saturday before start-up.

Q. That was the Saturday when you were down --

A. I bought the hoses.

Q. Where did you buy the hoses?

A. I don't recall the name of the company.

Q. In the exhibit C-14, you state in the second paragraph that you expressed your concern about the hoses many times?

A. Yes.

Q. Did you ever seek to express concern directly to the manufacturer of the hoses?

A. I did not know who it was.

Q. Did you ever ask Truck Tech where they got them?

A. I asked but I was not told.

Q. Do you know why you weren't told?

A. Common business, you don't tell where you get your items from because somebody go around you the next time, and they just bypass you.

Q. Was your assumption that Truck Tech was a competitor of whoever was manufacturing these hoses?

A. Yes.

Q. And therefore, you understood their lack of desire to give you that name?

A. Could you restate that?

Q. And therefore, you understood Truck Tech's lack of desire to give you the name of the manufacturer?

A. Yes. I understood why.

Q. For fear that you'd go around them the next time?

A. Yes, yes.

Q. And contract directly with whoever the manufacturer was?

A. Yes. It's common practice.

Q. I'm sorry?

A. That's common practice in business.

Q. Okay. How many times did you request the name of the manufacturer?

A. I don't know that I ever did.

Q. Did you ever desire to speak to the manufacturer so that you could go over your specifications with them?

A. I never asked for them, no.

Q. You never asked for the name of the manufacturer?

A. Not that I know of.

Q. You never asked to talk to the people at the manufacturer to discuss their proposed product with them?

A. No.

Q. Did you ever ask Truck Tech for the name of the manufacturer of the hoses at any time?

A. Not until the problem in Georgia.

A. Correct. (Indicating.)

Q. And pulling out the wooden piece first?

A. Oh, yes. Yes.

Q. And this way it's one large reservoir?

A. Yes.

Q. Did you do the welding?

A. No, sir.

Q. Who did the welding?

A. Al Collins.

Q. Did you check whether the inside of the reservoir was clean at that point?

A. I did clean it.

Q. Why did it need cleaning?

A. Pardon?

Q. Why did it need cleaning?

A. Why didn't he clean it?

Q. No. Why did it need cleaning?

A. When you take the wood off, you're going to have some splinters plus from shipping.

Q. What do you mean "plus from shipping"?

A. Bouncing down the road.

Q. What happens when it bounces down the road?

A. You're going to have sliver from the wood, I'm sure, even though it's bolted to it and sealed externally but.

Q. Does that bouncing down the road cause any of the other portions or parts of the reservoir to shift?

A. Not to shift, no.

Q. Cause any debris to fall on it?

A. No.

Q. Did you check the whole length of the reservoir or just the part where the wood was previously, sir?

A. You check the full length.

Q. He didn't crawl in it and crawl all the way down, did he?

A. I did not crawl in it, no.

Q. And no one else crawled in --

A. No.

Q. -- to see, did they? We're looking at the reservoir that appears in exhibit Cathell-4. Did the other half of the reservoir also have that piece of wood?

A. Yes.

Q. Did you clean that portion also?

A. Yes.

Q. Did you climb into that reservoir?

A. You cannot climb into it because of the baffles.

Q. So that visually, you took a look?

A. And cleaned just as far as you can reach and

that's all you can do.

Q. All right. Now, on your chronology of September 14th, do you recall what time of day you started up the pumps?

A. No, sir.

Q. Do you know if it was morning, afternoon or evening?

A. No, I don't.

Q. It says, "Towards the end, the equipment operated for one hour and then we turned off three pump sets, Leaving three pumps sets running." Do you know how long those three pump sets were left running?

A. All night.

Q. Does that bring back or refresh your recollection of when the other pumps were turned on?

A. No, sir.

Q. Was there any oil in the system on September 14 when you turned those pumps on?

A. Yes, sir.

Q. The reservoir was already connected and filled, correct?

A. Yes.

Q. Was there any problem with the pumps on September 14th?

A. No, sir.

the hose --

A. No, sir.

Q. -- with the other hand?

A. No, sir.

Q. Explain to me, sir.

A. You start the hose into the fitting by hand. You can't put a wrench on it.

Q. Why can't you put a wrench on?

A. Well, you can but I don't know what you're going to do with it.

Q. Okay.

A. And you screw it in by hand to start it. The wrench cannot do it because the wrench will just lay there.

Q. Okay. Keep going then, sir. How tight --

A. -- and as I stated before, once you got it screwed in, then you tighten it with the wrench.

Q. As tight as you can?

A. Yes.

Q. Were you concerned over how tight it was or the amount of ridges you saw?

A. Counting the number of threads.

Q. And what was the magic number that you're looking for?

A. Two to three as I stated before.

Q. So you tighten it with the wrench leaving two to three threads open?

A. Yes.

Q. And then what did you do, sir?

A. Connect this end. (Indicating.)

Q. And how did you go about connecting the opposite end?

A. Insert the male face of the adapter into the female face of the hose end and screw the nut on.

Q. Well, how did you screw them on, sir?

A. By hand.

Q. Did the hose move at the time that you're screwing the adapter on?

A. The adapter is already screwed in before you put the hoses on.

Q. The adapter's screwed onto what, sir?

A. On to the street L.

Q. Okay. Is the hose moving at the time you were screwing the adapter onto the hose? Into the hose?

A. You don't screw the adapter into the hose.

Q. You're screwing the -- what are you screwing in, sir?

A. You turn this female nut. (Indicating.)

Q. As you turn the female nut, is the hose moving?

Q. Well, what kind of method --

A. -- you are not to use it on suction hose.

Q. What kind of method did Tipco use?

A. I have no idea. Banding is banding.

Q. Other than on one occasion, had you ever fabricated hoses which leaked?

A. What do you mean by leaked?

Q. That had cavitations.

A. I had two units that we tried banding on two separate units. That's why I will not use banding.

Q. When was that, sir?

A. I don't know the exact date.

Q. Is that the same incident you're just telling me about?

A. One of them was, yes.

Q. Do you recall who the manufacturer of the -- well, you manufactured the hose; I'm sorry. Do you recall who the client was?

A. No. Not right now, no.

Q. Do you recall any of the specifics of that incident?

A. Yes. I remember they leaked.

Q. Who else worked on the hoses besides yourself?

A. Which ones?

Q. The ones that had cavitations.

A. At that time, I don't know who was working for me at that time.

Q. But you don't recall what time that was?

A. I don't remember exact dates on this unit, no, sir.

Q. Okay. Let's mark this as the next exhibit.

(Document marked for identification as Cathell-19.)

BY MR. KAPLAN:

Q. Sir, let me show you what has been marked as Exhibit-19. Now, that's a copy of the complaint which is filed in this matter; is that correct?

A. Yes.

Q. Have you seen this complaint before?

A. Yes.

Q. In paragraph 27, you mention an express warrantee. Did you ever receive any kind of warrantee from Tipco, sir?

A. No, sir.

Q. Did you ever talk to anybody from Tipco?

A. No, sir.

Q. And you've never as far as you know, ordered anything directly from Tipco?

A. No, sir.

Q. Paragraph 27, you also mention specifications

as you do in paragraph 30. You never provided any specifications to Tipco, did you?

A. No, sir.

Q. And it be fair to say, I meant that in terms of written specifications but we'll clarify it. You never provided any written or oral specifications to any representative of Tipco, did you?

A. No, sir.

Q. For paragraph 28, you state that Tipco didn't use reasonable care in designing the hoses. Sir, you actually designed the type of hoses that would be required here, didn't you?

A. The size and the length.

Q. So you required a hose of a particular size and of a particular length of Tipco, correct?

A. Yes. Of TTI.

Q. Of Truck Tech, I'm sorry. Correct?

A. Yes.

Q. So there's a difference -- you agree there's a difference between designing versus fabricating or manufacturing, correct?

A. Design versus manufacturing?

Q. Well, strike the question, sir. You were the one who designed the size and length of hose that was necessary for this hydraulic system, correct?

A. Correct.

Q. And then you sought a hose of a particular size and length from Truck Tech, correct?

A. Yes.

Q. And then it was Truck Tech who sought that particular size and length of hose from another entity, correct?

A. Correct.

Q. So you were the one who actually designed the size and length of hose that was necessary for this hydraulic system, correct?

A. Yes.

Q. Just to clarify your earlier testimony. You've never tested any of the hoses when you first received them from Truck Tech, correct?

A. No.

Q. Could have but chose not to?

A. I've never tested a hose prior to using it. In 25 years.

Q. But it's an easy -- it's easy to perform a test to make sure the hose is proper, correct?

A. Time-consuming but can be done.

Q. I think you told me four, for the 20 hoses you had, it would have taken collectively four to six hours?

A. Possibly, yes.

Q. Do you know whether Tipco knew that Don's Hydraulics was the company which ordered these hoses?

A. I don't know. I do not know, no.

Q. You have no reason to believe that Tipco knew that you were the entity which ordered the hoses from Truck Tech, correct?

A. That's correct.

Q. When you initially ordered the hose from Truck Tech, did they tell you that they had the ability to fabricate or manufacture the hose that you desired?

A. In the beginning, it was my understanding they could.

Q. Did they advise you that they could?

A. In the beginning, yes.

Q. Do you recall when you first learned that they would not be manufacturing the hose that you desired?

A. When we had a problem.

Q. Is that the first time it came up?

A. Pardon?

Q. Is that the first time it came up?

A. No. Sean had been at the shop many times. He's there almost every week.

Q. But was that the first time that Sean told you that they didn't manufacture or fabricate the hoses?

A. Yes. As far as I can recall, yes.

Q. So up until there was a problem with any of the hoses, you were always under the impression that it was Truck Tech that was fabricating the hoses for you?

A. Yes.

MS. BEAM: Objection to form.

BY MR. KAPLAN:

Q. Did you ever ask Sean Swain or any other employee of Truck Tech whether in their professional opinion you were using the correct size hose for the intended application?

A. No.

Q. But you did testify that Sean Swain advised you that it was the recommendation of the manufacturer that the hoses be swaged or branded (sic) as opposed to crimped?

A. As other options, yes.

Q. You think it was just as an option as opposed to a flat out this is an incorrect usage of it?

A. Correct.

MR. KAPLAN: I have no further questions. Look at my notes but I'm assuming other people have questions.

MR. SNELL: Does anyone need a break? I shouldn't be very long.

MS. RODGERS: I vote we run through it.

BY MR. SNELL:

Q. Good afternoon, Mr. Cathell. My name is Devon Snell. I just have a few questions for you. I shouldn't take up much more of your time.

A. Okay.

Q. Before I get started, I just want to tell you if my questions do not make any sense, please just let me know. I'll be happy to rephrase it or restate it for you, okay?

A. Okay.

Q. Mr. Cathell, if you could look at what was marked as Exhibit-1 from yesterday that is your proposal to Fieldale Farms. That's it, a two-page document.

A. (Witness complies.)

Q. On the second page it says a list of items separated by quantity and description. Is it correct to say that these are the items that you used in manufacturing the hydraulic power unit for Fieldale Farms?

A. Yes, sir.

Q. And is it correct to say that some of these units, some of these items you purchased --

A. Yes.

Q. -- from outside vendors?

A. Correct.

Q. Is it also correct to say that you took these items and you manufactured or assembled these items to create the hydraulic power unit?

A. Correct.

Q. And if you will look at Exhibit-8, the photograph. Is that the final product that you assembled for Fieldale Farms?

A. (Witness complies.) Correct. Half of it.

Q. That's half of it?

A. Correct.

Q. Is there any difference in the design for the second half that does not appear in that photograph?

A. Yes.

Q. And how is there a difference in the design?

A. This half (indicating) incorporated the filters and the two cooling loop systems.

Q. Okay. But for an untrained eye like myself, would the unit pretty much look the same?

A. Yes.

Q. Okay. And is it correct to say that when you took the two units that you were speaking of and you welded those two units together, you had the final product that was requested by Fieldale Farms?

A. Correct.

Q. Mr. Cathell, if you could tell me on the

second page of Exhibit-1, which item represents the hoses that are at issue at this case?

A. Third from the last where it says, "One lot of hoses, valves and fittings."

Q. And how about the pumps that were destroyed?

A. The third item down, ten tandem Rexroth variable volume pumps.

Q. Okay. And the ten tandem Rexroth variable pumps, from whom did you purchase those items from?

A. My son-in-law, Rob's Hydraulics.

(Document marked for identification as Cathell-20.)

BY MR. SNELL:

Q. Mr. Cathell, I'm handing you what's been marked as Exhibit-20. This is a document, a one-page document which states, "Fieldale Farms invoice." Will you look over that for a second please?

A. (Witness complies.) Okay.

Q. Do you recognize this document?

A. Yes.

Q. And what is this document?

A. It was an invoice from Fieldale Farms for the loss of time and the amount of labor and the expenses they paid due to the failure of the pumps.

Q. Did you receive this invoice from Fieldale?

A. Yes, I did.

Q. And who did you receive this invoice from?

A. Fieldale Farms is all I know.

Q. Did you receive it through the mail?

A. Yes.

Q. Okay. You don't know the individual who actually sent this document to you?

A. I have no idea.

Q. Do you recall when you received this document?

A. Not exact date, no.

Q. Once you received this document, did you contact anyone at Fieldale Farms concerning this document?

A. No, I did not.

Q. Have you had any discussions with anyone at Fieldale Farms concerning the cost which appear in this document?

A. Yes.

Q. And who did you have the conversations with?

A. Tom Hinsley, vice president.

Q. Do you recall the conversation?

A. Not exactly, no.

Q. Did you contact Tom or did Tom contact you?

A. I don't know exactly but most likely I called him.

Q. Okay. If you called Tom, what was the purpose of placing that phone call?

A. We talked many times concerning this failure of this project due to the extreme cost involved on their part and on my part both, and we agreed to work together to try to recover it rather than them sue me and me trying to sue everybody.

Q. Okay. Did you discuss with Tom the figures which appear on this document?

A. No. I don't recall doing it, no.

Q. Have you paid any of this invoice as of today?

A. Indirectly, yes.

Q. Okay. And what do you mean by indirectly?

A. Colony Insurance made a check directly to Fieldale for the 16,569.50 I believe it is; I'm not clear. Which I requested my attorney to tell Colony to make the check directly to them and not to me due to the fact they paid that particular invoice; I did not.

Q. Due to the fact that Fieldale paid that invoice?

A. They paid that invoice.

Q. Okay. And is that the $16,569.50 which appears on this document for the oil filtering expense?

A. Yes.

Q. And that's the service provided by

Cot-Puritech?

A. Yes.

Q. What was that service for; do you recall?

A. They came in and pumped the oil out filtering it until it met specifications of the manufacturer of the oil. Cleaned internally in the tank part of the reservoir.

Closed it back up. Cleaned all the suction screens before they closed it; got ahead of myself. And pumped the oil back into the unit and turned it over to us.

Q. Do you know what the $40,000 under the additional labor expense represents?

A. I assume it was the labor that assisted us during the time that we had the problems. I do not know that to be exact fact.

Q. Now, I believe you stated yesterday that there were employees from Fieldale Farms which assisted you for the full two-week period; am I correct?

A. Yes.

Q. So their employees were assisting you prior to the problems you had with the pumps; is that correct?

A. Yes.

Q. And they continued to assist you after the problem with the pumps?

A. Yes.

Q. How about the section titled, "Additional overhead expenses" and that total is $40,995; do you know what that figure represents?

A. That is loss of production, production pounds in chicken they could not produce due to the failure of the pumps.

Q. Now, how do you know that?

A. I was associated with the poultry business for the last 30 some years.

Q. So just based on your past experience --

A. Yes.

Q. -- in the business? Have you had any conversations with any individuals from Fieldale Farms that would lead you to believe that this amount represents what you just stated?

A. I'm not clear on what you're asking.

Q. Okay. You just stated that this $40,995 represents the loss of production to Fieldale Farms?

A. Yes.

Q. As a result of the plant being shut down for the repairs?

A. Unh-unh.

Q. Is that correct?

A. Not shut down for repairs, no. We did not

shut it down entirely.

Q. Okay.

A. We had lost production because I think there is six lines in that plant and we could only run maybe four.

Q. Okay.

A. I don't remember exactly. So they had sent people home. So then they had to run all night where they were possible to run two shifts, they ran three shifts to try to keep up.

Q. So it's your belief that this $40,995 represents the loss to Fieldale Farms as a result of the cutback in the production?

A. Yes, yes. That's correct

Q. Have you had any conversations with any individual from Fieldale Farms to support your theory?

A. Yes.

Q. And who was that conversation with?

A. That would be Tom Hinsley, Egbert Martin, Claude Sullens, and I think that's it.

Q. I'm sorry. What was Claude's last name?

A. Claude Sullens, S-U-L-L-E-N-S.

Q. Okay. And these individuals specifically told you that they incurred a loss of $40,995 as a result of the cutback in production?

A. Not to that exact word, no.

Q. Okay.

A. There was no figure mentioned when I was there.

Q. Okay. And I believe you stated yesterday the freight expense which shows, it looks like $16,050? I'm sorry. $1,650?

A. Yes.

Q. I believe you stated yesterday that was for shipping the pumps to Livingston and Haven; is that correct?

A. No. For shipping the pumps from Bethlehem, Pennsylvania to Gainesville, Georgia.

Q. And is that the repair pumps?

A. New pumps.

Q. The replacement pumps I mean?

A. Yes, the replacement pumps.

Q. How many pumps were shipped?

A. Twenty.

Q. Twenty. So is it your testimony here today that aside from this $16,569 that has been paid already by Colony, the remaining balance of this invoice is still due to Fieldale Farms?

A. Correct.

Q. And you have not made any payments on this

invoice as of today?

A. No, sir.

Q. Has Fieldale Farms made any attempt to collect this outstanding payment?

A. No, sir.

Q. Had Fieldale Farms initiated suit against you to collect this payment?

A. No, sir.

Q. Have you performed any work for Fieldale Farms since this incident?

A. No, sir.

(Document marked for identification as Cathell-21.)

BY MR. SNELL:

Q. Okay. Mr. Cathell, I've given you what's been marked as Exhibit-21. This is a letter from David Drummond of Livingston and Haven to yourself dated February 4, 2004. Do you recognize this document?

A. Yes, sir.

Q. And can you explain briefly what this document is?

A. An attempt to collect the 15,000-some-odd dollars.

Q. If you look at the second page, the second paragraph, there's a figure.

A. (Witness complies. ) Yes, $15,357.74.
Q. Okay. And what does that amount represent?
A. The balance of it on the 20 replacement pumps.
Q. Okay. Is that the 20 pumps that was shipped from Bethlehem, Pennsylvania?
A. Correct.
Q. And you stated that's the balance that is owed?
A. Was owed.
Q. Was owed.
A. At the time this was sent.
Q. Has that been paid?
A. I borrowed the money and paid it, yes.
Q. When was that paid?
A. I think it was in January of this year. I think, 2005. I'd have to check to be sure.
Q. Do you recall the total amount you were billed for the replacement pumps?
A. Fifty-one thousand --
Q. -- if you look at Exhibit-15?
A. (Witness complies.) Here it is.
Q. The second page of Exhibit-15.
A. Fifty-one thousand, four hundred twenty-nine dollars and two cents.
Q. Okay. And the total amount was payable to

Livingston and Haven?

A. Correct.

Q. And can you state why that you had to replace the 20 pumps?

A. Due to cavitation which is sucking air into the pumps. The 20 pumps failed which is beyond repairing. It is not feasible to repair them in that state, so you replace them.

Q. Do you have an invoice from Livingston and Haven for the full 51,000?

A. Yes, I'm sure I do.

Q. Can you get your hands on that and file that to us?

A. Yes.

MR. SNELL: And counsel will --

MS. RODGERS: Yes.

MR. SNELL: -- forward that as well.

BY MR. SNELL:

Q. And were you billed directly for that amount, the 51,000?

A. Indirectly.

Q. Indirectly. Can you explain what you mean by indirectly?

A. I am not in Livingston Haven's distributor territory. I cannot buy directly. I have to buy from

Airline Hydraulics in Bensalem, Pennsylvania.

Both companies bid on these pumps and several other components. Me dealing directly with Airline, my son-in-law, Rob's Hydraulics dealing with Livingston Haven. Livingston Haven got the bid because they were the lower price.

So they could only sell directly to him, so he could sell to me.

Q. "To him" being Rob?

A. Rob's Hydraulics.

Q. In North Carolina?

A. Right.

Q. Okay. So you placed the order through Rob's Hydraulics?

A. Yes.

Q. He placed the order to Livingston and Haven?

A. Correct.

Q. Who in turn shipped it --

A. Directly to me.

Q. -- directly to you? Who was invoiced for that amount?

A. He was.

Q. Rob was?

A. Yes.

Q. Who paid the invoice?

A. On the replacements?

Q. Yes.

A. I put fourty -- I don't have that figure. Thirty-six thousand-and-something on two credit cards. The balance of the $15,357.74 was outstanding until they served him with a warrant for payment.

Q. They served Rob --

A. Yes.

Q. -- with a warrant?

A. Yes.

Q. When you make payment on your credit card, did you make payment to Rob's Hydraulics?

A. No.

Q. Made it directly to Livingston and Haven?

A. When I made payments?

Q. The credit card payments you made, were those payments made to Rob's Hydraulics?

A. No. To the credit card companies.

Q. Okay. But when you ran your credit card through, who did you give your credit card information to; was it to Rob or to Livingston and Haven?

A. I'm not certain which one at this time. It went to Livingston Haven. Whether I did it directly or through him, but it went to them.

Q. Do you have documentation of that?

A. No, sir.

Q. Credit card receipts?

A. No. It was done verbally over the phone.

Q. You don't have a copy of your monthly statement showing that transaction?

A. I may have. I'm not sure.

Q. Okay. Could you check through your records and if you do, provide that to us?

A. (Nods head)

Q. So Mr Cathell, one final question and then I will be finished. Is it correct to say that of the remaining balance that's outstanding as a result of this incident, all that is remaining is the balance for the Fieldale Farms invoice which is $100,774.50 less the 16,000 that Colony has currently paid?

A. Is that pertaining to just Fieldale?

Q. For now, just Fieldale, correct.

A. Yes. Just that amount less the 16,000-and-something, yes.

Q. Okay. Now, for expenses you incurred personally. You have not -- is it correct to say that you have not been reimbursed by anybody for those expenses; is that correct?

A. Correct.

Q. Are those expenses what appear on Exhibit-15?

A. Yes.

Q. And can you explain to me what those expenses on Exhibit-15 represent?

A. Represent the labor of myself, Al Collins, Greg Knowles, Rob Lynch, Terry and Buddy; I don't know their last names. The motel expense, the meals, travel from the motel to the plant each day and back.

The cost of the 20 pumps. And the meeting in Georgia, and additional trip to tear down and inspect the pumps.

Q. Is there a cost for the replacement hoses?

A. Pardon?

Q. Did you incur a cost to replace the hoses?

A. Yes.

Q. Where is that cost represented on this document?

A. You got a freebie. Six thousand-some-dollars. How do you like that one?

Q. So it does not appear on Exhibit-15?

A. Let me double check. No, sir.

MR. SNELL: That's all the questions I have.

THE WITNESS: I know why it was.

BY MR. SNELL:

Q. You know why it wasn't?

A. Because that is included in the cost of the power unit originally.

Q. I'm sorry. Can you explain that?

A. The hoses were included in the cost of the power unit originally to 206,780, and my figure should have been included in this case also but it's not.

Q. It was included in the original proposal?

A. Yes.

Q. Which is Exhibit-1?

A. Yes. Those hoses were included in the cost of the unit.

Q. Were the original pumps also included in the cost of the unit?

A. Yeah.

Q. And that's represented on Exhibit-1 as the ten tandem Rexroth variable volume pumps?

A. Yes.

MR. SNELL: Okay. That's all the questions I have. Thank you.

BY MS. BEAM:

Q. Unfortunately, I do have a couple more questions.

A. You ruined my day.

Q. And --

MR. KAPLAN: -- I've got two also.

MS. BEAM: But I need a break to get another drink. Just take about five minutes.

(Brief recess.)

BY MS. BEAM:

Q. Mr. Cathell, I have a few more questions for you, sir. On exhibit number one which is the proposal that you had testified about previously.

Now, as a businessman, when you bid out a job and send a proposal, you build some kind of a profit into that proposal for Don's Hydraulics, correct?

A. Yes.

Q. Because you're in business to make a living, correct?

A. Yes.

Q. All right. How much of a profit was built into the proposal here that you sent to Fieldale Farms that is exhibit number one?

A. Exactly, I don't know. Probably in the range of 20 percent.

Q. Okay. When you say it's probably in the range of 20 percent, is that because that's what you usually build into a bid is a profit margin of 20 percent?

A. Try for it.

Q. Okay. Now, did Don's Hydraulics ever get paid anything for the Fieldale Farms job?

A. Partial.

Q. Okay. On the second page of exhibit number one, under the terms, you have one, two, three, four different amounts listed under terms, and down at the bottom there looks to be a little index, it has check equals INV which I'm assuming means invoiced?

A. Correct.

Q. And a zero which equals paid; is that correct?

A. Correct.

Q. And if I'm using that index correctly and applying it to the terms up here, does that mean that Don's Hydraulics got paid a little over $175,000 for this Fieldale Farms job?

A. The total of those top three.

Q. Okay. So if we totaled up the terms 59,966, 43,423 and 72,373, that's the total that Don's Hydraulics would have received from Fieldale Farms for this project?

A. Did receive.

Q. Did receive? Okay.

A. The first three, yes.

Q. Okay. So you had invoiced the final amount there, the $31,017 to Fieldale Farms but you did not receive that amount?

A. Correct.

Q. Okay. I'm changing gears on you now. When

Mr. Kaplan was asking you questions about how long it took you to complete this particular project and you said it was a 16-week project, correct?

A. Correct.

Q. When you're building smaller hydraulic units, like 200 horsepower or smaller which is what I believe you had testified you generally build, does it usually take you up to the last day before you ship that unit to build it?

A. No, ma'am.

Q. Okay. How much lead time do you usually have on these smaller units that you get done before a deadline?

A. It's very seldom you have an actual deadline for them. The ones that we have had had, probably two, three, four days. Possibly more.

Q. So from your answer, I take it that you usually don't have to work on a deadline like you did on this Fieldale Farms project?

A. Normally you don't, no.

Q. On this particular project, how long before you shipped out on August 25, 2005, did you have the unit completed but for the suction hoses?

A. I could not complete the unit in entirety because it had to be painted after these were put on.

Q. Okay. So other than the suction hoses and the painting afterwards, how long before you shipped the unit was the rest of it assembled?

A. I'm guessing probably two or three days. I don't know exact.

Q. Okay. It occurs to me when I was listening to you answer Mr. Kaplan's questions that I don't know if we've ever discussed: What is the difference, if any, between banding and swaging the end of a hose?

A. Banding is the external, meaning outside.

Q. Okay.

A. Swaging is internal, meaning inside.

Q. Okay. So then could you explain to me what swaging means? How do you swage an end of a hose?

A. Swaging, I don't have the capability of doing. I've never done. I have seen it done.

Q. Okay.

A. You have a tool that goes internal, inside the fitting and it expands causing that fitting to expand out against the hose internally to seal.

Q. Okay.

A. Banding, you have no outside sleeve. The steel sleeve is not there. You use a band of various widths, probably anywhere from three-eighths of an inch wide to half inch or so, which most of them are is half

inch, and you put a band that is made up and it has a buckle on it.

You slide that over the outside the hose. You have a tool that starts pulling it which draws it tight around the hose, and you have to use two to three depending on the size of the hose. The length of the internal stem, you use two, three bands, whatever's required. Whatever's recommended that tightens the outside of the hose against the stem inside the hose.

Q. Okay. So banding and swaging are not done in conjunction, they are two separate applications, correct?

A. Correct. Correct.

Q. Now, I understood you to say that when you had used two-and-a-half inch diameter hoses on a prior occasion had tried banding it, it had failed or leaked for you; is that correct?

A. Yes.

Q. All right. Had you on any prior occasion when you were using two-and-a-half inch diameter hose, had the ends swaged and had that failed on you also?

A. No.

Q. Okay. In response to one of Mr. Kaplan's questions earlier, he asked you when you were ordering the hoses, did you rely upon Truck Tech personnel and your answer was yes.

Now, my question to you is what were you relying upon the personnel of Truck Tech for in this ordering process?

A. To deliver the hoses on time.

Q. Okay. So you were not really looking to Sean Swain as someone who had a superior knowledge or technical ability above you in assembling hoses, were you?

A. No.

Q. Okay. Changing gears on you again. When Mr. Kaplan was asking questions about welding the reservoir that's depicted in I guess exhibit number four. Here let's use this one. (Indicating.) And he's talking about well, how come you couldn't get in and clean it and you said well, there's something inside of there that's blocking entry. You can't crawl into it once it's put together; is that correct?

A. There are baffles internally, yes.

Q. Okay. And the other hydraulic units that you routinely build that are 200 horsepower or less, how do they compare in size, the reservoirs, to the reservoir that is depicted in exhibit number four?

A. In proportion I guess is the best way to.

Q. Okay. So --

A. -- depending on the volume you're pumping.

Q. Okay.

A. The pump determines the size of the tank itself for lack of a better word.

Q. All right. So then maybe I'm not comparing this correctly, but would something that is being built for less than 200 horsepower, be half of the size of the reservoir that's depicted in exhibit number four?

A. Less than half of this? (Indicating.)

Q. Yeah. I'm just trying to get an idea.

A. That would be close. It probably be a little large but it'd be close.

Q. And exhibit number four is only half of the reservoir that was the complete unit for Fieldale Farms, correct?

A. Correct.

Q. All right. And the other hydraulic units that you routinely produce that are 200 horsepower or less, is it pretty much the same kind of design as this unit that we're looking at in Exhibti-4?

I mean, are you going to have a reservoir like that on the top and the pumps and motors on the bottom?

A. You would have the same components. The design could vary depending on the type of pump you use.

Q. Okay.

A. Some applications. The pump would be mounted

Q. Other picture, okay.

A. It travels down the full length. It comes back the full length and travels down the full length which is the front section. These in exhibit number eight, it shows these lids (indicating) right here which are large enough. They are removal. They're bolted on.

You can remove those lids and you can go down into this front section.

Q. I see.

A. They could reach over into this section but that's as far as they can get. (Indicating.)

Q. Okay.

A. After that, they vacuumed. They dropped the vacuum hose down. You cannot visually see. You just clean the best you can after that.

Q. Okay. Yesterday when we were initially talking about how does a pump disintegrate on the inside like had happened down at Fieldale Farms, I believe I remember you saying that one way was for foreign objects to be present; is that correct?

A. That is correct.

Q. Okay. So if foreign objects were somehow in the oil, could that cause a pump to disintegrate?

A. That would positively. Anything in the oil.

Q. Okay. So hypothetically speaking, okay, if

there was debris either in the oil that was delivered by Castrol or in the oil that was given to you by Fieldale Farms to pump, to prime each of the pumps, or even debris inside the reservoir, any of those things -- any of those circumstances could cause a pump to disintegrate inside; is that correct?

A. Correct.

Q. If a pump in the entire system is destroyed, then the whole system starts to lose power; is that correct?

A. Correct.

Q. If there's contaminated oil and the system was going to loop around and eventually reach all of your and disintegrate them; is that correct?

A. Correct.

Q. Okay. Shifting gears on you again. Talking about hoses that you thought were failing and leaking at the second day after the system was up and running. You and a couple of the other gentlemen there decided to tape the ends; is that correct?

A. Correct.

Q. Would you expect that taping the ends were in fact what was leaking, wouldn't that process of taping the ends have stopped that cavitation?

A. It did stop it and it gave us enough time to

Q. Okay. Have you ever in your career in the hydraulic business had occasion to use the services of COT-Puritech or another company like them prior to the Fieldale Farms project?
A. No.
Q. Was this project summary report something, if you know, that would ordinarily be produced by Puritech or were they specifically asked by one of you to produce this report?
A. Tony told us when he talked with us, this would be provided at the end.
Q. Okay. And who was it that chose COT-Puritech for this project?
A. They were recommended by Livingston Haven and the decision was made by the plant and myself to bring them in.
Q. Now, did you know Tony Blackman before this Fieldale Farms project?
A. No.
Q. Did you know anyone at COT-Puritech prior to this Fieldale Farms project?
A. No.
Q. While Mr. Blackman's crew was doing their work on the reservoir, the pumps had all been taken off of the unit at that point?

A. We did it at the same time.
Q. This 11, 12, and 13.
(Documents marked for identification as Cathell-11 and Cathell-12 and Cathell-13.)
BY MS. BEAM:
Q. You had indicated that you have maybe three hoses in your custody at this point; is that correct? Three hoses you had said?
A. I believe that's correct.
Q. Okay. You have a few hoses --
A. Yes.
Q. -- in your custody at this point? I'm not going to hold you to the number. What if any part did you play in having those hoses tested?
A. I was the one that tested them.
Q. Okay. And when did you decide to do that?
A. When the insurance company contacted me that they were sending an engineer in to test the hoses.
Q. The insurance company being who; Colony?
A. Yes.
Q. And give me an idea of when that was.
A. I don't. I sent a fax to my attorney at the time.
Q. Okay. I'm going to -- yeah, I don't want --
A. Making him aware of the fact --

Q. -- guess. Let me hand you that which is exhibit number 11 which looks to be a fax sheet from you to your attorneys; is that correct?
A. Yes.
Q. All right. The date on that is what, sir?
A. February 24, 2004.
Q. Okay. And is that the fax sheet that you were referring to a moment ago saying that that's when you --
A. Yes.
Q. -- decided to have the hoses tested? Okay.
A. This was after they were tested.
Q. Okay. Who did you have do the testing?
A. I did.
Q. You did them yourself?
A. He had no way to test them and didn't know what to do with them.
Q. Who didn't know how to test them?
A. Anthony Cornetta.
Q. Okay. So you got the hoses from Anthony Cornetta?
A. I had the hoses -- oh. Now, there was another engineer prior to him and he took the hoses and --
Q. Okay.
A. -- this Anthony Cornetta brought them back and that's when I did the testing for them because they had

no way to test them.
Q. May I look at that for one moment? I think I may have these out of order.
A. (Witness complies.)
Q. I did, okay. Here we go. I had them marked incorrectly. I'm going to hand you over exhibits 12, 13 and 11 and have you take a look at this for a minute. And I'm going to represent to you that these are documents that were produced by your counsel in response to request for production, and see if that refreshes your recollection as to the sequence of events --
A. Yes.
Q. -- with who had the hoses when and what was done, okay?
A. Okay. (Witness complies.)
Q. Have you had a chance to look at those?
A. Yes.
Q. All right. And like I said, I think I had these marked out of order but you have --
A. Yes.
Q. -- on top of your pile exhibit number 12, correct?
A. Yes.
Q. And at the top of that document it states, "Evidence transfer sheet S-E-A file number 603453, dated

Page 133

November 24, 2003"; is that correct?
A. Yes.
Q. All right. Explain to me what this document is or what it represents.
A. Thomas Butler, the engineer sent by Colony Insurance to examine the hoses and the pumps, requested to take these four hoses with him for testing. And this was my record that he took the four hoses.
Q. All right. Now, it has hose marked one, two and three, and an unmarked hose. Are these numerals something that you had put on the hoses that you could tell them apart?
A. No.
Q. Who put the numbers on the hoses; do you know?
A. I have no idea.
Q. All right. So did Mr. -- Dr. Butler examine any of the pumps while he was at your shop?
A. Very briefly.
Q. Okay. Tell me what you recall Dr. Butler doing with pumps.
A. I opened the crating and he looked into it, looked over some of the parts and that was it.
Q. Okay. And did Dr. Butler do anything to or with the hoses while he was in your shop?
A. No.

Page 134

Q. So all he did was he took the hoses with him?
A. Correct.
Q. All right. Were you ever made aware of what Dr. Butler's conclusions were in regards to either the pumps or the four hoses that he took on November 24, 2003?
A. No.
Q. And it was your understanding that Thomas Butler was sent to your shop by Colony Insurance?
A. Yes.
Q. And how did you come by that understanding?
A. That's what he told me.
Q. Okay. Exhibit number 13 is a fax sheet from Don's Hydraulics to Michael Tighe dated 2/19/04; is that correct?
A. Yes.
Q. Have you seen this document before?
A. Yes.
Q. Was this originated from your office?
A. Yes.
Q. Okay. What's the purpose of this fax that's been marked as Exhibit-13?
A. I received a phone call from Tony Cornetta that he was hired to test the hoses but he had no way of testing them and wanted to know if they could use my

Page 135

equipment to test them with.
Q. Okay. Now, did Tony Cornetta or anyone else suggest to you that Mr. Cornetta was associated with S-E-A or with Thomas Butler?
A. Tony told me it was requested of him to do the testing by Thomas Butler.
Q. So was Tony Cornetta going to bring the four hoses back that Dr. Butler had taken from you to test?
A. Yes, he did.
Q. And did he, in fact, bring those same four hoses back?
A. Yes, he did.
Q. Were you in the shop when Mr. Cornetta came back with the hoses to test them?
A. Yes, I was.
Q. Did you observe his attempts to test the hoses?
A. He made no attempt to test them.
Q. Okay. Tell me what happened when Mr. Cornetta came back to your shop with the four hoses.
A. He brought the hoses in and I took my equipment and hooked up to it and showed him how they were leaking, and he took several pictures showing the leakage.
Q. When did that occur that Mr. Cornetta came

Page 136

back to your shop and you tested the hoses? Could it have been --
A. -- I assume the February the 24th. That's. I couldn't.
Q. And you're referring to exhibit number?
A. Eleven.
Q. Eleven. Which is a fax sheet from Don's Hydraulics to Michael Tighe?
A. Yes.
Q. Dated February 24, 2004?
A. Yes.
Q. Explain to us what this document represents.
A. I notified attorney Michael Tighe that Tony had been. We had tested the hoses. He was there for approximately an hour and a half, and the three hoses we tested all failed. And he took several photos.
Q. Okay. While I'm thinking of it, let me just ask you this. On page two of exhibit number -- what number do you have in your hand, sir?
A. Eleven.
Q. Eleven. It indicates it's an evidence change of custody record and it's dated February 24, 2004. S-E-A project number 603453. And evidence was transferred from Anthony Cornetta representing S-E-A, Limited to Don Cathell representing Don's Hydraulics.