# EXHIBIT A

1

```
 1          IN THE UNITED STATES DISTRICT COURT
 2              FOR THE DISTRICT OF DELAWARE
 3                    -    -    -
 4    DON'S HYDRAULICS, INC.,  :   C.A. NO.
                               :
 5              Plaintiff,     :   04-1275 (KAJ)
                               :
 6          v.                 :
                               :
 7    COLONY INSURANCE         :
      COMPANY, TRUCK TECH      :
 8    INDUSTRIES, INC., and    :
      TIPCO TECHNOLOGIES,      :
 9    INC.,                    :
                               :
10              Defendants.  :
11                    -    -    -
12                August 3, 2005
13                    -    -    -
14              Oral deposition of JAMES M.
      BIGGS, held in the offices of Tighe,
15    Cottrell & Logan, Suite 500, 704 North King
      Street, Wilmington, Delaware 19801,
16    beginning at 1:33 p.m., on the above date,
      before Shenna M. Basye-Cara, a Professional
17    Reporter and a Notary Public in the State of
      Delaware.
18
19
20                    -    -    -
21          ESQUIRE DEPOSITION SERVICES
          Suite 760, One Commerce Center
22            12th & Orange Streets
          Wilmington, Delaware 19801
23              (302) 426-9857
24
```

2

1  APPEARANCES:
2
3      TIGHE, COTTRELL & LOGAN,
       P.A.
4      BY: MICHAEL K. TIGHE, ESQUIRE
       Suite 500, First Federal Plaza
5      P.O. Box 1031
       Wilmington, Delaware 19899
6      (302) 658-6400
       Representing the Plaintiff
7
8      ZARWIN, BAUM, DEVITO, KAPLAN,
       SCHAER, TODDY, P.C.
9      BY: DEVON F. SNELL, ESQUIRE
       Suite 1200
10     1515 Market Street
       Philadelphia, Pennsylvania 19102
11     (215) 569-2800
       Representing Defendant Colony
12     Insurance Company
13
       REGER & RIZZO, LLP
14     BY: CYNTHIA BEAM, ESQUIRE
       Suite 202
15     1001 Jefferson Plaza
       Wilmington, Delaware 19801
16     (302) 652-3611
       Representing Defendant Truck Tech
17     Industries, Inc.
18
       GOLDFEIN & HOSMER
19     BY: GARY H. KAPLAN, ESQUIRE
       Suite 1110
20     222 Delaware Avenue
       Wilmington, Delaware 19801
21     (302) 656-3301
       Representing Defendant Tipco
22     Technologies, Inc.
23
       ALSO PRESENT: SEAN SWAIN
24
           - - -

3

1              - - -
2           I N D E X
3              - - -
4  EXAMINATION OF: James M. Biggs
5  BY MR. TIGHE.....................4
6  BY MR. KAPLAN.....................38
7  BY MR. SNELL.....................65
8
9
10
11             - - -
12         E X H I B I T S
13             - - -
14
   NO.      DESCRIPTION        PAGE
15
16
17
        (No Exhibits Marked)
18
19
20
21
22
23
24

4

1              - - -
2           JAMES M. BIGGS, after having
3  been duly sworn, was examined and
4  testified as follows:
5              - - -
6           EXAMINATION
7              - - -
8  BY MR. TIGHE:
9      Q.    What is your full name?
10     A.    My full name is Jimmy Matt
11 Biggs.
12     Q.    Mr. Biggs, I'm Michael Tighe
13 and I represent Don's Hydraulics.
14          You've been here throughout
15 the deposition of Sean Swain; is that
16 correct?
17     A.    Yes, sir.
18     Q.    If at any time I ask you a
19 question which you don't understand, would
20 you let me know so that I can rephrase the
21 question?
22     A.    Yes.
23     Q.    What's your business address?
24     A.    The physical address is 321-A

5

1  South Division Street, Fruitland, Maryland.
2      Q.    How old are you?
3      A.    52.
4      Q.    What's your educational
5  background?
6      A.    I have -- and I haven't had it
7  exactly, but I have about -- the equivalent
8  of about three years of college education
9  and I've gotten continuing education.  I
10 started college out of high school and
11 decided to enlist and fight in the Vietnam
12 War.  And I came out and found a job that I
13 had a lot of enjoyment in, so over the years
14 I have taken some -- I've taken a lot of
15 continuing education-type courses.  I guess
16 if I ever finish, I'll have some sort of a
17 degree in business.
18     Q.    What branch of the service did
19 you serve in?
20     A.    The Air Force.
21     Q.    And did you serve in the
22 Republic of Vietnam?
23     A.    Excuse me?
24     Q.    Did you serve in Vietnam?

6

1    A.    Actually, my timing was -- by
2    the time that I was through my training,
3    Vietnam was now deescalating and I
4    actually -- no. I actually did not serve in
5    Vietnam.
6        Q.    Okay. Now I want to ask you
7    about your work history from the time you
8    left the service. What sort of employment
9    did you have?
10        A.    The first real job I had --
11    not stuff in high school and that type of
12    thing -- is I worked as -- I started working
13    more or less as a liaison between sales and
14    manufacturing for a company called American
15    Equipment Corporation, which was -- I guess
16    you can consider it a wholly-owned
17    subsidiary of Prince Hydraulics, which is a
18    major manufacturer, hydraulic manufacturer.
19        Q.    How long were you with that
20    company?
21        A.    I guess I was there -- I'm
22    trying to remember. I guess it was about
23    six years.
24        Q.    That's where you learned

7

1    hydraulics?
2        A.    That's where I started my
3    hydraulic education from a manufacturing
4    background. I later evolved as the sales
5    manager of a company that manufactured
6    hydraulic hoists and we sold product across
7    the contiguous United States.
8        Q.    What company was that?
9        A.    Pardon?
10        Q.    What company was that?
11        A.    It's a sales division of
12    American Equipment Corporation. It was
13    called Body Builders Products.
14        Q.    Was there a point where you
15    opened your own business?
16        A.    Yes. I -- for personal
17    reasons I left the manufacturing company and
18    came out east and went to work for a truck
19    equipment distributor. Truck equipment
20    distributors tend to be hydraulic in nature,
21    amongst other things, because there's a lot
22    of hydraulics on trucks, and I worked as
23    their sales manager for a number of years.
24    I guess three or four years. I left there

8

1    and went up and helped a friend of mine in
2    Milford who owns a
3    Mercedes-Benz/BMW/GMC/International
4    Harvester dealership and went in there and
5    ran his operation for about three years.
6    Had the opportunity to join a man named John
7    McCann back in Salisbury as a partner in a
8    truck equipment house and I guess -- I think
9    it was about three years later I ended up
10    buying him out.
11        Q.    So what year would that have
12    been?
13        A.    I guess I bought John out in
14    1987, '88.
15        Q.    Was the name of the company
16    Truck Tech?
17        A.    No. It was McCann Hydraulics
18    Company.
19        Q.    You changed the name?
20        A.    Yes, sir. And it's not --
21    actually, it's not Truck Tech anymore. I
22    can't break people of the habit. But a
23    couple of years ago, three years ago we --
24    well, in 1995, '94 we divested the truck

9

1    equipment side of the business and focused
2    on other things. So we don't work on trucks
3    any more, so -- it's not representative of
4    what we do. So everybody knew us as TTI and
5    so we changed -- just through an amendment
6    to the corporate charter, we changed it to
7    TTI, Inc. and that is the legal entity.
8        Q.    The scope of TTI now is what?
9        A.    It's actually changing. But
10    the scope of TTI back when this process was
11    taking place was two different types of
12    businesses operating under one legal entity.
13    All the revenues at the end of the year were
14    lumped together, all the taxes paid out. We
15    enjoy centralized accounting, some of the
16    luxuries of that type of thing.
17        We have the -- a power
18    transmission -- power transmission business,
19    which Sean explained, which I think is
20    pretty -- he did a pretty good job of it.
21    We also sell and service a full line of
22    mobility products. We're in a part of the
23    durable medical goods industry. We sell
24    wheelchairs, power chairs, we install

10

1   wheelchair lifts, we put stair lifts in
2   homes, that type of thing.
3       Q.    Okay.  Do you have any
4   recollection right now of anything which
5   Sean Swain said during his deposition that
6   you think was incorrect?
7       A.    There was one thing that I
8   think may have been vague, and I -- I'll
9   address that.  He was asked why we didn't
10  make the hose, and Cindy came back and
11  addressed it, but he said because we
12  couldn't find the 2 1/2 inch fitting.  He
13  didn't elaborate:  We couldn't have made it
14  anyway because we don't have the ability to
15  crimp to 2 1/2 inch.  We can only crimp to 2
16  inch.  We have the exact same crimper that
17  Don's Hydraulics has.  They got that from
18  us.  So our limitations are exactly what his
19  limitations are.
20          In the beginning I think they
21  got the idea that we could do above 2 inch,
22  and we can if we swage.  We have a swager
23  that allows us to put on an end above 2
24  inch.  Don absolutely insisted that it had

11

1   to be crimped, so very early on swaging was
2   taken out of the equation, so at that point
3   in time we could not do it.  As I remember a
4   conversation with Sean early on, something
5   to the effect that, at that point in time
6   when we realized swaging wasn't an option,
7   we were no longer capable of crimping the
8   hose and Don's was told that at the same
9   time.
10      Q.    Sean seems to have had the
11  direct contacts --
12      A.    Yes, sir.
13      Q.    -- in this transaction.  What
14  involvement did you have overall?
15      A.    There's really just a cursory
16  involvement.  We do a lot of business and
17  Sean will post me if it's a major order or
18  if there's something that's really weird,
19  strange in application -- engineering
20  application or something, he'll bring me in.
21  But, basically, I hear a lot more -- we got
22  a real nice order from Tilcon the other day.
23  They bought $800 worth of polychain belt or
24  something.  A lot of the times I hear about

12

1   things after the fact.
2           He had mentioned to me in the
3   ongoing process that he was working on a
4   large hose order with Don's.  He brought
5   me -- made me aware of the fact there was
6   problems with the hoses, but that he was in
7   the process of dealing with it.  He was
8   taking them back over to Tipco and Tipco was
9   going to take care of them.  I had no reason
10  to believe that it wasn't going to be
11  another fine delivery of product and I
12  really didn't start getting involved until
13  the day that he came up to me at my birthday
14  party and said:  The hoses failed.
15      Q.    Was there some earlier
16  involvement -- I think Sean said you were --
17  you stopped to see Don and you had some
18  opinion about these five hoses that turned
19  out to be prophetic.
20      A.    And I've tried to remember.
21  It's been so long that some of this runs --
22  runs together.  I can't remember if Sean
23  told me that -- he was telling me about the
24  application and 2 1/2 inch hoses and

13

1   explaining where the hoses ran and he told
2   me there was a real short hose, or if I
3   learned that myself when I walked in one
4   time -- and I visit all of our customers
5   periodically -- and I walked in and Don took
6   me back and showed me the power unit.
7           So I'm not sure why I was
8   aware of that, but as we went back there and
9   I looked at the application, it was very
10  obvious to me that he was going to have a
11  problem trying to take a 2 1/2 inch hose, as
12  short as it was, and making it fit between
13  the two connecting points.  And all my
14  suggestion was, because he's got this long
15  steel pipe coming down, was to take and cut
16  that pipe up a foot, foot and a half,
17  rethread it, and add length to the hose and
18  put a gradual bend in -- because hose bends
19  real nicely this way (indicating).  You take
20  a little short hose like this and you try to
21  move it laterally a quarter of an inch; it
22  doesn't go anywhere.  So it was just simply
23  a routing application.
24          But Don's got a lot of

4 (Pages 10 to 13)

14

1 confidence in himself. He's been doing this
2 for a lot of years.
3     Q.     When you did become aware that
4 there was a problem, did you get personally
5 involved in this matter?
6     A.     I asked Sean to sit down --
7 one of the things I did for the company back
8 in Iowa, the hydraulic manufacturing
9 company, is I did a lot of our advanced
10 legwork in product liability situations. If
11 we would have a call on a product liability
12 situation, at times I'd hop on an airplane
13 with a camera and a piece of paper and fly
14 out and start asking questions and taking
15 pictures. I learned early on that a lot of
16 these things become long and drawn out; your
17 memory becomes very late. So that's -- it
18 was under my direction, because I remember
19 telling Sean that he needs to sit down and
20 write down, to his recollection, the
21 process, because he was going to need to
22 draw on it later.
23     Q.     Did you have any personal
24 conversations with anyone from Don's

16

1         There was one conversation
2 where I went up there a month or two or
3 three or four after the fact. Time had gone
4 by. We sat down in his office and just
5 talked for a little while and he was
6 lamenting about his insurance problems. We
7 have a good relationship with him. We've
8 done a good job serving them. They've been
9 a good customer for us and it was really a
10 commiseration of, you know: "Yeah, I know
11 it's horrible. I sure wish you'd pay me.
12         "Well, I'm not going to pay
13 you."
14         That sort of thing. The only
15 thing that came out of that conversation, as
16 we talked about it -- it was kind of funny.
17 He, out of the clear blue, brought up again
18 that he was vehement about not having
19 banding or swaging and we talked about that
20 for a little while. His comment was, that
21 he had had a severe failure on a hydraulic
22 power unit years ago with banding -- banding
23 on the hose and he has used crimped ever
24 since and had excellent success with it.

15

1 Hydraulics?
2     A.     Only conversation I had prior
3 to the failure was the one conversation I
4 had with Don when I walked in, and that was
5 just a cordial: How are you doing? How are
6 we doing for you?
7         "Oh, let me show you my
8 hydraulic unit."
9         And I went back and looked at
10 it. Aside from that, no, sir.
11     Q.     How about after the failure?
12 Did you have any conversations with anybody
13 from Don's Hydraulics?
14     A.     Don and I talked on the phone
15 three or four times. You know, he asked me
16 to -- at one point he wanted me to turn it
17 in to my insurance company and I turned it
18 in to the insurance company and the
19 insurance company came back and said: We're
20 not going to do anything. You didn't do
21 anything wrong.
22         And I told Don that. Anyway,
23 so it evolved into him getting a lawyer,
24 getting us to this point.

17

1     Q.     How about Tipco? Did you have
2 any conversations directly with Tipco?
3     A.     Well, let me back up. Yes, I
4 did. I did, too. I almost forgot. When
5 this thing was starting to escalate, I
6 finally picked up the phone and called --
7 the man that owns the company. The son of
8 the owner.
9     Q.     Would it be Lyons?
10     A.     Rob. Rob Lyons. I got him on
11 the phone and I basically repeated what I
12 knew he knew was going on, but I shared with
13 him and I said -- I said: This is going to
14 turn into a can of worms.
15         He said -- his exact comment
16 was to me, is: That's what we've got
17 lawyers for. He says: I've got insurance.
18 He says: So we'll get there when we get
19 there.
20         And that was the end of that
21 conversation.
22     Q.     Do you remember any other
23 direct involvement in conversation with
24 anyone else who --

5 (Pages 14 to 17)

18

1    A.    No, sir. Never talked to
2  anybody else.
3    Q.    Do you remember looking at any
4  pictures or --
5    A.    Only after -- after the fact.
6    Q.    After the failure?
7    A.    (Witness indicates.)
8        I never saw the hoses before
9  they were delivered. I saw the power unit
10  one time for about five minutes, at the
11  most, and that really was the extent of my
12  direct contact with it until we had the
13  failure.
14    Q.    Sean made up a diary at your
15  suggestion. Is that correct?
16    A.    Yes, sir.
17    Q.    And then did you make up
18  the -- a timeline? Is that --
19    A.    Yes, sir. Actually, I -- when
20  this thing started to develop into a legal
21  situation, we went upstairs and I wanted to
22  go through it with him, because I hadn't
23  actually looked at it. And he had given it
24  to me and I went upstairs and realized I

19

1  couldn't read it, so I called him upstairs
2  and said: These are your notes. Tell me
3  what you wrote.
4        And I basically tried to
5  transcribe what he told me.
6    Q.    Okay. So this -- I'll show
7  you Swain No. 12.
8    A.    Yes, sir.
9    Q.    Is that the timeline that you
10  made up?
11    A.    Yes, sir. It looks like it.
12    Q.    That is not then made from
13  your direct knowledge, but basically you're
14  taking what Sean Swain is telling you and
15  writing it down in a timeline that you're
16  creating. Is that --
17    A.    Yes, sir.
18    Q.    Is that correct?
19    A.    Yes, sir.
20    Q.    I want to ask you about one
21  entry on there. You can probably guess
22  which one it is. On -- I guess it's five
23  pages in, there's an entry September 15,
24  2003. It's the second paragraph. It says

20

1  -- and I'll show it to you in a minute. It
2  says: "Knowing that hoses were defective,
3  Don start" -- I think that's "started."
4  It's cut off -- "Don started equipment which
5  subsequently destroyed pumps."
6        Do you see that?
7    A.    Yes, sir.
8    Q.    Did you write that?
9    A.    Yes, sir, I did.
10    Q.    Let me focus on the first part
11  of that. It says: "Knowing that hoses were
12  defective."
13        Do you concede that the
14  product that TTI sold to Don's Hydraulics
15  was defective?
16        MS. BEAM: Objection to form.
17        THE WITNESS: All I know is
18      that it failed when it was on the
19      power unit in Georgia. They could
20      have driven over it with a semi for
21      all I know.
22  BY MR. TIGHE:
23    Q.    Or they could have done
24  nothing whatsoever --

21

1    A.    That's also a possibility.
2    Q.    -- to make -- to change it in
3  any way.
4    A.    That's correct.
5    Q.    Is that correct?
6    A.    Yes, sir.
7    Q.    Do you think that if there
8  were no changes made by Don to the hoses,
9  then the product sold to TTI by Tipco was
10  defective?
11        MS. BEAM: Objection to form.
12        You may answer.
13        THE WITNESS: If the hoses
14      were not damaged --
15  BY MR. TIGHE:
16    Q.    By Don, you mean?
17    A.    By Don's. And I can speculate
18  there, but -- and the hoses were defective,
19  they had to be delivered defective. And
20  that was basically what my instincts were.
21    Q.    That the hoses were delivered
22  to Don's --
23    A.    To us and subsequently
24  delivered to Don's defective.

22

1    Q.    And the defect would be what?
2         MS. BEAM: Objection to form.
3    Calls for speculation. He's not an
4    expert.
5         You can answer, if you can.
6         THE WITNESS: Should I or
7    shouldn't I?
8         MS. BEAM: You can answer, if
9    you can.
10        THE WITNESS: Okay. I guess
11   "expert" is a label somebody puts on
12   you, but I've been making hoses for
13   a long time and I've learned things
14   about these hoses that I did not
15   know about during the process. Do
16   you want me to give you my gut
17   feeling? Is that allowable? What
18   -- I mean, what are you looking for?
19        MS. BEAM: I'm going to
20   instruct you not to guess at any
21   answer. If you know the answer to
22   his question --
23        THE WITNESS: Okay.
24        MS. BEAM: -- give it. If you

24

1    turn in a hose if you put a wrench
2    on it, and it's not properly
3    installed. You can take a properly
4    installed fitting in a two-piece
5    fitting with a stem and ferrule, and
6    even if it's crimped properly, if
7    you put enough force on it, it will
8    turn.
9         So it's a relative situation.
10   But to be able to take a hose and
11   twist it on a machine with two hands
12   tells me that it was not installed
13   properly. And all they did, as I
14   understand, was start crimping and
15   crimping and crimping until they got
16   it tight enough that it didn't turn.
17   There's a lot of internal forces
18   that go into a hydraulic stem that I
19   think need to be looked at. The
20   mere fact that we had a shell split
21   lengthwise -- everything I've ever
22   seen is, that's an overcrimp.
23        Well, one end of this hose had
24   a somewhat hydraulic stem in it, the

23

1    don't --
2         THE WITNESS: I believe --
3         MS. BEAM: -- say you don't
4    know.
5         THE WITNESS: I believe that a
6    fitting that's turning in a hose has
7    been im -- installed improperly. I
8    know that we have specific
9    guidelines from our manufacturer
10   that tells us as to -- how to
11   install a stem, how to put a ferrule
12   on a hose, and where to crimp it to.
13   They guessed where to crimp this to.
14   I wonder right now if the ferrule
15   and the stem are compatible. I'd
16   like to talk to the manufacturers.
17   But I believe any stem that can be
18   turned in the hose as easily as
19   these turned -- and you need to
20   understand, "easily" is relative. I
21   can take a lot of hydraulic hoses
22   that you and I can take a hold of
23   the hose and not turn it, but it's
24   still loose enough that it would

25

1    other end had a Tainey (phonetic)
2    nipple in it, which is -- I think if
3    you check you'll find it's made for
4    banding, and I suspect the
5    manufacturer might even tell you
6    it's not made to be crimped. I
7    think if you check with the
8    manufacturer of the hose, then the
9    hose manufacturer will tell you that
10   that hose was not tested for
11   crimping and it doesn't surprise
12   them that it failed.
13        So I think they got into a
14   situation that might have been
15   beyond them, and you try to make a
16   bad situation good and it just gets
17   worse and worse and worse. And my
18   gut -- my instinct tells me that's
19   what happened.
20   BY MR. TIGHE:
21        Q.    Your attorney said you're not
22   an expert and you have not been designated
23   formally as an expert in this litigation.
24   With regard, however, to the specific issues

26

1    that we've discussed here this morning and
2    this afternoon, do you regard yourself as
3    having expertise?
4        A.    I believe I'm fluent in what
5    we do.  Are there people that know more than
6    me?  Yes, sir.  Do I know more than a lot of
7    people?  Yes, sir.
8        Q.    Would you, however, expand a
9    little bit upon that, your background in
10   these finite areas, what your experience is
11   in that --
12       A.    I've been making hoses since
13   1983.  You develop a lot of experience in
14   doing things right and doing things wrong.
15   You see failures, you see problems.  Over
16   those years you learn to understand what
17   really is a good application and what is not
18   a good application.  So to say that I've
19   been educated -- I've got 20-some years of
20   on-hand experience.  That's my education.
21       Q.    Okay.  Are you in any way,
22   other than what you've already mentioned,
23   critical of Tipco's performance in this
24   matter?

27

1            MS. BEAM:  Objection to form.
2            MR. KAPLAN:  Objection to
3        form.
4            MS. BEAM:  You may answer.
5            THE WITNESS:  I'm not going to
6        say -- I'm disappointed.  I would
7        have done things differently.
8    BY MR. TIGHE:
9        Q.    How would you have done it
10   differently?
11       A.    They've done some things that
12   I wouldn't have done, to start with.  I
13   wasn't aware that to make that little short
14   hose, they were -- can I get a cup of
15   coffee?  My mouth is getting dry.
16           MR. TIGHE:  Yes, you can.
17            - - -
18       (A short break was taken.)
19            - - -
20   BY MR. TIGHE:
21       Q.    Go ahead.
22       A.    We requested that they cut the
23   stems short.  If I had known that, I would
24   not have let it happen.  Those stems are

28

1    made to a certain length for a number of
2    reasons:  Retention, seal.  Our customer,
3    because he had needed little short hoses,
4    those stems were very close to each other
5    which means there's not a lot of rubber hose
6    that's flexible.  So his idea was to cut the
7    stems short to create more rubber hose.
8    Well, hindsight being 20/20, that should
9    have never happened.  I'm glad those hoses
10   did not go on that piece of equipment.  They
11   should have never cut them down.
12       Q.    "They" being?
13       A.    Tipco.  Those hoses should
14   have never been produced.  They should have
15   come back and said:  We'll not do that.
16           I don't know anybody that
17   assembles hoses that tests every hose
18   assembly that they make.  Gates Rubber up in
19   Chambersburg, Pennsylvania, who is the
20   manufacturer of our product, creates
21   hundreds of thousands of assemblies a year
22   for people like John Deere, Caterpillar.
23   There's a periodic testing of hoses, but I'm
24   going to guess 98 percent of them are never

29

1    tested.  So do I hold it against them for
2    not testing hoses?  No.  But I think it's my
3    gut -- my gut instinct was, those hoses --
4            COURT REPORTER:  Excuse me one
5        second.  Off the record.
6            - - -
7        (A short break was taken.)
8            - - -
9            MS. BEAM:  I'm going to make a
10       request that Mr. Tighe's original
11       question be read back to the
12       witness, please, to make sure that
13       he's answering the question.
14           MR. TIGHE:  And his answer up
15       to that point, too.
16            - - -
17   (The requested notes of testimony were read
18       by the court reporter.)
19            - - -
20   BY MR. TIGHE:
21       Q.    I think there were a couple
22   more words at the end there.  I thought I
23   heard you say that your gut instinct was,
24   you didn't think there was ever any testing.

8 (Pages 26 to 29)

30

1    Did I hear that correctly?
2        A.    That was where I was going.
3    Or at least they weren't all tested.
4        Q.    You're familiar with the
5    letter that Sean wrote to Tipco?
6        A.    Yes, sir. I've read it.
7        Q.    With the capital letters
8    saying, make sure these do not suck air, and
9    so on. Given that, what would you expect
10    Tipco to do? Given that --
11        A.    Well, I know if I had received
12    that letter, I would be very careful.
13        Q.    Why so?
14        A.    I'd have been put on notice,
15    number one. I also would have, at that
16    point in time, understand that we're not
17    talking about a $300 hydraulic pump on
18    somebody's farm tractor. I would have --
19    hopefully, I would have -- I would have not
20    been concerned, because -- it's not really
21    fair. We are a hydraulics distributor and
22    we sell hydraulic hose and fittings, so we
23    would have assembled that hose in accordance
24    to Gates' guidelines. Having assembled that

31

1    hose in accordance to Gates' guidelines, if
2    that hose would have failed, we would have
3    been covered under our million dollar
4    blanket liability policy from Gates, as long
5    as we used Gates hose, Gates fittings, and
6    assembled it to their specification. When
7    you step outside of that umbrella and you
8    start buying product from everybody on the
9    street, you leave that umbrella.
10        So I would have -- I would
11    have gotten involved, I'd have confirmed
12    that the hose was proper for the
13    application, the fittings were proper for
14    the application, that our installation was
15    proper, and I would have assumed that we
16    were providing good product.
17        Q.    All this was in answer to my
18    question about what, if any, criticism you
19    had of Tipco, which was objected to. But is
20    there anything else that you could add that
21    you feel that should have been done
22    differently by Tipco?
23        A.    I think, really, I've covered
24    most of it.

32

1        Q.    How about Don's Hydraulics?
2    Are you critical of Don's for what it did?
3        A.    Like with the little short
4    hoses, Don can be stubborn.
5        Q.    Yes.
6        A.    I'm sure when I suggested it
7    to Don, Don probably thought it was the
8    right thing to do or the easier thing to do.
9    There's not a right or a wrong. If he could
10    have taken that little hose and put it in
11    there and connected it, then he was right
12    and I was wrong. All I knew was, he was
13    creating a tough installation situation and
14    all -- my suggestion really wasn't going to
15    make it a better piece of equipment; it was
16    just going to make it easier to put
17    together. And he was far enough down the
18    road, I guess maybe he didn't want to invest
19    the dollars into making the change.
20    Hindsight being 20/20 -- but Don's done a
21    lot of this. He's very proud. He's made a
22    lot of hoses in his lifetime and far be it
23    from me to argue with the man.
24        Q.    In your timeline, you seem to

33

1    imply that Don should not have started the
2    equipment. Is that something you think is
3    -- you say, knowing the hoses -- that hoses
4    were defective. In other words, Don knew
5    that. Don started the equipment which
6    subsequently destroyed the pumps.
7        A.    What he told us was that --
8    and you have to understand: You can't test
9    a hydraulic power unit very easily,
10    especially one of that size, without hooking
11    it up to the system. Because the hydraulic
12    wheels got to go somewhere and you're
13    talking about hundreds of gallons of oil a
14    minute trying to circulate off of those
15    pumps. I don't know how he would have
16    tested it. So he had to take it down and
17    hook it up to the system to start with to
18    turn it on. I would not, knowing that I
19    couldn't turn the system on -- I'm going to
20    guess there's thousands of gallons of
21    hydraulic oil in that reservoir. I sure as
22    heck wouldn't fill that reservoir up with
23    hydraulic oil here when I couldn't check
24    anything until I've gotten down there.

9 (Pages 30 to 33)

34

1        So what happened was, at least
2   through my eyes, he -- they -- it arrived.
3   They put it in the building or wherever it
4   went. In the process to start the machine,
5   is -- naturally, you have to prime the
6   pumps, which means, basically, unstarted,
7   you open the suction port and you pour oil
8   into the pump. Sometimes you got to turn
9   the shaft so that you fill either the
10  gear -- the gear set or the pistons with
11  hydraulic oil so it's lubricated, put the
12  hose back on, and fill the hydraulic
13  reservoir. In the process of filling the
14  hydraulic reservoir, he had hoses leaking on
15  the floor. That sure tells me that that --
16  if he turns it on, the hydraulic leaks might
17  just go away because now we're pulling, in a
18  suction environment, hydraulic oil to the
19  pumps. But if they'll leak hydraulic oil,
20  they'll suck air.
21      Q.    Did you talk to Don's about
22  this particular issue of what -- what the
23  exact situation was at the time that he
24  began the operation of the equipment?

35

1      A.    No, sir. I did not talk to
2   him. Sean talked to him. Sean came over to
3   me the day that he called and said that the
4   hoses were leaking, sitting there just by
5   themselves, and I told Sean to call -- asked
6   Sean to call Tipco. And Sean in his
7   conversation -- Don was going to try to
8   figure out if he could find somebody down
9   there that could help him with these hoses
10  and later that day Sean let me know that Don
11  had got it handled. He had taken care of
12  it.
13      Q.    So do you know what subsequent
14  events occurred following Don observing the
15  leaking of the hoses?
16      A.    No, sir, I do not.
17      Q.    What should TTI have done
18  differently here?
19          MS. BEAM: Objection to form.
20          You may answer.
21          THE WITNESS: I'm really not
22      sure I know what we could have done
23      differently. We -- we access
24      product from hundreds of vendors.

36

1      You have to take vendors at face
2      value, especially if they're -- you
3      know, if I'm dealing with Mike's
4      Welding Shop down the corner and
5      Mike is the only guy there, I might
6      be a little careful what I get from
7      Mike. I trust that what Gates
8      provides for me is high quality
9      product. If somebody like Tipco --
10     Tipco is one of the largest
11     suppliers of hoses in this area.
12     They provide product to every major
13     industrial company that I know of
14     and they've been doing it for a lot
15     of years. We have to take them at
16     their professional face value, just
17     like our customers take us at our
18     professional face value.
19         You know, hindsight being
20     20/20, I'm sorry I ever got those
21     hoses from Tipco. But Tipco's made
22     a lot of hoses of that size. We
23     assumed that Tipco was very capable
24     of providing that product.

37

1          Aside from that, I don't know
2      what we could have done differently.
3   BY MR. TIGHE:
4      Q.    Do you still do business with
5   Tipco?
6      A.    I don't believe we've done any
7   business with them since then. No, sir.
8      Q.    Is there a reason for that?
9      A.    To start with, there's a
10  lawsuit, but I've lost a lot of confidence.
11  I was disappointed in the way Rob Lyons
12  dealt with my phone call, trying to get him
13  involved. And subsequently, listening to
14  the way some of this went down, I'm
15  disappointed in what happened in the claim
16  that those hoses were tested. I could be
17  all wet, but I don't believe you can take a
18  hose and twist it and have it pressure test
19  and work.
20      Q.    And have it pressure test --
21      A.    Have it pressure tested and
22  hold pressure. So that's -- I know if you
23  split a ferrule, that that hose will not
24  hold pressure.

38

1    Q.    So that if a hose comes over
2  with a split ferrule and a representation
3  that it was tested and held pressure, you --
4  you know on its face that's incorrect?
5    A.    I believe if they pressure
6  tested it to 150 pounds of pressure, they
7  would have blown the end off of that faster
8  than you can shake a stick at it. I've seen
9  it -- hose -- hose ends blown off.
10        MR. TIGHE: Thank you. That's
11    all the questions I have.
12        MR. KAPLAN: A few questions,
13    sir.
14          - - -
15        EXAMINATION
16          - - -
17  BY MR. KAPLAN:
18    Q.    First, when is your birthday?
19    A.    Pardon?
20    Q.    When is your birthday?
21    A.    September 12th, 1953.
22        MS. BEAM: Are you getting him
23  a present?
24        THE WITNESS: I prefer money.

39

1  BY MR. KAPLAN:
2    Q.    You need to look to your left
3  for that one there.
4    A.    My birthday party is on
5  Saturday, if that's where you're going. My
6  birthday is on Friday.
7    Q.    How many years has Don Cathell
8  been involved in the business of hydraulic
9  systems?
10    A.    That I cannot answer. I do
11  know that before Don ever got into business
12  for himself, he worked in maintenance in
13  poultry plants, which means that his
14  experience goes beyond his ever opening a
15  business.
16    Q.    Did you read his deposition
17  transcript?
18    A.    Yes, sir, I did.
19    Q.    Did you make notes from it?
20    A.    No, sir, I didn't.
21    Q.    Did you think he's been
22  involved in the business for 20-some odd
23  years?
24    A.    I'm not going to speculate. I

40

1  don't remember what he said.
2    Q.    But he has been involved in it
3  for quite some time, correct?
4    A.    Well, I've been on the shore
5  since 1983 and I'm sure I can remember him
6  being over there in the late '80s.
7    Q.    And yet, you looked at his
8  hydraulic system and you said,
9  quote/unquote, it was very obvious that
10  there was a problem with it. That is your
11  words, is it not, sir?
12    A.    I think I backed up and said
13  then that I saw something that needed to be
14  routed. I didn't see a problem with the
15  hydraulic system.
16    Q.    No. You said you were there
17  for five minutes and you said it was,
18  quote/unquote, very obvious that the -- the
19  problem with the -- there being small hoses.
20    A.    Yeah. I said there was a
21  problem with the routing and then I went on
22  to say there wasn't a right or wrong. If he
23  could have connected the hoses -- I'm
24  repeating myself, I believe. If I could

41

1  have connected -- if he could have connected
2  the hoses, then they would have worked and I
3  would have been wrong. All my suggestion
4  did was make the assembly easier.
5    Q.    The transcript will be what it
6  is, and my recollection was, that
7  explanation came quite longer -- quite
8  further back in your deposition.
9        But what you saw, from your
10  viewpoint, was a routing application that
11  you thought could be better --
12    A.    I saw something I would have
13  done differently.
14    Q.    So even though he had all
15  those years in business, this problem jumped
16  out at you, looking at the system for less
17  than five minutes. Correct?
18        MR. TIGHE: I object to the
19    form of that question.
20        THE WITNESS: I saw
21    something --
22  BY MR. KAPLAN:
23    Q.    You can answer.
24    A.    I saw something I would have

42

1  done differently.
2      Q.    How long did it take you to
3  identify that situation that you would have
4  addressed differently, sir?
5      A.    Not very long. I was only
6  there for about five minutes.
7      Q.    And that was just based upon a
8  visual --
9      A.    Yes.
10     Q.    -- observation? So it didn't
11 involve any testing at all?
12     A.    Excuse me?
13     Q.    It didn't involve any testing
14 at all?
15     A.    No, sir.
16     Q.    Just, you thought it could be
17 done differently?
18     A.    I would have done it easier.
19     Q.    Easier for?
20     A.    Whoever is putting the hose
21 on. I've put some very short hoses on in my
22 life and I've sweated blood trying to get
23 them on.
24     Q.    Did you use wrenches to get

43

1  those on?
2      A.    Use wrenches, use my feet.
3      Q.    Is it important to you -- is
4  there a particular size wrench for a
5  particular size hose?
6      A.    If at all possible, yeah. You
7  need to use the right wrench.
8      Q.    Does that involve different
9  pressures that can be applied to the fitting
10 and to the hose itself?
11     A.    Yes, sir.
12     Q.    Why don't you expand on that
13 for me, sir. Why is it important to use the
14 appropriate wrench?
15     A.    You can damage the internal
16 organs of a hydraulic fitting if it's
17 improperly torqued, overtorque it.
18     Q.    How is that?
19     A.    Just put enough pressure on
20 it, you can distort the seats, mechanical
21 seats, you can tear threads.
22     Q.    And if you tear threads, does
23 that cause leakage?
24     A.    It can cause the hose -- yes,

44

1  sir. It can cause leakage.
2      Q.    Could it cause air leakage
3  into it, into the hose itself?
4      A.    It could.
5      Q.    Did you do any inspection of
6  the -- either the hoses or any of the pieces
7  of equipment attached to the hoses to see if
8  there were any wrench marks left?
9          MS. BEAM: This is at what
10     time period?
11 BY MR. KAPLAN:
12     Q.    Any time period, sir.
13     A.    I have visually inspected not
14 every hose, but a number of the hoses that
15 we have in our possession. Some of them are
16 not inspectable because they had tape put
17 over them and I was not going to remove tape
18 or anything else. But the ones that I can
19 see where -- because of oil that the tape is
20 falling off or something like that, I can
21 see no wrench marks.
22     Q.    How many would that have been,
23 sir?
24     A.    I'm going to guess I probably

45

1  looked at a half a dozen.
2      Q.    Half a dozen hoses or a half a
3  dozen ends?
4      A.    Half a dozen ends.
5          If I may continue, there are
6  wrench marks, but the wrench marks are where
7  they are supposed to be, on the tightening
8  nut on the female side of the JIC and at the
9  base of the threads on the male pipe. I was
10 looking to see if I could see wrench marks
11 on the ferrule -- and I didn't expand enough
12 on that. I could not see any wrench marks
13 on the ferrules that were exposed.
14     Q.    Did you look for wrench marks
15 there, sir?
16     A.    Specifically, that's what I
17 was looking for, after I read the -- I think
18 it was the testimony -- or the deposition of
19 Tim Bombick and he talked about wrench marks
20 down on the ferrules. I was curious if they
21 were there, so I looked.
22     Q.    But you looked at only half a
23 dozen?
24     A.    I probably looked at six

46

1    fittings.
2        Q.    Out of how many fittings were
3    there, sir?
4        A.    I had not specifically counted
5    the hoses. I heard Sean state there were 12
6    hoses, so I guess that means --
7        Q.    So there was 24.
8        A.    24. Yes, sir.
9        Q.    Now, when you spoke about Mr.
10   Cathell you said he, quote/unquote, had
11   confidence in himself, and I think, to put
12   that in context, you were describing how you
13   would have done a routing application
14   differently than he did.
15       A.    Yes, sir.
16       Q.    And you brought to his
17   attention at that time that you would have
18   done the routing differently.
19       A.    Yes, sir.
20       Q.    And you nicely put it that,
21   him having confidence in himself, he wasn't
22   going to listen to your suggestion.
23           MR. TIGHE: Objection to form.
24           THE WITNESS: I wouldn't say

47

1            that he wasn't going to listen, but
2            he believed that the application as
3            he had it put together was going to
4            work.
5    BY MR. KAPLAN:
6        Q.    And he was adamant in his
7    belief?
8        A.    He just said: I'm going to do
9    it this way.
10           I guess you could call that
11   adamant.
12       Q.    And that was because he had
13   confidence in himself in what he desired
14   appropriate for the system, correct?
15           MR. TIGHE: Objection to form.
16   BY MR. KAPLAN:
17       Q.    Now, you also told us earlier
18   that you had discussed the possibility of
19   swaging with Mr. Cathell.
20       A.    The conversation that I had
21   with him, sitting in his office after the
22   fact, after the failure, he made the comment
23   that he wasn't going to do banding or
24   swaging, only crimping.

48

1        Q.    Did you have any conversations
2    with him regarding swaging, crimping, or
3    banding prior to that occasion?
4        A.    I had no conversation with
5    either Delmar or Don from the time that the
6    order was placed to the time that the order
7    was delivered.
8        Q.    Okay. And the conversation
9    you had after the fact with him in his
10   office, did he mention banding at all or
11   just the swaging?
12       A.    When he said that he didn't --
13   he didn't want anything but crimping, his
14   comment then went: I've had banding before
15   and I've had some severe, real problems with
16   it and I don't want that.
17           Swaging was not included in
18   his report.
19       Q.    Had you discussed with Mr.
20   Swain of your company whether it had been
21   recommended to Don's Hydraulics that the
22   fittings be crimped or swaged or banded?
23           MS. BEAM: Again, are we
24           talking about after the fact?

49

1            MR. KAPLAN: No. Before.
2            MS. BEAM: During the process.
3            THE WITNESS: I talked with
4    Sean about it and it's been
5    discussed a couple of three times,
6    but I'm not sure I can tell you
7    the -- when the first time was. Was
8    it sometime before the order was
9    delivered or was it right after the
10   failure, that's such a small time
11   frame, I'm not sure I can tell you.
12   I'm not a hundred percent positive
13   right now.
14   BY MR. KAPLAN:
15       Q.    In your narrative that you
16   prepared, you have dates of December of '02
17   -- between December '02 and July 30th of
18   '03.
19       A.    Yes, sir.
20       Q.    Does that help you at all?
21           MS. BEAM: I'm sorry. What
22           was the date?
23   BY MR. KAPLAN:
24       Q.    Well, I'm looking between

50

1    December 4, '02 and July 30 of '03. Why
2    don't you look at the large paragraph there,
3    sir, the paragraph that begins, quote,
4    during, quote, process, unquote.
5        A.    This is what Sean was
6    dictating to me. This has got nothing to do
7    with my conversation. This is a hundred
8    percent of what Sean dictated to me long
9    after the failure
10       Q.    Well, what was the reason that
11   you -- if you had no firsthand knowledge,
12   why did you prepare this narrative --
13       A.    Because we were getting
14   ready --
15       Q.    -- that applied to that time
16   period, when you already had Sean's
17   narrative?
18           MS. BEAM: Objection. Asked
19       and answered.
20           MR. TIGHE: I'll object to the
21       form of it.
22           MS. BEAM: You can answer
23       again.
24           THE WITNESS: Because I

51

1        couldn't read it.
2    BY MR. KAPLAN:
3        Q.    In the narrative which is
4    marked as -- what's it marked as?
5           MS. BEAM: 12.
6    BY MR. KAPLAN:
7        Q.    -- as 12, is in your
8    handwriting, correct?
9        A.    Yes, sir.
10       Q.    So you just rewrote it?
11       A.    The exact process was, shortly
12   after this happened I told Sean to sit down
13   and write it down and retain it, because we
14   may need it. Quite a period of time after
15   that, when it appeared this was going to
16   litigation, I asked Sean to come upstairs
17   and bring those notes because we needed to
18   sit down and review what had happened. He
19   came upstairs and handed them to me and I
20   could not read them. I pulled out a tablet.
21   I handed him his notes and said: We're
22   going to start from square one and we're
23   going to create a timeline. You refer to
24   your notes, because I can't read them.

52

1           And everything developed from
2    Sean taking me through, step by step, what
3    happened.
4        Q.    Are there any standards that
5    would apply to the hose and fitting
6    industry?
7        A.    I need some expansion on that.
8    Are you talking industrial hose or are you
9    talking hydraulic hose?
10       Q.    I'm talking industrial and
11   hydraulic.
12       A.    I can't speak clearly to
13   industrial because we do such very little
14   industrial business and that's a very vague
15   term. Anything that's medium, low pressure
16   tends to fall into industrial. You can --
17   heck, garden hoses is considered industrial
18   hose. Because you're talking such low
19   pressures, I believe that there's a lot
20   looser constraints on industrial application
21   than hydraulic. But I do not know where
22   those constraints lay because I've never
23   studied them.
24       Q.    What about hydraulic hoses?

53

1        A.    Hydraulic has some very
2    concise constraints.
3        Q.    And who is the publisher or
4    what is the code that is --
5        A.    Well, initially there was a
6    code published -- the code that I'm familiar
7    with is published by the Society of
8    Automotive Engineers. They rate our types
9    of hoses with a 100-R code: 100-R-1,
10   100-R-2. 100-R-4 happens to be the
11   specification from the manufacturer of --
12   manufacturer of hydraulic suction hoses. It
13   calls out what the inside tube should be,
14   what the reinforcements should be, what the
15   outside cover should be, what the operating
16   characteristics of that hose should be. For
17   you to achieve an SAE rating, you have to
18   meet or exceed all of those requirements.
19   As far as how to assemble, our specific
20   guidelines come from the manufacturer of the
21   hose.
22       Q.    So is SAE the gold standard or
23   the --
24       A.    We consider it the gold

14 (Pages 50 to 53)

54

1    standard for hydraulics. There may be
2    another one out there, but we have always,
3    as an industry -- in fact, if you open the
4    Gates book and look at hydraulic hose, each
5    hose is rated by its SAE 100-R rating.
6        Q.    Earlier you spoke about
7    wrenches and torques.
8        A.    Yes, sir.
9        Q.    Are there standards for torque
10   wrenches as well?
11       A.    Can you further expand on
12   that?
13       Q.    I wouldn't know. I don't
14   think such a thing exists, but I figured I'd
15   throw it out and ask you. Are you aware of
16   any kind of standards that exist regarding
17   wrenches in terms of application of torque?
18       A.    I suspect there probably are.
19       Q.    Would you know of any?
20       A.    Can I quote them? No, sir.
21       Q.    Do you know any sources of
22   them?
23       A.    Of what? Specifications?
24       Q.    Yes.

55

1        A.    I don't know what it would be.
2    I don't believe there's anything listed in
3    the information that we get from Gates.
4        Q.    The wrenches that you would
5    have at TTI, are they described by the
6    amount of torque that they're capable of
7    applying?
8        A.    We have torque wrenches at the
9    store. Do we use those? No, sir. We don't
10   put hoses on and off.
11       Q.    Would you suspect that torque
12   wrenches should be used to put hoses on and
13   off?
14       A.    I believe if you had an
15   engineer sitting here, he would tell you:
16   Absolutely.
17           I would believe that
18   99.9 percent of all hydraulic hoses that are
19   put on are put on to the squeak method.
20       Q.    The what method?
21       A.    The squeak method.
22       Q.    Why don't you tell me what
23   that is and how --
24       A.    You tighten until it squeaks.

56

1        Q.    Okay. Why wouldn't the
2    engineer say that the torque should be taken
3    into account --
4        A.    Because all --
5        Q.    -- when installing hoses?
6        A.    -- all fittings are analyzed
7    for failure. When you manufacture a
8    product, you better know where your product
9    is going to fail. And because they know
10   where that failure point is, naturally, what
11   they're going to do is, they would find a
12   point somewhere below that where they know
13   that they're going to get a good seal and
14   have retention of the fittings together. So
15   what they're really doing is telling you the
16   optimum point to tighten that fitting to.
17   That doesn't mean it won't work below that
18   or above that. It's their optimal point.
19       Q.    But if you work too far below
20   or too far above --
21       A.    It creates problems.
22       Q.    Problems that would lead to
23   leakage.
24       A.    Yes, sir.

57

1        Q.    Do you know the various -- are
2    you aware of what indications would be that
3    someone had used either too low or too high
4    pressure in applying a hose? In installing
5    the hose. Sorry.
6        A.    If you have leakage where the
7    thread end threads into the other orifice,
8    where the hose goes into, if at that
9    connection you have leakage, you have one of
10   a couple of three situations: It's not
11   tight enough, it's too tight and you've
12   damaged something, or possibly there was a
13   manufacturing defect in one of the -- the
14   mechanical seats where they -- to stop the
15   leakage.
16           We use O-rings. You can have
17   a nick in an O-ring. So there could be a
18   lot of things that can cause it, including
19   undertightening and overtightening.
20       Q.    Could undertightening or
21   overtightening cause a nick in the O-ring?
22       A.    I really don't think so.
23       Q.    What indication or sign would
24   there be on the hose if someone had

15 (Pages 54 to 57)

58

1   overtightened it?
2       A.   You would have some sort of
3   metal failure. You'd have threads torn.
4   You'd be able to look at a manufactured seat
5   and see a crack in it or a wrinkle.
6       Q.   Your testimony earlier, that
7   you thought that -- your gut feeling was
8   that the hoses were not fabricated properly
9   by Tipco?
10      A.   I -- I would accept that.
11  Yes.
12      Q.   If they were not fabricated
13  properly, would leakages occur within
14  minutes of their -- of the pump being turned
15  on?
16          MS. BEAM: Objection to form.
17          You may answer.
18          THE WITNESS: They should have
19      leaked immediately, which is what
20      they did.
21  BY MR. KAPLAN:
22      Q.   By "immediately," you're
23  talking minutes or seconds?
24      A.   I wasn't there, so I can't

59

1   tell you how long it took. While they were
2   dumping hydraulic oil in the reservoir, the
3   hoses that connected the reservoir to the
4   pumps were reported to be leaking.
5       Q.   So the answer to my question
6   is, if there was -- if these were fabricated
7   improperly, would the leakages have become
8   evident within seconds of the piping --
9       A.   I would -- I would say yes,
10  but that doesn't mean that it wouldn't have
11  shown up later. Let's say you're threading
12  in pipe thread and you tighten it -- it's a
13  compression thread and you tighten it too
14  much so you break a few of the threads. Not
15  all of them, but a few of the threads as
16  you're compressing this. It may be that
17  this thing runs a day, a week, or a month
18  until finally you have enough additional
19  loss of material that it fails.
20      Q.   You're saying it could take
21  months before leakage would be observed?
22      A.   I wouldn't say it would take
23  months. No.
24      Q.   It could take weeks or days

60

1   for the leakage --
2       A.   I would say -- I would say
3   hours. You got to remember, we're talking
4   about a suction hose, not a pressure hose.
5   In a suction environment, the seats are
6   under a lot less strain than they are in a
7   pressure environment.
8       Q.   So it would be your opinion
9   that it would take either seconds or hours
10  for it to become apparent?
11      A.   I would assume it would become
12  apparent very quickly.
13      Q.   And again, "very quickly"
14  being measured in terms of minutes, would
15  it, or hours, as opposed to weeks or
16  months --
17      A.   I really don't want to be
18  pinned down because there's an exception to
19  every rule.
20      Q.   Okay. There was discussion
21  before regarding revenue produced by Don's.
22  Is Don's one of TTI's major clients?
23      A.   Yes, sir. I would say they're
24  in the top five.

61

1       Q.   Can you give me a range of the
2   revenue that -- business that Don's
3   produces?
4       A.   I'm as -- I would say that
5   typically they average about $2,000 a month.
6   In busy times there's more. In January
7   there's less. So, on average, I would guess
8   they're a $25,000 account. But that's just
9   a guess. I can give you that answer, if
10  you'd like to know.
11          MS. BEAM: Please just listen
12      to his questions and answer.
13          THE WITNESS: I thought I was.
14      He asked me a question.
15          MS. BEAM: Just listen to what
16      he's asking you.
17          MR. KAPLAN: Sure, I'll take
18      the answer, if you have it.
19          THE WITNESS: I'll be back in
20      four hours.
21  BY MR. KAPLAN:
22      Q.   Is it your testimony that
23  these hoses could not have been tested by
24  TTI?

16 (Pages 58 to 61)

62

1    A.    We do not have the ability to
2    test these hoses.
3        Q.    What would have been the
4    process of testing the hoses?
5        A.    You have to build a test stand
6    capable of connecting the 2 1/2 inch hoses
7    and creating pressures and holding
8    pressures, and I'm not sure I know a half a
9    dozen companies on the East Coast that can
10    do that.
11        Q.    Is there any other way to test
12    these hoses, sir?
13        A.    I don't know what it would be.
14        Q.    How much time would it have
15    taken to create such a test stand?
16        A.    For me, a month. A month.
17        Q.    A month. Okay. Could Don's
18    have tested the hose without putting on the
19    entire system?
20        A.    If they wanted to build a test
21    stand.
22        Q.    That is the only way you
23    believe the hoses could have been tested?
24        A.    You've got to be able to

63

1    connect one end to something that creates
2    pressure and plug off the other end and
3    raise pressure in that hose and hold it for
4    a period of time to see if you have any
5    leaks. I don't know any other way to test a
6    hose. If it's a small end I can stick my
7    finger in one end and blow in the other,
8    but...
9        Q.    If these hoses were pressure
10    tested, does that require a different
11    apparatus?
12        A.    Excuse me, sir?
13        Q.    If you were going to pressure
14    test the hoses --
15        A.    That's what I'm referring to.
16        Q.    That's what you're referring
17    to?
18        A.    Yes, sir.
19        Q.    Do you know if Don's has that
20    equipment to do so?
21        A.    I would be speculating. I do
22    not know whether he does or does not.
23        Q.    What exactly would that system
24    be again? What would that apparatus

64

1    require?
2        A.    You'd have to plug one end of
3    the hose. You'd have to have a pump with a
4    power supply -- a power supply and pump of
5    some source and you'd have to fill the hose
6    -- generally, they use water, because
7    hydraulic oil is messy and air is dangerous
8    -- and pump it up to the specific pressure
9    you're going to test it at. Then you close
10    up -- you put like a ball valve in there and
11    you close the ball valve. Sometimes the
12    leak is very small, so what you do is, you
13    have a pressure gauge on there and you watch
14    to see if you have a diminishing pressure
15    gauge. Or another way you can do it, you
16    can submerse it in a water tank and see if
17    you have -- if you're using air, you'd look
18    for air bubbles. But that -- again, most
19    people don't like to use air because if you
20    compress air and if it gives way, it can be
21    dangerous.
22        MR. KAPLAN: I have no further
23    questions.
24        - - -

65

1        EXAMINATION
2        - - -
3    BY MR. SNELL:
4        Q.    Good afternoon, Mr. Biggs. I
5    just have a couple other questions for you.
6        A.    Yes, sir.
7        Q.    Do you know whether Don's has
8    paid the invoice for the hoses?
9        A.    I know they haven't.
10        Q.    Do you know why they have not
11    paid?
12        A.    Because he claims he hasn't
13    got any money or he's working on very tight
14    cash flows.
15        Q.    Are you making any attempts to
16    collect from Don's?
17        A.    I will -- when this is
18    resolved, I will in one form or fashion make
19    an attempt to collect my money.
20        Q.    Currently, are you attempting?
21        A.    No.
22        Q.    Why not?
23        A.    Because Don has been a good
24    customer for a long time and I see no reason

66

1  brutalizing somebody who is having a hard
2  time as it is.
3      Q.    Is that a concession you would
4  make for other good customers?
5      A.    I've made it for a lot of
6  customers.
7      Q.    How about current invoices for
8  current work that Don has --
9      A.    They pay cash for anything
10 they buy.
11         MR. SNELL:  Paying cash.
12         Okay.  That's all the
13 questions I have.
14         MS. BEAM:  I have nothing.
15         MR. TIGHE:  I have no further
16 questions.
17         MS. BEAM:  We are going to
18 read this one.
19         - - -
20     (Witness excused.)
21         - - -
22     (Deposition concluded at 2:48
23 p.m.)
24

68

1         INSTRUCTIONS TO WITNESS
2
3      Please read your deposition
4  over carefully and make any necessary
5  corrections.  You should state the reason in
6  the appropriate space on the errata sheet
7  for any corrections that are made.
8         After doing so, please sign
9  the errata sheet and date it.
10        You are signing same subject
11 to the changes you have noted on the errata
12 sheet, which will be attached to your
13 deposition.
14        It is imperative that you
15 return the original errata sheet to the
16 deposing attorney within thirty (30) days of
17 receipt of the deposition transcript by you.
18 If you fail to do so, the deposition
19 transcript may be deemed to be accurate and
20 may be used in court.
21
22
23
24

67

1
2         CERTIFICATE
3
4
5      I HEREBY CERTIFY that the
   witness was duly sworn by me and that the
6  deposition is a true record of the testimony
   given by the witness.
7
      It was requested before
8  completion of the deposition that the
   witness, JAMES M. BIGGS, have the
9  opportunity to read and sign the deposition
   transcript.
10
11
12     Shenna M. Basye-Cara
13     Delaware Certified Shorthand
       Reporter and Notary Public in the
14     State of Delaware
       DE Certification No. 167-PS
15
16     Dated:  August 17, 2005
17
18
19     (The foregoing certification
20 of this transcript does not apply to any
21 reproduction of the same by any means,
22 unless under the direct control and/or
23 supervision of the certifying reporter.)
24

69

1         - - - - - -
           E R R A T A
2         - - - - - -
3  PAGE  LINE  CHANGE
4  ____ ____ _____
5  ____ ____ _____
6  ____ ____ _____
7  ____ ____ _____
8  ____ ____ _____
9  ____ ____ _____
10 ____ ____ _____
11 ____ ____ _____
12 ____ ____ _____
13 ____ ____ _____
14 ____ ____ _____
15 ____ ____ _____
16 ____ ____ _____
17 ____ ____ _____
18 ____ ____ _____
19 ____ ____ _____
20 ____ ____ _____
21 ____ ____ _____
22 ____ ____ _____
23 ____ ____ _____
24 ____ ____ _____

70

```
 1          ACKNOWLEDGMENT OF DEPONENT
 2
 3          I,_____, do
 4   hereby certify that I have read the
 5   foregoing pages, 1 - 66, and that the same
 6   is a correct transcription of the answers
 7   given by me to the questions therein
 8   propounded, except for the corrections or
 9   changes in form or substance, if any, noted
10   in the attached Errata Sheet.
11
12
13   _____
14   James M. Biggs              DATE
15
16
17
18   Subscribed and sworn
     to before me this
19   _____ day of _____, 20___.
20   My commission expires:_____
21
22   _____
22   Notary Public
23
24
```

71

```
 1          LAWYER'S NOTES
 2   PAGE  LINE
 3   ____  ____  _____
 4   ____  ____  _____
 5   ____  ____  _____
 6   ____  ____  _____
 7   ____  ____  _____
 8   ____  ____  _____
 9   ____  ____  _____
10   ____  ____  _____
11   ____  ____  _____
12   ____  ____  _____
13   ____  ____  _____
14   ____  ____  _____
15   ____  ____  _____
16   ____  ____  _____
17   ____  ____  _____
18   ____  ____  _____
19   ____  ____  _____
20   ____  ____  _____
21   ____  ____  _____
22   ____  ____  _____
23   ____  ____  _____
24   ____  ____  _____
```