Page 93

A. It's impossible.
Q. Why?
A. Because you never know. You got a 50/50 chance of which way it runs when the electrician wires up the motors.
Q. So whose electrician would have wired up the motors?
A. Outside contractor.
Q. This would be the same outfit that's doing the piping and cooling system?
A. No. It'd be an electrical contractor.
Q. Is it a normal course of events when you deliver a hydraulic power unit that an outside contractor electrician has to come in and wire up your electric motors?
A. Either outside or in-plant.
Q. Okay. The next entry for September 14th states, "Proceeded to start each unit one by one and set the pressure at 900 PSI." Explain to me what you mean by that.
A. To start one electric motor and then you set the pressure compensator to your desired pressure that you want which at this time was 900.
Q. Okay. So each unit is each --
A. Pump.

Page 94

Q. -- pump and each motor and two pumps; is that how it goes?
A. Correct.
Q. So how many units all together were on this hydraulic power unit?
A. There's ten electric motors with tandem pumps.
Q. Okay. So when you're talking about proceeded to start each unit, there's ten units; is that correct?
A. Correct.
Q. All right. How do you determine that the pressure that you need is 900 PSI?
A. It's not determined at that time that 900 is what you need, but I knew it was lower than what I needed. So it's a safe starting point and then you increase once you start the plant up according to what you need.
Q. Okay. And how do you know how much pressure you need when the plant gets up and running?
A. When everything is operating satisfactorily, capable of starting and stopping under the load they want and at the speed that they want.
Q. So when you go down there and you're setting this up to get ready to run on September 14th, have the plant engineers already told you what the full PSI they're going to need when the plant is up and running?

Page 95

A. Nobody knew.
Q. So how are you going to figure it out between Sunday and Monday when the thing is supposed to go online?
A. We start up on Sunday night and operate the equipment.
Q. So it's just hit and miss is how you figure out what your total pressure is you're going to need when your system is up and running?
A. (No response.)
Q. Are my questions making sense or if you want to explain to me in a way that maybe us lawyers can understand, that would be good.
A. Normally, the equipment that was in this plant, 1,000 PSI will operate all of it satisfactorily.
Q. The old equipment?
A. All.
Q. All of it?
A. (Nods head.)
Q. All right. So is that the number you were assuming was going to be needed when you got this hydraulic unit online?
A. Yes.
Q. Okay. Did that turn out to be the pressure that was needed?

Page 96

A. No.
Q. What turned out to be the pressure that was needed?
A. Six hundred.
Q. Six hundred?
A. (Nods head.)
Q. Okay.
MR. KAPLAN: Six hundred PSI, correct?
THE WITNESS: Six hundred PSI, yes.
BY MS. BEAM:
Q. So you were expecting -- let me see if I understand this. You were expecting that the pressure that you were going to need for your unit was somewhere around 1,000 because that's what had been used in the past to run all of the machinery in the plant?
A. Not that particular plant. I don't know what pressure they were operating at. At this time, I don't recall.
Q. Okay. So you were going by your experience at other poultry processing plants --
A. Yes.
Q. -- to come up with a number of 1,000?
A. Yes.
Q. All right. Had you ever installed power units in a poultry processing plant that was as large as the

EXHIBIT
A-24

Page 97

one at Fieldale Farms?
A. Yes.
Q. And on how many occasions, sir?
A. Numerous.
Q. Okay.
A. I don't know.
Q. So this is an average-size production at Fieldale Farms?
A. Yes.
Q. Were the plant engineers available to you for consultation over the weekend of September 13th and 14th for installation of these units?
A. Yes.
Q. Did you take advantage of their availability and consult with them in regards to the needed pressures for running this system?
A. No.
Q. Okay. Is there a reason you did not, sir?
A. They wouldn't know.
Q. They wouldn't know?
A. No.
Q. Well, would they know the pressures that were needed to run the existing equipment?
A. They knew what pressure they were operating at prior with the old units.

Page 98

Q. So I guess that takes me back to my question before. Is it sort of like an educated guess that you use when you're trying to determine what pressure you think you're going to have to run this new unit at?
A. I have records or knowledge I guess of prior experiences with all of this type of equipment in the poultry plants that repeats and that's what I base all my design on is the past experience.
Q. Okay. So when you set out to design a hydraulic power unit, are you going to design it one way if you're looking for say 1,000 PSI as opposed to if you're looking for 600 PSI?
A. No. Be no difference.
Q. Okay. And you would anticipate using the same equipment regardless of what PSI you're expecting to have to run the unit at?
A. The only change would be the electric motor horsepower.
Q. And why would you change the electric motor horsepower?
A. A higher pressure requires higher horsepower.
Q. And is there a problem if you use a higher horsepower motor for a lower pressure need?
A. No problem.
Q. Okay. Going down to the next entry under

Page 99

September 14th, sir. It says, "Maintenance personnel opened all valves to the equipment in the processing rooms."
I assume I know what that means but can you explain to us for the record what that entry means?
A. There are hand valves on the majority of the equipment in the plant for maintenance purposes so they can work on it and not shut the unit down which would shut the entire plant down.
Those were all closed, so they went through and opened all of them and made sure everything was opened.
Q. Okay. And that process connects the plant to your hydraulic unit?
A. It was already connected in the piping. They just had to open the valves.
Q. Okay. The next entry states, "The pumps were started one by one until we had six pump sets running." So you had six out of the ten motors with the two pumps operating at that point, correct?
A. Correct.
Q. At that point, did you notice any problem at all with the hoses or the unit at all?
A. At that point, no.
Q. The next entry states, "The equipment operated

Page 100

for one hour and then we turned off three pump sets, leaving three pump sets running for the clean-up operation." What's the clean-up operation?
A. The plant has a specified clean-up crew that comes in which has to clean all the plant and make sure it's sanitary for USDA inspection before start-up.
Q. So the three pumps were so there's electricity in the plant so they can get their job done?
A. Not electricity because everything operates hydraulically, so they had to have the system running so they can run the equipment to clean it.
Q. Okay. And for how long did those three pumps that you left running for the clean-up operation continue running?
A. All night.
Q. Okay. So you left and you and your people left and the clean-up crew came in, correct?
A. Yes.
Q. All right. You came back on September 15th which is that Monday morning, correct?
A. Yes.
Q. Were the three pumps that you had left running for the clean-up operation still operating when you went back on Monday morning?
A. Yes.

EXHIBIT
tabbies
A-25

Q. At that point, did you notice any problems with the three pumps that had been running all night?
A. No.
Q. Can you tell us at this point which three pumps on the unit had been running all night?
A. No, I cannot.
Q. Okay. Is there a usual way which is to do the first three?
A. It may have been but I couldn't say for certain so.
Q. Would the plant have any kind of records that would indicate something like that?
A. I doubt it very much.
Q. Okay. Monday, September the 15th, your entry on exhibit number three states, "Started four pump sets to begin shift operation." Now, is that four additional pump sets in the addition to the three that were still running?
A. No.
Q. So did you shut the other three down and start four more or how did that happen?
A. We just started one additional.
Q. Gotcha, all right. Next line states, "We started operation pumps as needed to operate the plant until we had eight sets of pump running." So you just

started four more pumps at that point?
A. One at a time.
Q. And as you're -- tell me why it is that you'd go one at a time; is there a specific reason?
A. That whole design of this unit is to reduce cost of mainly electric. The more pumps you have running, the larger the electric bill.
Less pumps, the lower the electric bill. So you don't want to run five pumps if two will do it. You generate excess heat and oil and lots of other problems with it.
Q. Okay. So are the plant engineers in on this process at this point with you?
A. Yes.
Q. Okay. So you and your guys are starting the pumps one by one and someone's in the plant reading valves and telling you if it's enough power to do what they need; is that's what's going on?
A. The maintenance supervisor worked with us closely and as they started up -- they start up one line at a time. I think there's six, five or six lines in that plant, but they don't start them all at once.
So as they started additional equipment and they didn't operate, we started additional pumps to give it more hydraulic flow.

Q. Okay. The next line reads, "With eight pump sets operating, we could not achieve full speed on several pieces of equipment. By noon, we had lost two pumps." Okay. So I guess my first question is when you couldn't achieve full speed on two pieces of equipment, did you then start the other two pumps?
A. Correct.
Q. All right. And then by noon, you had lost two pumps. What do you mean you had lost two pumps?
A. Two pumps had failed.
Q. Probably an obvious answer, but when you said they had failed, does the what; the motor just stops working or?
A. Pressure drops off.
Q. Okay.
A. Indicating no output.
Q. I see. And then just for completion, the next line reads, "During the second shift, two more pumps failed." Which would mean you're down to six pumps at that point, correct?
A. Could you repeat that please?
Q. I'm just reading the last line in your September 15th entry. "During the second shift, two more pumps failed." We're under September 15th.
A. Oh, okay.

Q. Okay?
A. Um-hmm.
Q. So by the end of Monday, September 15th, you have four pumps out of ten that aren't working on this unit; is that correct?
A. Four out of 20.
Q. Four out of 20.
A. (Nods head.)
Q. Which translates into two units out of ten units that aren't working, correct?
A. Yes.
Q. All right. At this point at the day, September 15th, 2003, what if anything had you and your employees determined was the problem in why these pumps were failing?
A. At first I thought it was the compensators and I talked with the supplier, the pump supplier and he suggested that we change them. So he sent me two new ones.
MR. KAPLAN: By pump supplier, who do you mean?
THE WITNESS: Livingston Haven. They arrived the next day.
BY MS. BEAM:
Q. Okay. The compensator, is that a separate

EXHIBIT
A-26

Page 105

part of the pump or is that part integrated into the pump?
A. Integrated in the pump.
Q. So if the compensator was bad, you had to replace the whole pump; is that correct?
A. No. You can replace just the compensator.
Q. So when you said the new ones arrived the next day, it was two new compensators?
A. Yes.
Q. All right. Why did you think it was the compensator at first?
A. Because I couldn't get any response out of them.
Q. So is the compensator part of the tandem Rexroth variable volume pumps?
A. Yes.
Q. All right. And you had obtained those ten pumps from Livingston Haven, is it?
A. Yes.
Q. So what happens when you replaced the compensators in two of the pumps?
A. No change.
Q. And then what did you do to determine what the problem was?
A. Remove the pumps and sent them to Livingston

Page 106

Haven.
Q. So you removed the four out of the 20 pumps --
A. Two of them.
Q. -- that had failed?
A. We took two.
Q. Okay. So you took two of the pumps and you sent the whole pump assembly to Livingston Haven?
A. Yes.
Q. When was that done?
A. (No response.)
Q. Would that have been on the 6th -- well, let's see.
A. I think it was on Tuesday; I'm not sure.
Q. Okay. And what was the purpose or what were you hoping to achieve by sending two of the pumps back to Livingston Haven?
A. Find out what the problem was.
Q. Okay. And when did you next communicate with Livingston Haven about the pumps?
A. The same day.
Q. And what did they tell you?
A. The pumps were disintegrated internally.
Q. What does that mean?
A. Ground up. Fine pieces of metal is the only thing that was left.

Page 107

Q. Okay.
A. Non-repairable.
Q. All right. In your years of experience building hydraulic power units, had you ever encountered a pump that was destroyed internally like that?
A. Yes.
Q. And in your experience, what have you found to be the cause of that?
A. Majority of the time, it's sucking air into the pump.
Q. Okay. How about the minority of times? What could be the other causes?
A. Foreign material.
Q. Foreign material?
A. (Nods head.) Starting up dry instead of filling the case would do the same thing.
Q. Okay. So after you communicated with Livingston Haven and they told you that the two pumps were disintegrated internally, what did you do next?
A. Authorized them to rebuild them.
Q. Okay.
A. Using new parts out of other pumps they had in stock.
Q. All right. And I'm assuming they did that?
A. Yes.

Page 108

Q. And sent them back to you?
A. Yes.
Q. All right. So after you get these two new pumps back, what do you do?
A. Reinstalled them on the unit.
Q. All right. Now, were you still trying to run the unit while these two pumps had been shipped off to Livingston Haven?
A. Had to.
Q. All right. And there's an entry under September 16th which would be Tuesday, when you had sent the pumps back to Livingston and Haven, and the first sentence states, "We decided to use elastic tape and tape both ends of all 20 hoses."
First of all, whose we in the "we decided"?
A. Myself and the plant maintenance supervisor and the general manager.
Q. What was the plant maintenance supervisor's name?
A. Oh.
Q. Would it be either --
A. -- Egbert.
Q. Egbert, okay. Is that his first name or last name?
A. First.

EXHIBIT
A-27

Q. Okay.
A. I don't remember his last name right now.
Q. How about the general manager, do you remember his name?
A. Claude Sullens.
Q. Claude S --
A. -- S-U-L-L-E-N-S. Martin. That's that kid's last name. I'm sorry.
Q. Okay. Thank you. In your next sentence under September 16th, "This step decreased the rate of pump loss enough that we were able to maintain partial production by shutting down some lines and sending the employees home."
At this point, were the other eight units still running?
A. Yes.
Q. All right. Maybe I'm confused, but when the two units out of the ten had failed, the other eight units were still running, correct?
A. Yes.
Q. All right. So you sent the two units, pumps back off to Livingston Haven for them to check it out, right?
A. Yes.
Q. The other eight units were still running?

A. Yes.
Q. Okay. Was it because you needed all ten units to provide enough power that you weren't getting the job done?
A. As the pump's starting to fail, the pressure starts dropping, and if the pressure dropped, I had to increase more pumps while I'm running until I had everything running that was left to run. And it kept dropping.
Q. So the eight units that were left running, the eight pumps that were left --
A. Yes.
Q. -- were the 16 pumps that were left, were losing pressure --
A. Yes.
Q. -- as this process is going on?
A. Yes.
Q. All right. And how is it that you can tell that they're losing pressure as the process goes on?
A. Reading the gauge.
Q. Okay. So what happened after you taped up the ends of the hoses with the elastic tape?
A. It increased. Gave us enough time to get through the weekend so we could change the pumps out without having to shut the plant down entirely.

Q. Okay. Your next line reads, "By Friday evening, had finalized all arrangements to have 20 new suction hoses and 20 new pumps flown in"; is that correct?
A. Yes.
Q. All right. So Wednesday and Thursday the plant was running on the eight units that you had provided?
A. Yes.
Q. Okay. The 20 new pumps came from where, sir?
A. Bensalem, Pennsylvania. I mean, I'm sorry. Bethlehem, Pennsylvania.
Q. Is that where Livingston Haven is?
A. No.
Q. Who did you get --
A. -- Rexroth. They went through Livingston Haven but they're Rexroth's warehouse is in Pennsylvania.
Q. Okay. So you got new Rexroth pumps but they came through Livingston Haven?
A. They are the distributor.
Q. I see, okay. At that point, what made you think you needed all new pumps?
A. Majority of them had failed.
Q. When had that happened?
A. Continuously from Monday.

Q. And Livingston Haven had rebuilt the two pumps that you had sent them initially?
A. (Nods head.)
Q. Did they ever send those rebuilt pumps back to you?
A. Yes.
Q. All right. So then you only needed eight more new pumps; is that correct?
A. (Shakes head.)
Q. No? How come?
A. We destroyed them too.
Q. Okay. Where did you get the new suction hoses from?
A. They were manufactured in Texas and shipped to me next-day air.
Q. How did you find the company to order the hoses through?
A. From Rob's Hydraulics.
Q. And had you had a prior relationship with Rob's Hydraulics?
A. My son-in-law.
Q. Rob's your son-in-law?
A. (Nods head.)
Q. Is that yes?
A. He bought the business from me.

EXHIBIT
A-28

Q. Okay. Now, you lost me. Where is Rob's Hydraulics located?
A. Grimsland, North Carolina.
Q. At one point you had owned Rob's Hydraulics?
A. Well, it was Don's at the time I owned it.
Q. Okay. How long ago did Don's Hydraulics in North Carolina become Rob's Hydraulics?
A. 1990.
Q. So did you have more than one location where Don's Hydraulics operated in 1990? In other words, did you have a shop in North Carolina and a shop up here?
A. Yes.
Q. Did you have more than those two shops of Don's Hydraulics at any time during your career?
A. No.
Q. All right. So what's your son-in-law's name?
A. Rob.
Q. I got that part.
A. Lynch.
Q. Lynch, okay. So when you were looking for a hose distributor when you ran into this problem in Georgia, you called your son-in-law?
A. Yes.
Q. And he gave you the name of somebody that he uses?

A. He took care of it for me.
Q. He ordered them for you?
A. He ordered it for me.
Q. Are these hoses that he produced or assembled himself?
A. No. He can't do it either.
Q. All right. So his shop doesn't have the ability to assemble hoses that are greater in two inches in diameter either?
A. Correct.
Q. Okay. The invoices for these new pumps, these new Rexroth pumps that you had to order, do you have that documentation in your --
A. -- no.
Q. Do you have that documentation, the invoices for the new pumps somewhere in your company?
A. Yes.
Q. Okay. And do you have the invoices for the new hoses that your son-in-law procured through Rob's Hydraulics?
A. Yes.
Q. All right. Again, I'm going to ask that you have somebody look for them and provide them to your counsel please. Okay.
A. I thought the one for the pumps was in there.

Q. I'll look again. It may be. I don't recall seeing it. The next entry indicates, again, "I had also contacted COT-Puritech to clean the oil in the system and the reservoir." All right. What is COT-Puritech?
A. A company that's specializes in pumping the oil out, filtering it to factory specs or beyond, and pump it back in as clean oil. And they go in and they clean the reservoir out. All the fine metal and all from these pumps had to be cleaned out.
Q. Okay. So this company COT-Puritech would come in and you said clean the reservoir, and when I'd asked you before, you said this whole thing is the reservoir but it's actually this top -- (indicating)
A. Yes.
Q. -- steel colored unit?
A. Tank part of it.
Q. Tank? All right. So it's the tank that this Puritech would have cleaned out, correct?
A. Yes.
Q. All right. And you said they pump the fuel out and filtered it or cleaned it or whatever; is that correct?
A. Yes.
Q. All right. And that's to save from having to replace the fuel?

A. So you didn't have to buy new hydraulic oil and pay for getting rid of the contaminated oil.
Q. Okay. And I'm correct that COT-Puritech had billed you for their services, correct?
A. They billed Fieldale.
Q. They billed Fieldale, okay. So at this point, you're past your deadline for having this unit up and running, correct, by what would that be? Wednesday, Thursday, Friday, three days, September 19th?
A. We should have been operating full capacity from Monday.
Q. Okay.
A. But we could not.
Q. Under entry "H," you indicate that you had three additional people from Rob's Hydraulics come in to give you a total of six men. What did you need the additional people from Rob's Hydraulics to do?
A. We had from Sunday night until Monday morning to change out 20 pumps, 20 hoses, put the oil back in the system, start it up, and set it.
Q. Okay. And the invoice for the time for these three men from Rob's Hydraulics, was that billed to Fieldale?
A. No, it was billed to me.
Q. All right. Did one of those three men include

EXHIBIT
A-29

your son-in-law, Rob?
A. Yes.
Q. The pumps that you and these other five other men took out of the unit and replaced, the old pumps, where are they now?
A. In my shop.
Q. Have you personally or have you directed anyone to inspect those old pumps?
A. Yes.
Q. Okay. Have you personally inspected them?
A. Yes.
Q. All right. And tell me what it is that you do when you inspect a pump? Do you take it apart?
A. Disassemble it.
Q. And have you disassembled all of them or just some of them?
A. Twenty.
Q. All of them?
A. Yes.
Q. And what did you find when you disassembled the pumps?
A. Every one of them is destroyed internally.
Q. And are the pumps in the same condition now as when you inspected them?
A. Yes.

Q. When did you do this inspection? Was it shortly after returning to Delaware on September 24, 2003?
A. On the sheet that has the invoice or the time and the motel bills, there's a date on the last entry of that that indicates the time I went back down and inspected the pumps with Livingston Haven personnel and Rexroth and the plant.
Q. So that's when you inspected the pumps?
A. Yes. Not all of them but we did four or five, six, something like that. I don't remember the quantity but the rest were done at my shop.
Q. Did you bring the pumps back with you when you left in September?
A. No.
Q. Okay. What happened to them?
A. I crated them up, we sealed them until we determined what this outcome was. In that time, I gave them permission to put them on a freight truck and ship them back to me.
Q. "Them" being who?
A. Fieldale.
(Brief recess.)
BY MS. BEAM:
Q. You still have in front of you, sir, a copy of

Plaintiff's responses to Defendant Colony Insurance Company's interrogatories. I'm going to ask you to turn to number seven please. It's on page three.
A. (Witness complies.)
Q. Okay. And the question reads, "For each occasion you or your company returned suction hoses at issue in this case to the manufacturer, provide," and then under C, "the individual who initially noticed the problem or raised a concern that warranted the return of the hoses."
And the answer provided is: "Keith Johnson, a self-employed farmer." Who is Keith Johnson and what has he got to do with any of this?
A. He is a friend of mine that stops by and talks with us and he knew we was in a jam trying to get this done, so he was helping us.
Q. Okay. Was this while you were still in your shop up here?
A. Yes.
Q. All right. And he initially noticed the problem with the hoses?
A. He was working with Al at the same time putting them on.
Q. Okay. I think you mentioned Al Collins doesn't work for you anymore?

A. No.
Q. Whom does he work for?
A. Self-employed.
Q. Self-employed. Do you know the name of his company?
A. Collins Welding.
Q. All right. And where is Collins Welding?
A. In my shop.
Q. It's in your shop?
A. Yes. I lease to him.
Q. When did Al Collins start his own shop?
A. I don't really know.
Q. Was it long after this Fieldale Farms project?
A. Prior to that. And then he would work on me on my payroll at times if I had a large project or something. If he had nothing to do.
Q. So at the time of this Fieldale Farms project, he worked for you part time?
A. Yes.
Q. And he leased space from Don's Hydraulics for his own shop, Collins Welding?
A. Yes.
Q. All right. What, Greg Knowles is the other individual that traveled down to Georgia with you; is that correct?

EXHIBIT
A-30

A. Yes.
Q. What is Greg's profession or occupation?
A. Self-employed serviceman for poultry industry.
Q. Do you know what the name of his business is?
A. Other than Greg Knowles, I don't know.
Q. Where is Greg Knowles located?
A. Wallace, North Carolina.
Q. How do you get a hold of him if you need him?
A. Cell phone.
Q. And what was it that Greg was going to provide for you that you or Alfred couldn't do on the Fieldale Farms job?
A. Just another body assistance.
Q. Under interrogatory number seven, sub "D," the question is "Whether you or your company was provided with new replacement suction hoses?" And the response given is: "I did not receive any new replacement hoses from Truck Tech Industries or Tipco Technologies either time the hoses were returned."
From that, my question is: Is it your belief that at no time were the hoses actually replaced with new hoses but rather the ends were just recrimped?
A. That is my assumption, yes.
Q. What about the one, the cracked sleeve, how would you go about fixing that particular problem? Would

you have to have a new hose?
A. No.
Q. What would you do; just take off the sleeve and put another one on?
A. Yes.
Q. So you don't have any real first-hand knowledge regarding whether or not there were new replacement hoses; this is an assumption that you were making?
A. By looking at the hoses when they came back, it looked like they'd just been recrimped is all.
Q. And you're going to have to explain for the record how it is that you could ascertain that just by looking at the hoses.
A. The crimp marks were closer together; meaning, they did not line up exactly as it was the first time when they put it in the machine.
Q. Okay. Sir, can you tell me what if any expressed warrantee that you allege that Truck Tech provided to Don's Hydraulics in regards to the purchase of these hose assemblies?
A. Nothing in writing.
Q. Okay. How about not in writing, was there any expressed warrantee given to you by Truck Tech in regards to the purchase of these hose assemblies?

A. No.
Q. And since the problems on the project at Fieldale back in August 2003, are you now aware that Truck Tech Industries in fact did not manufacture or assemble these hoses that were provided to you?
A. Yes, I'm aware of it.
Q. And can you tell us for the record how it is that you became aware of that?
A. As I remember, when we had the first problem with them turning.
Q. Okay.
A. The stems turning in the hose.
Q. Okay. When the stems turned in the hose, how did you become aware that Truck Tech was not the one that was assembling or manufacturing the hose assembly?
A. Sean said he had to take them back to Baltimore or wherever it was.
Q. I see, okay. When you look at the fittings on the ends of any hose apparatus, can you tell if there's a Trademark or emblem or anything like that on the ends of these stems --
A. Yes.
Q. -- generally? Okay. Did you have occasion to examine the fittings on these particular hoses that you were attempting to use in the Fieldale Farms project to

see whether or not there were any Trademarks or indications of who manufactured the fittings?
A. I don't recall doing it, no.
Q. How about after the Fieldale Farms project and the problems that you had, did you have occasion to examine the fittings on the ends of the hoses that you allege failed to see if there were any Trademark indications or any manufacturer's demarcations on those fittings?
A. I may have. I don't recall doing it.
Q. Who is in possession of the hoses at this point if you know?
A. I'm in possession of three I think, and Truck Tech is in possession of the rest.
Q. Could I have this marked the next exhibit.
(Document marked for identification as Cathell-9.)
BY MS. BEAM:
Q. Sir, I'm going to hand you a two-page document that's been marked as exhibit number nine to your deposition, and again, I'm going to represent to you that this was produced by your counsel in response to request for productions.
And at the top, it says, "Common policy declaration." And the first question is have you ever

EXHIBIT
A-31

Page 125

seen that document before?
A. Yes.
Q. Okay. As you know, Colony Insurance Company is also a defendant in this case, correct?
A. Yes.
Q. All right. And did Don's Hydraulics, Inc., hold an insurance policy with Colony Insurance at the time of this loss in August 2003?
A. Yes.
Q. Was it your understanding that this policy of insurance through Colony was a commercial general liability policy? That's what's indicated on the dec sheet anyway.
A. Yes.
Q. All right. Have you ever had to make a claim through any general commercial liability coverage in respect to failure of a hydraulic unit prior to this?
A. No.
Q. Okay. Do you know what the policy limits were of your Colony commercial general liability policy?
A. Not right off, no.
Q. Okay. Did you or someone on your behalf of Don's Hydraulics, Inc, pay the premiums for that policy with Colony on time during the year of 2003?
A. As far as I know, yes.

Page 126

Q. Has anyone from Colony or anyone else suggested to you that your company hadn't paid its policy in the year 2003? Hadn't paid its premiums? I'm sorry.
A. Not that I know of.
Q. Did you or someone else on behalf of Don's Hydraulics, Inc., submit a claim for this loss to Colony Insurance?
A. Yes.
Q. And what response, if any, did Don's Hydraulics receive after you submitted a claim for this loss?
A. As I recall, the agent told me that we were not covered.
Q. Did you ask why?
A. Yes.
Q. And what were you told?
A. If I understood it right, it falls back on each components manufacturer.
MR. KAPLAN: I'm sorry. Can you repeat his answer please.
(Whereupon, the court reporter read back the requested portion of testimony.)
BY MS. BEAM:
Q. Okay. Did you ever have any conversation with

Page 127

your agent or anyone else regarding what, if anything, would be covered under your general commercial liability coverage with Colonial? (Sic.)
A. Yes, but I don't remember exactly what she told me this time.
Q. Who did you have that conversation with; your agent?
A. Pam Busby.
Q. Who's Pam Busby?
A. Agent.
Q. She's your insurance agent?
A. Yes.
(Document marked for identification as Cathell-10.)
BY MS. BEAM:
Q. Sir, I've handed you what I've marked as exhibit number ten which is entitled, "Project summary report Fieldale Farms, Gainesville, Georgia. Prepared on October 4, 2003 by Tony Blackman for Fieldale Farms and Don's Hydraulics."
And have you ever seen this document before?
A. Yes.
Q. All right. My first question is at the very end in my packet, there was an invoice from Fieldale Farms attached to the report. Does this belong with this

Page 128

report? This invoice, would that have been prepared by --
A. -- one portion of it does.
Q. Okay. And what portion of the invoice is the last page of exhibit number ten would belong to the report?
A. $16,569.50 I think it is.
Q. The oil filtering --
A. Expense.
Q. -- expense? Is Tony Blackman with COT-Puritech?
A. Yes.
Q. I see. And how is it that this report or project summary report came to be prepared by Tony Blackman for Don's Hydraulics and Fieldale Farms?
A. He was their representative that came to the plant. Spoke with us or me and the plant personnel on filtering the oil. He was the one in charge of the crew that came in.
Q. Okay. And the service that his crew provided was the filtering of the oil in the system, cleaning out the reservoir?
A. Yes.
Q. And was there anything else?
A. That was it.

EXHIBIT
A-32

Q. Okay. Have you ever in your career in the hydraulic business had occasion to use the services of COT-Puritech or another company like them prior to the Fieldale Farms project?
A. No.
Q. Was this project summary report something, if you know, that would ordinarily be produced by Puritech or were they specifically asked by one of you to produce this report?
A. Tony told us when he talked with us, this would be provided at the end.
Q. Okay. And who was it that chose COT-Puritech for this project?
A. They were recommended by Livingston Haven and the decision was made by the plant and myself to bring them in.
Q. Now, did you know Tony Blackman before this Fieldale Farms project?
A. No.
Q. Did you know anyone at COT-Puritech prior to this Fieldale Farms project?
A. No.
Q. While Mr. Blackman's crew was doing their work on the reservoir, the pumps had all been taken off of the unit at that point?

A. We did it at the same time.
Q. This 11, 12, and 13.
(Documents marked for identification as Cathell-11 and Cathell-12 and Cathell-13.)
BY MS. BEAM:
Q. You had indicated that you have maybe three hoses in your custody at this point; is that correct? Three hoses you had said?
A. I believe that's correct.
Q. Okay. You have a few hoses --
A. Yes.
Q. -- in your custody at this point? I'm not going to hold you to the number. What if any part did you play in having those hoses tested?
A. I was the one that tested them.
Q. Okay. And when did you decide to do that?
A. When the insurance company contacted me that they were sending an engineer in to test the hoses.
Q. The insurance company being who; Colony?
A. Yes.
Q. And give me an idea of when that was.
A. I don't. I sent a fax to my attorney at the time.
Q. Okay. I'm going to -- yeah, I don't want --
A. Making him aware of the fact --

Q. -- guess. Let me hand you that which is exhibit number 11 which looks to be a fax sheet from you to your attorneys; is that correct?
A. Yes.
Q. All right. The date on that is what, sir?
A. February 24, 2004.
Q. Okay. And is that the fax sheet that you were referring to a moment ago saying that that's when you --
A. Yes.
Q. -- decided to have the hoses tested? Okay.
A. This was after they were tested.
Q. Okay. Who did you have do the testing?
A. I did.
Q. You did them yourself?
A. He had no way to test them and didn't know what to do with them.
Q. Who didn't know how to test them?
A. Anthony Cornetta.
Q. Okay. So you got the hoses from Anthony Cornetta?
A. I had the hoses -- oh. Now, there was another engineer prior to him and he took the hoses and --
Q. Okay.
A. -- this Anthony Cornetta brought them back and that's when I did the testing for them because they had

no way to test them.
Q. May I look at that for one moment? I think I may have these out of order.
A. (Witness complies.)
Q. I did, okay. Here we go. I had them marked incorrectly. I'm going to hand you over exhibits 12, 13 and 11 and have you take a look at this for a minute. And I'm going to represent to you that these are documents that were produced by your counsel in response to request for production, and see if that refreshes your recollection as to the sequence of events --
A. Yes.
Q. -- with who had the hoses when and what was done, okay?
A. Okay. (Witness complies.)
Q. Have you had a chance to look at those?
A. Yes.
Q. All right. And like I said, I think I had these marked out of order but you have --
A. Yes.
Q. -- on top of your pile exhibit number 12, correct?
A. Yes.
Q. And at the top of that document it states, "Evidence transfer sheet S-E-A file number 603453, dated

EXHIBIT
A-33

November 24, 2003"; is that correct?
A. Yes.
Q. All right. Explain to me what this document is or what it represents.
A. Thomas Butler, the engineer sent by Colony Insurance to examine the hoses and the pumps, requested to take these four hoses with him for testing. And this was my record that he took the four hoses.
Q. All right. Now, it has hose marked one, two and three, and an unmarked hose. Are these numerals something that you had put on the hoses that you could tell them apart?
A. No.
Q. Who put the numbers on the hoses; do you know?
A. I have no idea.
Q. All right. So did Mr. -- Dr. Butler examine any of the pumps while he was at your shop?
A. Very briefly.
Q. Okay. Tell me what you recall Dr. Butler doing with pumps.
A. I opened the crating and he looked into it, looked over some of the parts and that was it.
Q. Okay. And did Dr. Butler do anything to or with the hoses while he was in your shop?
A. No.

Q. So all he did was he took the hoses with him?
A. Correct.
Q. All right. Were you ever made aware of what Dr. Butler's conclusions were in regards to either the pumps or the four hoses that he took on November 24, 2003?
A. No.
Q. And it was your understanding that Thomas Butler was sent to your shop by Colony Insurance?
A. Yes.
Q. And how did you come by that understanding?
A. That's what he told me.
Q. Okay. Exhibit number 13 is a fax sheet from Don's Hydraulics to Michael Tighe dated 2/19/04; is that correct?
A. Yes.
Q. Have you seen this document before?
A. Yes.
Q. Was this originated from your office?
A. Yes.
Q. Okay. What's the purpose of this fax that's been marked as Exhibit-13?
A. I received a phone call from Tony Cornetta that he was hired to test the hoses but he had no way of testing them and wanted to know if they could use my

equipment to test them with.
Q. Okay. Now, did Tony Cornetta or anyone else suggest to you that Mr. Cornetta was associated with S-E-A or with Thomas Butler?
A. Tony told me it was requested of him to do the testing by Thomas Butler.
Q. So was Tony Cornetta going to bring the four hoses back that Dr. Butler had taken from you to test?
A. Yes, he did.
Q. And did he, in fact, bring those same four hoses back?
A. Yes, he did.
Q. Were you in the shop when Mr. Cornetta came back with the hoses to test them?
A. Yes, I was.
Q. Did you observe his attempts to test the hoses?
A. He made no attempt to test them.
Q. Okay. Tell me what happened when Mr. Cornetta came back to your shop with the four hoses.
A. He brought the hoses in and I took my equipment and hooked up to it and showed him how they were leaking, and he took several pictures showing the leakage.
Q. When did that occur that Mr. Cornetta came

back to your shop and you tested the hoses? Could it have been --
A. -- I assume the February the 24th. That's. I couldn't.
Q. And you're referring to exhibit number?
A. Eleven.
Q. Eleven. Which is a fax sheet from Don's Hydraulics to Michael Tighe?
A. Yes.
Q. Dated February 24, 2004?
A. Yes.
Q. Explain to us what this document represents.
A. I notified attorney Michael Tighe that Tony had been. We had tested the hoses. He was there for approximately an hour and a half, and the three hoses we tested all failed. And he took several photos.
Q. Okay. While I'm thinking of it, let me just ask you this. On page two of exhibit number -- what number do you have in your hand, sir?
A. Eleven.
Q. Eleven. It indicates it's an evidence change of custody record and it's dated February 24, 2004. S-E-A project number 603453. And evidence was transferred from Anthony Cornetta representing S-E-A, Limited to Don Cathell representing Don's Hydraulics.

EXHIBIT
A-34

And under description of evidence noting all markings, it says, "Four hydraulic hoses labeled one, two three and four." Did I read that correctly?
A. Yes.
Q. All right. Now, the evidence transfer sheet that you had marked up indicating that Thomas Butler was taking four hoses from you have hoses marked one, two and three but the fourth hose was not marked.
Can you explain the difference in the fourth hose marking? What happened there?
A. I don't know. That's unless he marked them up himself; I don't know. I don't know how.
Q. "He" being Anthony Cornetta?
A. Thomas Butler.
Q. Thomas Butler, okay. And now, on the front page of exhibit number 11, this fax that you had written to your counsel, did you actually write out the comment section; is that your handwriting?
A. Yes.
Q. Okay. Second sentence reads, "Tony was here doing the testing approximately one and a half hours." Did Tony actually do any of the testing?
A. No.
Q. Okay. So what you really meant was Tony was there for an hour and a half watching you do the testing?

A. Yes.
Q. All right. And at any time prior to February 24, 2004, had you performed testing on any of the hoses that are the basis of this claim?
A. Yes.
Q. When was that?
A. I don't recall the date.
Q. Okay. Was it after you came back from Georgia?
A. Oh, yes. Yes.
Q. Did you make any notations or any documentation about that testing of the hoses that you performed after leaving Georgia and before February 24, 2004?
A. Yes.
Q. And where would those notes be now?
A. Should be in this stuff. (Indicating.)
Q. You believe that you gave those to your counsel?
A. Yes.
Q. On how many occasions after leaving Georgia and prior to February 24, 2004, had you performed any testing on the hoses that are the subject of this claim?
A. One time.
Q. Okay. And on that one time in between those

two dates, you recollect writing down notes when you did this testing?
A. Yes.
Q. What types of things would you have recorded when you did this prior testing of the hoses?
A. Sent a letter to Jim Biggs from TTI.
Q. When you say you sent a letter to Jim Biggs, what would have been in that letter in regards to the testing that you did?
A. That they failed on vacuum test and they failed on pressure test.
Q. On the occasion prior to February 24, 2004, and after leaving Georgia when you performed these tests, was there anyone else present in the shop that observed these tests being performed?
A. Yes.
Q. Who was that?
A. Al Collins, Harold Williams, myself.
Q. Anyone else?
A. That's all I recall now.
Q. Okay. Who is Harold Williams?
A. He's a contractor I use at times for small jobs. He was just there visiting.
Q. What kind of contracting does Harold Williams do?

A. Painting.
Q. What's the name of his shop?
A. Nothing.
Q. Okay.
A. He doesn't have a name for it.
Q. Whereabouts does Harold Williams live?
A. Georgetown, Delaware.
Q. When you were doing the testing on the hoses this time when Al Collins and Harold Williams were present, did you make any notes or anything while you were doing the testing?
A. No.
Q. Okay. How long after you tested the hoses that time when Al Collins and Harold Williams were present, did you write this letter to Jim Biggs about the testing?
A. May have been the same day or the next day; I'm not sure.
Q. Was there anything in the letter other than telling Jim Biggs that you tested the hoses and they failed?
A. As I recall, I think I had it broke down for each hose, I think. I think I tested three of them and.
Q. The three hoses that you tested on this particular occasion, not on February 24, 2004, were they

EXHIBIT
A-35

Page 141

any of the same four hoses that were tested when Tony Cornetta was at your shop?
A. Same hoses.
Q. Exact same hoses?
A. (Nods head.)
Q. Okay. Did you discuss with Mr. Cornetta -- am I saying his name right -- why he or someone else at S-E-A hadn't performed their own testing of the hoses?
A. He told me he did not have the equipment to do it with and no way of -- no knowledge how to do it.
Q. So during the process on February 24, 2004, you did the actual testing of the hoses?
A. Correct.
Q. Mr. Cornetta stood there and watched you?
A. Correct.
Q. Did you explain to Mr. Cornetta what kind of testing you were doing?
A. He knew what it was. It was pressure testing.
Q. Okay. Mark this.
(Document marked for identification as Cathell-14.)
BY MS. BEAM:
Q. Sir, I'm going to hand you a document that has been produced by your counsel in response to request for production. I've marked it as exhibit number 14.

Page 142

And it's a letter to Truck Tech, Inc., from Don's Hydraulics dated August 25, 2003. And have you seen that document before, sir?
A. Yes.
Q. Okay. And did you draft that document?
A. Yes, I did.
Q. And is that your signature at the bottom?
A. Yes.
Q. Okay. Now, this is a letter dated August 25, 2003. That's the same day that the hydraulic units were being loaded onto the truck and shipped to Florida or Georgia, correct?
A. Yes.
Q. And what was the purpose of you sending this letter on August 25, 2003 to Truck Tech?
A. Because of my concern with the problems we had with the hoses at this point, and I wanted something documented in case there was a problem.
Q. Okay. Now, you had indicated that when you tested the hoses while Mr. Cornetta was in your shop on February 24, 2004, it took you about an hour and a half to do that testing; is that correct?
A. Yes, according to the -- what I had wrote here.
Q. I'm sorry?

Page 143

A. According to what I had wrote in Exhibit-11.
Q. Okay. Does that sound about right as you sit here today?
A. Yes.
Q. Okay. Now, this letter dated August 25, 2003 indicates that you still had some concerns about the suction hoses on the day that the units were being shipped down to Gainesville, Georgia, correct?
A. Yes.
Q. What, if any, reason was there for you not to take an hour and a half to test a couple of those hoses before you shipped that unit down to Gainesville if you had the ability and the knowledge --
A. -- I didn't. At that time, I had knowledge but I didn't have the equipment to do it with them.
Q. What equipment did you not have in August of 2003 that you needed to test these hoses?
A. A two-and-a-half inch coupling and two-and-a-half inch plug, and a number 40 SAE plug.
Q. Okay. I dropped the second one there. You said two-and-a-half coupling, two-and-a-half inch?
A. Plug.
Q. Plug. And an S-A-E plug?
A. No. A number 40 S-A-E.
Q. A number 40 S-A-E plug?

Page 144

A. Um-hmm.
Q. This is like when we were talking about before: You may know what this stuff is, I have no clue. So where did you obtain these three items that you needed to be able to test these hoses?
A. R.D. Grier Company and Thomkins, Incorporated.
Q. And when did you acquire these three items that you say you needed in order to test these hoses?
A. I don't recall the exact dates.
Q. Why did you acquire these three items that you needed for your shop in order to do this test?
A. To prove that the hoses did leak.
Q. How much did these items cost?
A. Between -- almost $200.
Q. It's getting late in the day and I may have asked you before we broke for lunch and I apologize if I did, but do you recall any conversations with Sean Swain regarding testing that Tipco purportedly did upon the hoses before you had shipped your final project down to Gainesville?
A. As I stated before, I don't recall asking him to have them tested but I may have. I don't recall.
Q. Okay. So then my question is just a little different. Do you remember Mr. Swain or anyone from TTI telling you that the hoses had been tested?

EXHIBIT
A-36

Page 145

A. He did. I don't recall exactly when, but I know he did tell me.
Q. Okay. He did tell you that they had been tested?
A. Yes.
Q. I'm trying to think of what's the best way to do this. I guess let's mark this as the next one please.
(Document marked for identification as Cathell-15.)
BY MS. BEAM:
Q. Sir, I'm going to hand you a two-page document that's been marked as exhibit number 15. And on its top it says, "Don's Hydraulics, Inc." And it has dates and expenses listed. I'm going to ask you to take a look at that please.
A. (Witness complies.)
Q. Have you ever seen that document before?
A. Yes.
Q. All right. And who caused that document to be compiled or produced?
A. I did.
Q. All right. And when did you cause that document to be compiled or produced?
A. After I returned to from Georgia.
Q. Okay. What is represented on this two-page

Page 146

document?
A. Cost involved. Motel, meals, phone, travel, labor. Changing out the pumps, and getting the unit going again.
Q. Okay. The first page and it looks like half of the second page have to do with labor and travel expenses; is that correct?
A. Yes.
Q. All right. And is it your contention that these expenses are over and above what was included in the original proposal which included manpower to supervise the start-up?
A. Yes.
Q. And is it your testimony that it cost Don's Hydraulics $1,000 per man per day to have your employees down on-site longer than was anticipated?
A. Yes.
Q. And do you -- does Don's Hydraulics have documentation to that effect?
A. Just this one. (Indicating.)
Q. For example, who does the payroll for Don's Hydraulics?
A. Anna Lee Cathell or Thompson.
Q. Is that your daughter?
A. Ex-wife.

Page 147

Q. Ex-wife? Your ex-wife does your payroll?
A. Keep it all in the family.
Q. Okie, dokie.
MR. KAPLAN: Is she doing it next month too? For the record, somebody's getting remarried next month.
BY MS. BEAM:
Q. And is Ms. Thompson an employee of Don's Hydraulics?
A. Yes.
Q. So she's one of the three women that do the office work for you?
A. Yes.
Q. All right. Is the payroll documented in some way?
A. Yes.
Q. All right. And those documents would still be available to you?
A. Not for this because this ain't been paid.
Q. Okay. Do your employees generally get paid $1,000 per day?
A. That is what I charge per day at this time was $1,000 a day away from the shop.
Q. I understand that's what you would charge a customer. My question is do your employees get paid

Page 148

$1,000 per day for work that they do for Don's Hydraulics?
A. No.
Q. For example, Al Collins back in August of 2003, how much did Mr. Collins receive in salary from Don's Hydraulics for a day's work?
A. I don't have that recollection.
Q. Is that the type of record that your payroll employee would have access to?
A. Yes.
Q. Is it safe to say that Mr. Collins would have been paid substantially less than $1,000 a day back in September 2003?
A. I think it was 700 or 750; I'm not sure.
Q. How about Greg Knowles, do you know how much he was getting paid a day in wages by Don's Hydraulics back in September 2003?
A. It would have been the same as Al Collins.
Q. Okay. What was 60 miles of travel for you and your employees every day for?
A. Motel to the plant and back.
Q. And what was in Charlotte, North Carolina that you had to travel to?
A. Livingston Haven.
Q. So you or one of your men actually took the

EXHIBIT
A-37

Page 149

pumps back to North Carolina?
A. Yes.
Q. Okay. Who was it; do you recall? That took the pumps back to North Carolina?
A. Greg Knowles.
Q. Okay. The next entry for 20 hydraulic pumps. Were the pumps replaced twice?
A. No.
Q. Okay. On the proposal, you have ten pumps. Ten tandem Rexroth variable volume pumps; is that correct?
A. Yes.
Q. So you needed ten pumps for the project; is that correct?
A. Ten tandem.
Q. Ten tandem. So a tandem pump is actually two pumps?
A. Yes.
Q. All right. So when it says 20 hydraulic pumps, that's the same thing as saying ten tandem pumps?
A. Yes.
Q. Okay. And am I reading this correctly that you paid for hydraulic pumps on your what; business MasterCard?
A. Personal.

Page 150

Q. Personal MasterCard, all right. So according to this exhibit, that would bring your MasterCard payments up to the neighborhood of $36,000; does that sound about right according to this exhibit?
A. Yes.
Q. Okay.
A. Plus interest.
Q. I understand that. What was paid for on your MasterCard specifically?
A. Pardon?
Q. What is it that you paid the $36,000 for?
A. Twenty pumps.
Q. How did the remainder of the $51,429.02 get paid then?
A. I borrowed the money in January to finish paying it.
Q. Okay. So they gave you the pumps on the $36,000, what down payment; is that the arrangement?
A. They were going to run the card again the next day for the balance but that filled it up.
Q. Oh, I see. Okay. And then at the very bottom of the second page, I think you had touched on this before when we were talking about inspection of the pumps --
A. Yes.

Page 151

Q. -- in Georgia. And the date on there is 10/31/03. Is that the first time, 10/31/03, that you personally would have inspected the pumps after they had failed when you tried to start up this project in September of 2003?
A. Yes.
Q. So this five days at $1,000, that includes your travel time by car, correct?
A. Yes.
Q. How much time did you actually spend at the inspection meeting in Georgia for the pumps?
A. One day.
Q. Okay. And what was the purpose of that pump inspection meeting?
A. Try to verify the problem. Why they failed.
Q. Okay. Who met with you in Georgia for this pump inspection meeting?
A. Livingston Haven and Rexroth.
Q. Okay. So representatives from those two companies?
A. Yes.
Q. Do you have any recollection of who those representatives were at this time?
A. I don't have their names, no.
Q. Is there any kind of documentation that was

Page 152

produced pursuant to that meeting?
A. No.
Q. No letters were exchanged afterwards or anything like that?
A. No.
Q. I think you had indicated in earlier testimony that after this meeting in Georgia for the pump inspection on October 31, 2003, you had given permission to Fieldale Farms to send you the pumps back; is that right?
A. Yes.
Q. Was that done in writing or over the phone?
A. Phone.
Q. When you had this document that's been marked as Exhibit-15 compiled, it was your intention to have this billed to whom as far as the manpower expenses are concerned?
A. The insurance company.
Q. Okay. The insurance company meaning --
A. Colony.
Q. -- your carrier, Colony; is that correct?
A. Yes.
Q. Okay.
(Document marked for identification as Cathell-16.)

EXHIBIT
A-38

Page 153

BY MS. BEAM:
Q. Sir, I've had marked as exhibit number 16 a letter from your counsel, Mr. Tighe to Ms. Lackovitch of Argonaut Group, and it's dated March 5, 2004. It was produced by your counsel in response to request for production. I'm going to ask you if you've ever had occasion to see that document before?
A. Yes.
Q. Okay. I'm just trying to get a handle on your damages claim at this point, okay. Let me see this for a second.
A. (Witness complies.)
Q. This is March 5, 2004, okay. I'm really just skipping to the second to the last paragraph regarding outstanding expenses. He references outstanding expenses in the amount of $92,000 and change for repairs expenses that you had incurred; is that correct?
A. Yes.
Q. All right. Are those the expenses that you had enumerated on exhibit number 15 that he's referring to as your outstanding expenses --
A. Yes.
Q. -- related to repairs?
A. Yes.
Q. Are there any other expenses that are not

Page 154

listed on exhibit number 15 that would be included in that $92,168 figure?
A. There a Fieldale invoice.
Q. That's attached to this next letter, okay. So you believe there might be some other items involved in that. Let me just -- we'll come back to that in one second, okay.
A. Okay.
Q. He's also referencing this invoice from Livingston and Haven for replacement of the defective pumps in the amount of $15,357.74.
A. 92,000 I believe is these two (indicating) which includes the 15,000 and 84,000 is the Fieldale invoice.
Q. Let's have this marked. This Fieldale invoice was already part of the exhibit that was the report of Mr. Blackman, correct? Exhibit number ten.
A. (No response.)
Q. Here we go. This is the last page of exhibit number ten and it says, "Fieldale Farms invoice." Is that the invoice that you're referring to?
A. Yes.
Q. Where does the $84,000 figure come from since the invoice is for over a $100,000?
A. The 16,000-and-odd dollars has been paid by

Page 155

Colony.
Q. Okay.
A. Directly to Fieldale.
Q. I see. So the outstanding invoice from Fieldale then is --
A. -- the 100 less the 16.
Q. Gotcha. Did you ever have occasion to discuss with anyone at Fieldale this invoice?
A. Yes.
Q. Okay. Can you explain to me what the invoice is for then? I can barely read my copy.
A. The labor the plant furnished which was the maintenance personnel assisting us on changing out the pumps, filtering the oil, and all the work that was done. The first two numbers as far as for their labor.
I'm not sure what the additional labor expense is. The next three numbers is lost production due to the fact we had to shut some lines down and send employees home, so they lost production time and sales.
Freight expense was the air freight to ship the pumps in. The filters was filters or no. That's the filtering expense, 16. And the last item, the filter expense was filters they purchased to change out the filters on the equipment after the oil was filtered, so we started up with clean filters on all the equipment.

Page 156

Q. Do you recall with whom at Fieldale Farms you discussed their specific charges that are included on this invoice?
A. Yes.
Q. Who did you discuss that with?
A. Claude Owens or Claude Sullens.
Q. Okay. He was the general manager?
A. Yes.
Q. The week after that initial weekend when you tried to get the hydraulic unit up and running down at Fieldale Farms, there were maintenance personnel that worked for Fieldale Farms assisting you?
A. Yes.
Q. How many maintenance employees of Fieldale Farms were assisting you during that week?
A. I don't recall how many.
Q. Was there more than one?
A. Yes.
Q. Was there more than ten?
A. I don't really know.
Q. Okay. What hours were you working at Fieldale Farms during that subsequent week to try and get this unit up and running?
A. About 16 hours a day or more.
Q. Were there maintenance personnel at Fieldale

EXHIBIT
A-39

Farms assisting you for those entire 16-hour shifts?
A. Oh, yes.
Q. For how many days or weeks were you working the 16-hour shifts accompanied or assisted by Fieldale Farms maintenance employees?
A. Eight to ten days at least.
Q. What were these maintenance employees that were employees of Fieldale Farms doing to assist you during all those hours?
A. Carrying pumps. Hooking up hoses. Whatever we had to do as far as changing the pumps out and getting oil back in.
Q. Okay. I thought that's what you brought the three guys down from Rob's Hydraulics to help you do: Change the pumps out, right?
A. They were also.
Q. Okay. Is that a specialized kind of job: Changing out these pumps on these hydraulic units?
A. Not specialized really, no.
Q. So how many men did you have working with you at one time to switch out these pumps for the new pumps?
A. Six plus.
Q. Okay. And it took -- is it your testimony that it took six-plus men eight to ten days working 16-hour shifts to switch out eight pumps?

A. No, not the actual change out, no.
Q. Okay. What in addition to the actual change-out did the maintenance personnel that worked at Fieldale Farms have to help you do?
A. Carrying the pumps by hand. Put the pumps on by hand.
Q. Isn't that all part of the actual change-out of the pumps?
A. Yes. They were helping.
Q. Okay.
A. Putting down Sta-Dry to clean up the oil on the floor. Changing out hoses. Putting on hoses.
Q. I'm just trying to get a handle on what could have been $50,000 worth of labor that was provided by Fieldale Farms maintenance personnel in helping you to switch out these eight pumps.
A. That was for the entire two weeks we were down there. They assisted us for everything we did.
Q. Okay. Mark this.
(Document marked for identification as Cathell-17.)
BY MS. BEAM:
Q. Sir, exhibit number 17 is a three-page document. It is a two-page typewritten letter from your counsel, Mr. Tighe dated March 24, 2004 to Rob Lyons of

Tipco and James Biggs of Truck Tech. And the third page is a handwritten computation it looks like of expenses that was attached to this letter when I received it as a production by your counsel.
Have you seen any of those three pages of that document before?
A. Yes.
Q. Okay. You're looking at the third page of Exhibit-17 right now. Is that your handwriting?
A. No.
Q. Do you know whose handwriting that is?
A. No.
Q. Okay. Do you know where those computations came from?
A. Hmm.
Q. Not really?
A. Yes.
Q. Okay. Where did those computations come from?
A. From the two invoices Don's Hydraulics and Fieldale.
Q. Okay. On page two of the letter dated March 24, 2004, your counsel has indicated that the total damages suffered by Don's Hydraulics is in the amount of $191,704.16 exclusive of interest. Did I read that correctly?

A. Yes.
Q. All right. Is that your understanding of the total damages that are being claimed by Don's Hydraulics in this matter?
A. Yes.
Q. Okay. Of that total amount, $84,177.90 is the balance remaining on this Fieldale Farms invoice that we were just discussing, correct?
A. I would assume, yes. Without figuring it out.
Q. Okay. And assuming that your counsel or someone in his office did the arithmetic correctly, the $92,168.52 is the amount of damages that you had totaled up on exhibit number 15 which had your manpower, additional expenses and the pump and your subsequent trip for the pump inspection?
A. Yes.
Q. Okay. Were you provided any additional documentation regarding the expenses that Fieldale Farms alleges that it incurred and that had been supplied on this invoice?
A. No.
Q. So your knowledge regarding the amounts on this invoice come from this invoice and the discussion that you had with Mr. Sullens?
A. Yes.

EXHIBIT
A-40

Page 161

Q. All right. And to your knowledge, the remainder of this invoice other than the 16,000 and some that was paid to Puritech is still pending?
A. Yes.
Q. All right. You or someone at Don's Hydraulics however does have some kind of backup documentation to verify the damages that total $92,000-and-some-odd cents that are contained in exhibit number 15; is that correct?
A. I have documentation for the meals and the motels.
Q. Okay. Do you have documentation of the invoices for the 20 hydraulic pumps that you purchased?
A. I'm sure I do.
Q. Okay.
A. It'd be invoiced to Rob's though, not to me because they had to go through him.
Q. Was that invoice paid by either Don's Hydraulics or Rob's Hydraulics?
A. It was paid from us, from Don's Hydraulics to Rob's Hydraulics to Livingston Haven.
Q. So the invoices or documentation of that would be at Rob's Hydraulics?
A. Yes.
Q. And do you know the address of Rob's Hydraulics or can you?

Page 162

A. No, I'm not --
Q. Can you give that information --
A. -- not by memory.
Q. -- can you give that information to your counsel for us?
A. Yes.
Q. And as far as payroll expenses for your employees in August and September of 2003, is that information that would be available to your payroll person that works at Don's Hydraulics; is that correct?
A. Yes.
Q. Okay. Again, I would ask that you ask your employee to look that information up for you and have that printed out in some form and provide that to your counsel please.
A. (Nods head.)
MS. BEAM: And with that, gentlemen, I believe that's all I have and given that it's 4:25 and we need to stop at 4:30, this may be as good a place to stop as any; do you agree?
MR. KAPLAN: That's fine.
(Witness excused.)
(Deposition adjourned at 4:25 p.m.)
- - -

Page 163

CERTIFICATE

I, Joanne H. Gusler, a Notary Public and Registered Professional Reporter, do hereby state that prior to the commencement of the examination,

DON CATHELL

was duly sworn by me to testify to the truth, the whole truth and nothing but the truth.

I do further state that the foregoing is a true and accurate transcript of the testimony as taken stenographically by and before me at the time, place and on the date hereinbefore set forth.

I do further state that I am neither a relative nor employee nor attorney nor counsel of any of the parties to this action, and that I am neither a relative nor employee of such attorney or counsel and that I am not financially interested in this action.

Joanne H. Gusler
Notary Public, State of Delaware
Cert# 190-RPR
Exp. 1/31/08

EXHIBIT
A-41